# EXHIBIT B

## Part 2 of 2

## The Issue of Multidose Versus Single Dose Was Seemingly Resolved at Markman

- Plaintiff said a "single dose" was giving all of the drug at one time:

  - "The total amount of a drug taken at one time is essentially what plaintiffs' position is." (Tr. 135:22-23)

- Mylan raised the concern that "single dose" could morph into doses given over several days:

  - "[T]he real issue is when we're interpreting that claim, are we really talking about a...drug concentration that's in the body from the dose that the patient took this morning, or are we talking about some amount that might be left over from the day before or a couple days before? ... [W]e think the claim is talking about administration of that one dose of that particular day...." (Tr. 163:3-8, 10-12)

### Conclusion

The Court seemed to address Mylan's concern (Tr. 163:17-24) and ruled: "[T]he language 'single dose' is construed to mean the amount of the drug administered to a human patient at one time."

## Plaintiff's Current Argument That 'Single Dose' Encompasses Multidose Steady-State Results Is Contrary to the Intrinsic Evidence



The term "single dose" means that the human patient has received a single dose of the drug formulation *and the drug plasma concentration has not achieved steady state.*

'866 patent at 7:60-62 (emphasis added)

22

**In Sum, Table 1 of the Package Insert Does Not Report Data Demonstrating Infringement Because the Table Reports:**

* The **wrong** test (multidose steady state)

  ON

* The **wrong** product (Fortamet®)

  AND

* *Pliva* puts the package insert into proper context

23

## Pliva Involved an Instructively Close Situation

- Allegation "at the heart of all of plaintiff's claims against Actavis and Pliva" was that "the risk ratio of developing tardive dyskinesia was significantly higher than the ratio listed on the [brand and generic] labels"

  *Mensing v. Wyeth, et al.,* 562 F. Supp. 2d 1056, 1061 (D. Minn. 2008)

- Allegation was also that Actavis intentionally concealed scientific research in order to mislead the scientific community and prevent FDA action

  *See Demahy v. Wyeth, et al.,* 586 F. Supp. 2d 642, 644 (E.D. La. 2008)

- Louisiana court quoted "a manufacturer of generic products is responsible for the accuracy of labels placed on its products"

  *Id.* at 657

- Supreme Court adhered to FDA's interpretation of its Changes-Being-Effected (CBE) and other regulations that a generic firm could not change its label either before or after FDA approval, thus rejecting the allegation of ability to change the label

## *Pliva* Requires Deference to FDA Regulations

- Tardive dyskinesia is arguably more serious than the $T_{max}$ differences presented here

- If, however, Plaintiff was actually correct that these $T_{max}$ differences were important to safety or efficacy, then FDA would prohibit Lupin from changing the label:

> "FDA emphasizes that the exceptions to the requirement that a generic drug's labeling be the same as that of the listed drug are limited. The agency will not accept ANDA's [sic] for products with significant changes in labeling (such as new warnings or precautions) intended to address newly introduced safety or effectiveness problems not presented by the listed drug."
>
> 54 Fed. Reg. 28884 (July 10, 1989)

25

## Deference Due to FDA Encompasses Both Technical Issues and FDA's Own Regulation

* Deference due FDA's determination that the $C_{max}$, AUC, and $T_{max}$ values are close enough to be immaterial to safety and efficacy

* Deference due FDA's narrow construction of regulation permitting labeling differences due to different manufacturers

54 Fed. Reg. 28884

26

## Bizarre?

- Plaintiff calls our reading of impact of *Pliva* "bizarre" (Reply Brief, Footnote 5), but the statute controls

- *Pliva*: "[I]t is not this Court's task to decide whether the statutory scheme established by Congress is unusual or even bizarre"

  Slip Opinion at 19

- FDA regulations further statutory purpose to encourage substitution of generic drugs for brand-name drugs

27

## Plaintiff's Argument (If Adopted) Would Interfere With Statutory Purpose

✤ Generic drugs:
  - ✤ Same active ingredient; 21 U.S.C. § 355(j)(2)(A)(ii)
  - ✤ Bioequivalent drug; 21 U.S.C. § 355(j)(2)(A)(iv)

✤ Generic tablet will routinely have different $C_{max}$/AUC/$T_{max}$ values than brand's tablet

✤ If Plaintiff were correct that the generic label must describe the **generic's** $C_{max}$/AUC/$T_{max}$, generic drug label would be routinely different from the brand's label

✤ Material labeling differences would thwart generic substitution if, *inter alia*, the doctor has to worry that the generic label is different from the brand's

28



"Moreover, FDA does not believe that it would be consistent with the purpose of section 505(j) of the act, which is to assure the marketing of generic drugs that are as safe and effective as their brand-name counterparts, to interpret section 505(j)(2)(A)(v) of the act as permitting the marketing of generic drugs with diminished safety or effectiveness and concomitantly heightened labeled warnings."

54 Fed. Reg. 28884

29

## Plaintiff's Case Law Is Superseded and Distinguishable

### Superseded

* *Pliva* rejected generic duty for accurate label

### Distinguishable

* *Abbott* involved active ingredient; suitability petition (mis)assumption
* *Ranbaxy* was based on understanding that CBE regulations permitted generic to correct inaccurate statements; *Pliva* said otherwise

## Plaintiff's Case Law Is Superseded and Distinguishable

* *Research Foundation*
  * Generic's counsel represented that everything in the label was accurate
  * Even so, Court considered evidence outside the label
  * At trial, District Court found no infringement and noted that its reliance on label at preliminary injunction stage "does not withstand scrutiny"

    *See* 2011 WL 3796228 at *23 (D. Del. 2011)

31

## Summary of Non-Infringement

- Only after-dinner study demonstrates non-infringement

- Lupin's breakfast study does not support speculation of infringement at least because Lupin and Fortamet® have substantially different $T_{max}$ values

- As a matter of fact and of law, Lupin's package insert does not admit infringement

## Invalidity Overview

**Lupin's defense is obviousness**

- Same defense as in contentions
- Same prior art as in contentions

**Presumption of validity does not help Plaintiff**

- Microsoft decision
- Wrong claims issued

**Intervening *KSR* decision supports obviousness**

- Motivation to change $T_{max}$
- Patentability requires advance in the art, not merely back-filling

33

## The '866 Patent Is Invalid

- The '866 patent is obvious for the reasons Lupin disclosed in its contentions
  - Cheng, WO 99/47125 (same as '859 patent)
    - Discloses a $T_{max}$ as low as 8
      (Morris Decl., Ex. C at 3:12-17; 15:37-39; Fig. 8)
  - Timmins, WO 99/47128
    - Discloses $T_{max}$ values ranging from 4 to 8 hours
      (Morris Decl., Ex. D at 34)
  - Admission during prosecution history
    - Desired $T_{max}$ "routine experimentation"
      (Brauerman Decl., Ex. 9 at AND 0000236)

34

## Microsoft Clarifies Effect of Presumption of Validity

- Clear and convincing evidence for factual issues

  "Where the ultimate question of patent validity turns on the correct answer to legal questions. ... Today's strict standard of proof has no application."

- See also Footnote 4 of majority opinion

35

## *Graham* Identifies Factual Issues

"Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved."

*See, e.g., Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17 (1966)

## Plaintiff Conceded During Prosecution
## All of the Requisite Factual Findings

* Scope and content of prior art
  * Cheng is prior art disclosing every element but $T_{max}$ of 5.5 to 7.5 hours
  * Timmins is prior art disclosing another extended release metformin product, but with $T_{max}$ of 4 to 8 hours
* Difference between prior art and claimed invention
  * Cheng tablet with $T_{max}$ of 5.5 to 7.5 hours
* Level of skill in the art
  * Person of ordinary skill could modify Cheng/'859 patent to achieve claimed $T_{max}$ range

37

## *KSR* Is Key Intervening Decision

- Patentee: "[I]t is respectfully submitted that one skilled in the art would be able to manipulate the processes and formulation of the '859 by other methods to obtain the claimed pharmacokinetic parameters of the present invention by routine experimentation."

AND 0000236

- *KSR*: "If a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability."

*KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 418 (2007)

## The '866 Patent Is Invalid

- *KSR* also broadened obviousness inquiry to include motivation from "market pressure to solve a problem"

550 U.S. at 421

- Expert opinion of Kenneth R. Morris, Ph.D., confirms that Timmins discloses a market-based reason for a formulator to create the claimed $T_{max}$ range

¶ 19

## The '866 Patent Is Invalid

- So even if the presumption of validity applies, these patent claims are likely invalid for obviousness

- Rationale for presumption of validity does not apply because that presumption is based on the notion "that the PTO, in its expertise, has approved the claim"

  *Microsoft Corp. v. I4i Ltd. P'ship*, 131 S. Ct. 2238, 2240 (2011)

- The '866 patent mistakenly issued with the wrong $T_{max}$ range