**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

_____

SCIELE PHARMA, INC., ET AL,

      Plaintiffs,              CIVIL ACTION NUMBER:

       -vs-                   09-00037

LUPIN PHARMACEUTICALS, INC., ET
AL,

      Defendants.
_____

    Mitchell H. Cohen United States Courthouse
    One John F. Gerry Plaza
    Camden, New Jersey 08101
    December 2, 2011

B E F O R E:      THE HONORABLE ROBERT B. KUGLER
                 UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

MORRIS NICHOLS ARSHT  & TUNNELL
BY:  KAREN JACOBS LOUDEN, ESQUIRE
ATTORNEYS FOR SHIONOGI

WILMER HALE
BY:  DAVID BASSETT, ESQUIRE
     CHRISTOPHER NOYES, ESQUIRE
     DAVID MANSPEIZER, ESQUIRE
     SOMIL TRIVEDI, ESQUIRE
ATTORNEYS FOR SHIONOGI

RICHARD LAYTON & FINGER
BY:  STEVEN FINEMAN, ESQUIRE
ATTORNEYS FOR THE WATSON PARTIES

POLSINEZLI & SHUGART
BY:  GARRY HOOD, ESQUIRE
ATTORNEYS FOR THE WATSON PARTIES

MORRIS JAMES
BY:  MARY MATTERER, ESQUIRE
ATTORNEYS FOR MYLAN DEFENDANTS

```
 1
    MCGUIRE WOODS
 2  BY:  TIMOTHY KRATZ, ESQUIRE
    ATTORNEYS FOR THE MYLAN DEFENDANTS
 3
    BAYARD, PA
 4  BY:  RICHARD D. KIRK, ESQUIRE
    ATTORNEYS FOR THE LUPIN DEFENDANTS
 5
    SCHIFF HARDIN
 6  BY:  DOUGLAS HOCHSTETLER, ESQUIRE
         BETH JACOB, ESQUIRE
 7       JASON HARP, ESQUIRE
         KELLY MORRON, ESQUIRE
 8  ATTORNEYS FOR THE LUPIN DEFENDANTS

 9  STERNS & WEINROTH
    BY:  KAREN A. CONFOY, ESQUIRE
10  ATTORNEYS FOR THE LUPIN DEFENDANTS

11
                          Carl J. Nami, CSR
12                        Official Court Reporter
                          New Jersey CSR #557
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    (Open court)

2               THE DEPUTY COURT CLERK:  All rise.

3               THE COURT:  Good morning.

4               MR. BASSETT:  Good morning, your Honor.

00:31   5       MS. MATTERER:  Good morning, your Honor.

6               MR. KRATZ:  Good morning, your Honor.

7               MR. NOYES:  Good morning, your Honor.

8               MS. JACOB:  Good morning, your Honor.

9               MR. HOCHSTETLER:  Good morning, Your Honor.

00:43  10       THE COURT:  Good morning.  Have a seat.  How is

11  everybody?  Good?

12              MR. BASSETT:  Good.

13              THE COURT:  All right.  I don't know if I dare to ask

14  this question, but I saw in your papers you had some

00:45  15  settlement discussions, which apparently didn't have, have not

16  led to a settlement yet.  But is that something that you want

17  to pursue at this point, or what do you want to do?  Because

18  we've got this motion on.  I'm prepared to hear it.  It's

19  likely I will rule today on it.  I don't know if I'm going to

00:46  20  be able to issue a written opinion today but if not today,

21  certainly Monday or Tuesday a written opinion.  And that I

22  would think would alter settlement positions of some people?

23  You tell me.

24              MR. BASSETT:  Your Honor, I believe from Shionogi's,

00:46  25  perspective, we have had discussions, but there's nothing more

1    to discuss at this point until after the Court rules on the

2    motion.

3            THE COURT:  Okay.  Okay.  Let's start with the

4    appearances of counsel, please.  With the plaintiffs.  Start

00:46    5    with the plaintiffs.

6            MS. JACOBS:  Good morning, Your Honor.  For the

7    plaintiff Shionogi, I'm Karen Jacobs Louden from Morris

8    Nichols Arsht and Tunnell from Delaware.  We have David

9    Bassett, Christopher Noyes, David Manspeizer, Somil Trivedi

00:46    10   from Wilmer Hale.

11           THE COURT:  Thank you.  Good morning.

12           MR. FINEMAN:  Good morning, Your Honor.  Steve

13   Fineman from Richard, Layton and Finger on behalf of the

14   Watson parties.  Sitting at counsel table is Gary Hood from

00:47    15   Polsinezli and Shugart.  And sitting in the back with me is

16   Matthew Brady from Watson.

17           THE COURT:  Thank you.  Good morning.  Welcome back.

18           MS. MATTERER:  Good morning, Your Honor.  Mary

19   Matterer from Morris James in Wilmington and on behalf of the

00:47    20   Mylan defendants and I'm here with Timothy Kratz from the

21   McGuire Woods law firm.

22           MR. KRATZ:  Good morning.

23           THE COURT:  All right.

24           MR. KIRK:  Good morning, Your Honor.  Richard Kirk

00:47    25   from the Wilmington firm, Bayard PA for the Lupin defendants.

1    I have a large cast of characters.  It's of great interest to

2    us.

3        My cocounsel are Douglas Hochstetler and Beth Jacob

4    from Schiff Hardin, and their colleagues are Jason Harp and

00:47    5    Kelly Morron.  And from Lupin itself, Sophia Moontaz and

6    Anthony Romano.  And also our New Jersey colleague is Karen

7    Confoy.

8        THE COURT:  All right.  Thank you.  Anybody else want

9    to put their appearance on the record?  No?  Okay.

00:48    10        One thing we do need to discuss today, by the way, is

11    where we go from here.  I'm sure you're aware that Delaware is

12    now up to speed with their judicial allotment.  My question

13    becomes whether this case should go back to Delaware or in

14    Delaware, but whether it goes to a Delaware Judge or I should

00:48    15    keep this case.  I want to hear your positions on that.

16        MR. BASSETT:  From our perspective, your Honor, it

17    may depend on how you rule on this motion.

18                        (Laughter)

19        THE COURT:  Fair enough.  So you want to talk about

00:48    20    this afterwards.

21        MR. BASSETT:  Okay.

22        THE COURT:  Okay.  Now what I've been trying to do

23    with all my Delaware cases is if I have nothing to do in it,

24    at this point I'd send it back.  If it's brand new, I'd send

00:49    25    it back.  But if I've invested quite a bit of time in it, I've

1  offered the Delaware Judge is that I'll keep it because I have

2  some familiarity with it, with the attorneys and the facts in

3  the case.  I mean you may not agree that I get it right, but

4  at least the new Judge doesn't have to get up to speed on this

5  stuff.  So I really leave it up to you what you want to do.

6  You all come to Camden.  You don't seem to mind.  You have a

7  right to go to Wilmington in the case and have it tried there.

8  I will go to Wilmington and try the case there when the time

9  comes if that's what we decide to do.

10       Let's talk about it after this motion.

11       All right.  Who is -- are you going to speak for the

12  plaintiffs?

13          MR. BASSETT:  Yes, Your Honor.

14          THE COURT:  Well, okay.  This is your motion.

15  Obviously you all know the factors that have to be applied,

16  likelihood of success on the merits.  Irreparable injury,

17  balance factors, public interest.

18       So let's start at the beginning.  Likelihood of success

19  on the merits.  The defendants say they've raised a

20  substantial question here as to the patent and whether or not

21  they're violating the patent.  They point to the study by

22  Doctor Shepard.  So let's start with that.

23          MR. BASSETT:  Sure, your Honor.  If I could, I'd like

24  to hand up copies of --

25          THE COURT:  Sure.

1        MR. BASSETT:  -- slides that we prepared.  One for

2   you, your Honor.

3        THE COURT:  Thank you.

4        MR. HOCHSTETLER:  Thank you.

00:50   5        MS. MATTERER:  Thank you.

6        MR. BASSETT:  Your Honor, if I might, before I turn

7   to the likelihood of success on the merits, I'd like to try

8   to, if I could, to address the suggestion in Lupin's brief

9   that Shionogi somehow delayed in bringing this motion and took

00:51   10  no steps to protect itself.  And then I'll turn directly to

11  the question that your Honor has posed about the likelihood of

12  success on the merits.

13       Your Honor, nothing could be farther from the truth.

14  On June 30, 2011, Lupin and Shionogi entered into a settlement

00:51   15  and release agreement that required the parties to maintain

16  the status quo.  That agreement was in effect until

17  September 30th, 2011 when Lupin for the first time terminated

18  that agreement, launched its generic product and then we filed

19  this motion a couple of days later.  Perhaps we can look at

00:51   20  that time line just quickly.  Based on the documents that have

21  been produced in discovery, we now know that Lupin began

22  forecasting for a launch as early as December 2010.  And by

23  March 2011, Lupin was planning to launch the generic product

24  as early as June 1st, 2011.  But none of that, of course, was

00:52   25  public information.  Now, Lupin --

1      THE COURT:  Why would they make it, necessarily make

2   it public at that time?

3      MR. BASSETT:  Well, I'm not suggesting that they

4   should have made it public, your Honor.  But Lupin has

00:52   5   suggested in its briefs that we somehow slept or our rights

6   because it was public.  And they point to a couple of Wall

7   Street Journal articles.

8      THE COURT:  I know.

9      MR. BASSETT:  The first of which was dated June 22,

00:52   10   2011 in which there was one sentence in which they said that

11   they may launch this year.  But what happened right after

12   that, your Honor.  That was June 22nd.  On June 30th, Shionogi

13   and Lupin entered into the Settlement and Release Agreement

14   that obligated the parties to maintain the status quo, and

00:52   15   that stayed in effect until September 30, 2011 just before we

16   filed this motion and just before they launched.  They

17   obviously started to make plans for the launch even though

18   they were contractually obligated to maintain the status quo.

19   Lupin planned for an August or October launch, and they

00:53   20   maintained a high level of secrecy about all these plans, as

21   one would expect, for what they called this stealth launch.

22   This -- from a company that now suggests to this court,

23   however, that Shionogi should have known that they were going

24   to launch, despite the contractual obligation to maintain the

00:53   25   status quo.  As early as August, despite being contractually

1   obligated to maintain that status quo, they were preparing to

2   launch but ran into quality control problems.  And we

3   highlighted one of the e-mails that we've been given in

4   discovery that talks about why they couldn't launch this

5   product when they wanted to in August, they were having

6   trouble with their equipment which their own people call a 15

7   year old piece of junk.  That was the problem.  That's the

8   reason they didn't launch earlier.

9         So then in September 7th of this year, the Court and

10  the parties engaged in the Markman Hearing.  Lupin again never

11  suggests they're about to launch.  And despite still being

12  contracturally obligated to maintain that status quo, on

13  September 23rd, Lupin shipped product from India to the United

14  States in quantities sufficient to satisfy one third of the

15  entire annual market for extended release Metformin.  Then

16  came the second of the Wall Street Journal articles.  It

17  points to on September 28th a mere two days before Lupin

18  launched its generic product.  But what does Lupin say in that

19  article.  It says in the next few months they're going to

20  launch their product.  On September 29th, Lupin secretly

21  shipped all launch orders and gave truck drivers so-called

22  covert tracking numbers.  So that even the truck drivers

23  didn't know where they were going as they took this generic

24  product around the United States before they got the final

25  orders.  Then, finally, on September 30th, Lupin for the first

1   time delivered to Shionogi a letter by hand terminating the

2   Standstill Agreement that had supposedly obligated the parties

3   to maintain the status quo after it had already shipped from

4   India one third of the annual supply and after it had

00:55   5   delivered around the country so-called covert tracking

6   deliveries.  It was over that weekend that we investigated and

7   we filed a preliminary injunction motion.  So days later.

8         So Lupin's argument that Shionogi delayed in seeking

9   injunctive relief, took no steps to protect itself, we

00:55   10   respectfully suggest should be given no weight by this Court.

11   And I would just note that Lupin and Shionogi have

12   subsequently entered into a second Standstill Agreement which

13   is what brings us here today.  We were negotiating the date of

14   this hearing.  We agreed to a later date for a preliminary

00:56   15   injunction hearing based on a second Standstill Agreement

16   which expires at midnight tonight, your Honor.

17         So, with that time line in mind, I'd now turn to the

18   merits of the P.I. motion.  And as you say, the Court is well

19   aware of the standards that apply to a motion for a

00:56   20   preliminary injunction.

21         Your Honor, we believe that Shionogi is likely to

22   succeed on the merits of this motion because Shionogi will

23   show that it's likely by a preponderance of an evidence

24   standard that we can show Lupin infringes.  Its own product

00:56   25   label establishes that fact.  Lupin is also unlikely to meet

1   the burden of proving invalidity by clear and convincing

2   evidence.  The invalidity argument it makes are based almost

3   exclusively on prior art.  It was considered and rejected by

4   the Patent Office.  And Shionogi has suffered irreparable

00:56   5   harm.  We'll get to that later, as you suggest.

6       First let's turn to the likelihood of success on the

7   merits.  As you know, your Honor, to prevail Shionogi need

8   only show a likelihood that Lupin infringes at least one claim

9   of the asserted patent.  So we have focused on the 866 Patent.

00:57   10       THE COURT:  In claim one.  Correct?

11       MR. BASSETT:  Claim Count 1 and Claims 3, your Honor,

12   to be fair.  They're virtually identical.  Just a little bit

13   narrower time frame for the Tmax element.  We need look no

14   further than Lupin's own FDA approved label as evidence of

00:57   15   infringement of that Tmax claim element.  They have

16   acknowledged that they meet every single element of Claim 1

17   and Claim 3 of the 866 Patent, but for the Tmax element.  And

18   their own FDA proved label addresses that issue directly, as

19   does a study that they submitted to the FDA as part of the

00:57   20   Andrx approval.  But first and foremost, despite Lupin's, I

21   would say, elaborate attempts to walk away from its own

22   product label, we believe that label alone establishes a

23   likelihood of success on our claim of infringement.  But first

24   let's look at the relevant claim language.  Claim 1 has

00:58   25   various elements but the key element that we're focusing on is

1    a claim that the dosage form provides a mean time to maximum

2    plasma concentration which is what's called Tmax of the

3    Metformin from 5.5 to 7.5 hours after administration following

4    dinner.  And your Honor will recall some discussions about

00:58   5    what dinner means and all of that in our context, in the kinds

6    of claim construction.  Claim 3 has identical language, except

7    a slightly narrower time frame for the Tmax at 5.5 to 7.0

8    hours.  What does Lupin's own FDA approved label say about

9    this element.  It describes the properties of Lupin's copy of

00:59   10   Fortamet.  It instructs the condition how to use it and it

11   provides important information to physicians that are

12   proscribing this drug.  And the Federal Circuit has declared a

13   proposed label must be truthful and accurate.  The proposed

14   label is submitted to the FDA under penalty of perjury.  What

00:59   15   does the text of Lupin's own FDA approved label say about

16   Tmax.  It says that it falls clearly within the claimed

17   training when the product is administered with food.  When

18   Metformin hydrochloride has extended release tablet was

19   administered with food, Tmax was increased by approximately

00:59   20   30 percent.  And Tmax was more prolonged compared with the

21   fasting state 6.1 versus 4.0 hours.  Squarely within the claim

22   range of 5.5 to 7.5 hours or 5.5 to 7 hours.  Table one from

23   the label further confirms the infringement.  There's the

24   second line says Tmax in hours.  It's six hours.  Again

01:00   25   squarely within the range claimed in the 866 Patent.

1    Your Honor, we believe that is enough to prove

2    likelihood of proving infringement.  The Federal Circuit has

3    looked at this issue and it has said, where a generic label

4    defines a property of a generic product, such that it must

5    meet a limitation of an asserted claim, then there will almost

6    never be a genuine dispute of a material fact that the claim

7    is infringed with respect to that limitation.  Sure there can

8    be exceptions, your Honor, and I'm going to address Lupin's

9    argument that it's one of those exceptions, but the standard

10   that's applied for this motion for a preliminary injunction is

11   whether we're likely to establish infringement.  And we

12   believe this label with this language the way the Federal

13   Circuit has treated such labels, ends the issue.  But let's

14   look at Lupin's arguments.  Lupin struggles mightily to walk

15   away from its own label.  It first tries to argue that, oh,

16   no, what's claimed in this patent relates to something called

17   a steady state, as opposed to a one time use of the product.

18   It never made this argument before.  It makes it for the very

19   first time in its opposition to this motion in a footnote and

20   it argues that Shionogi's patent excludes the so-called steady

21   state and applies only to a Tmax value achieved after one

22   single dose ever taken by a patient.  This argument is flawed

23   on many levels, your Honor.  First of all, it violates this

24   Court's claim construction.  Secondly, it's contrary to

25   scientific logic and evidence, medical evidence.  And it's

1  contrary to Lupin's own product label.  First, Lupin's steady

2  state argument contradicts the Court's Markman opinion.  This

3  Court found that single dose means the amount of drug

4  administered to a human patient at one time.  There's no

5  indication in this Court's construction or even in Lupin's

6  proffered arguments, Re:  The Markman process about the

7  definition of a single dose in a patient excludes the steady

8  state.  Moreover, Lupin's manufactured steady state argument

9  contradicts the basic science.  We've submitted a declaration

10  from Doctor Lawrence Flekenstein from the University of Iowa,

11  Department of Pharmaceutical Sciences.  And Doctor Flekenstein

12  makes the point that I think is intuitive, but we submitted it

13  through a declaration that scientifically speaking this

14  argument that they're making between a steady state and a

15  single dose is scientifically irrelevant.  That is steady

16  state simply means that the peaks and valleys associated with

17  the drug concentration are predictable and it doesn't change

18  the body's reaction to the actual ingestion of the drug.  Each

19  time the patient takes the drug, she is taking a single dose.

20  There's no saturation or pent up accumulation of the drug in

21  the system, as Lupin somehow seems to be suggesting with its

22  steady state argument.  Again without support.

23       Finally, Lupin's newly admitted steady state argument

24  contradicts its own FDA approved label which says nothing

25  about any supposed distinction between a one-time only use and

1   an administration in a steady state.  In Lupin's final effort

2   to walk away from its own FDA approved label, it tries to

3   suggest that it somehow had no choice but to put false

4   information on the label.  Not surprisingly, your Honor, that

01:04   5   is simply not true.  There is a provision in the CFR which

6   allows full use to be made to labels of even generic products,

7   even copies of drugs based on differences in pharmacokinetics

8   such as Tmax, and, in fact, if Lupin thought there was such a

9   difference, it had an obligation to change its label, and it

01:04   10   didn't.  Lupin's own label itself should be enough, as we say,

11   to show that Shionogi is likely to prove infringement.  But

12   there's more.  First, there's Lupin's own ANDA, the study that

13   it submitted to the FDA in support of its approved, its

14   product, its copy of Fortamet.  And we have submitted to this

01:05   15   Court a detailed declaration from Doctor Flekenstein detailing

16   and translating what is contained in that submission.  But in

17   sum, your Honor, two key points come out of that declaration.

18   First, the study that they submitted themselves to the

19   FDA shows that the results on the Tmax fall within the

01:05   20   claimed, the ranges claimed in the 866 Patent if one takes

21   into account the standard deviation that they themselves

22   included in the study that they submitted to the FDA.

23   Second, that study demonstrates that Lupin's own data

24   shows that their product has a Tmax value and profile that is

01:05   25   virtually identical to Fortamet, and there is no dispute that

1    Fortamet falls within the claimed range of Tmax that's set

2    forth in the 866 Patent.  First, just looking at this standard

3    deviation issue, and I'm not a mathematician, your Honor, but

4    this has been explained to me that when they -- Lupin focuses

01:06   5    on the fact that this study shows an arithmetic mean time of

6    10.3 for the Tmax.  That's true.  But the study also shows

7    S.D., a standard deviation of 3.2.  Standard deviation means

8    if one were to run the study again, there's a 95 percent

9    chance that the value will fall within the range of two

01:06   10   standard deviations.  So that means you apply that to the

11   facts of this study, that means that if Lupin's ANDA study

12   were run again, one would expect 30 of 32 subjects, that's

13   95 percent to exhibit a Tmax of between 3.7 hours and

14   16.9 hours.  That is a range that squarely covers the range

01:06   15   claimed in the 866 Patent.  Also in that study they show a

16   graph that shows the Tmax of their copying of Fortamet and

17   Fortamet.  And if we can go to the next slide, it highlights

18   the curve that's Fortamet and then the next one highlights the

19   curve that is their copy of Fortamet.  It shows that the Tmax

01:07   20   value for those two products is virtually identical.

21        Now it is true that the Tmax value in these -- in this

22   chart is higher than what is claimed.  But there is no dispute

23   in this case that Fortamet falls within and covers the claimed

24   change range of the 866 Patent.  So what is the explanation

01:07   25   for the fact that Lupin's study shows that both Fortamet and

01:07 its own product while having virtually identical Tmax profiles are both, have a higher Tmax value range. Doctor Flekenstein has explained in his declaration. You can go back. There's a number of factors that Lupin -- where Lupin deviated from the studies that underlie the 866 Patent, all of which will likely increase the Tmax values for both Fortamet and its own copy of Fortamet. It gave glucose after breakfast. There was an afternoon meal. There are a high number of withdrawals from the, from the study. The salient point, though, is that both Fortamet and Lupin's copy of Fortamet acted virtually identical when it came to the Tmax value and that leads to the opinion of Doctor Flekenstein. Therefore, it is his opinion that the flaws were remedied and Lupin conducted its test in a manner substantially similar to the tests supporting the 866 Patent. The products would not only behave similarly, which we don't dispute, but also fall within the 5.5 to 7.5 hour range described in the 866 Patent.

Finally, Lupin tries to walk away from its own FDA approved label, based on a study that it did not submit to the FDA. Lupin provided one study to this Court that it says proves that it is likely to show non-infringement based on the study of ten patients. But this study's methodology is fundamentally flawed and its results are scientifically invalid. The study cannot be reproduced or verified. It cannot be properly compared to the studies underlying the 866

1    Patent.  The results, therefore, are highly questionable.  But

2    Lupin did not submit this flawed study as part of its ANDA

3    submission, and there's a reason it didn't submit this study

4    as part of its ANDA submission.  If this study violates the

01:09    5    FDA guidelines on how these tests are to be conducted in a

6    number of key ways.  It doesn't have enough subject.  They

7    gave the subjects many more calories in a different mix of

8    food, all of which has a great impact on the Tmax values that

9    results.  The study also had a number -- it lacked certain

01:10    10    basic information, and we've listed them all in our brief and

11    in Doctor Flekenstein's declaration.

12    In sum, these flaws do not allow one to reproduce or

13    verify the results.  You can't compare the study results to

14    other studies which leads to the a questionable result on the

01:10    15    Tmax value itself.  Lupin tries to downplay the significance

16    of these flaws, but we would ask the question, if these -- if

17    this study was scientifically valid, why didn't they submit it

18    to the FDA.  Maybe if we can skip to slide 52.

19    Another point to make about these two slides that have

01:10    20    been performed by Lupin.  One that they did submit to the FDA

21    on and one that they chose to withhold from the FDA.  The

22    results that came from these two studies are very different.

23    The one that they submitted had a Tmax of 10.3 hours plus or

24    minus 3.3 hours.  The study that they didn't submit to the FDA

01:11    25    produced a Tmax of 12.8 hours plus or minus 1.7 hours.  And

1   that's the cite, of course, on which Lupin tries to rely for

2   its argument it isn't likely to prove non-infringement.  But

3   these values vary so greatly by nearly 25 and 50 percent, that

4   they are scientifically useless.  Doctor Flekenstein offers

01:11   5   the opinion that in making the comparison of these two tests

6   is scientifically difficult, if not impossible.  As such I

7   cannot with any certainty opine as to why the test results are

8   so divergent.  However, it is my opinion the divergence proves

9   that Lupin's test methodologies are fundamentally flawed and

01:11   10   neither test can be verified or relied upon.  Thus, your

11   Honor, we believe that Shionogi is at least likely to be able

12   to prove infringement by a preponderance of evidence.  Based

13   first upon Lupin's own FDA approved label which is

14   unequivocal.  To the extent the Court finds that these studies

01:12   15   that have been performed by Lupin are at all reliable, the

16   study that they submitted to the FDA shows that their own

17   product would, in fact, fall between the range claimed by the

18   866 Patent and the one that they did not submit as we've said

19   is unreliable.  But, of course, there's a second piece to the

01:12   20   likelihood of success on the merits.  And I now would like to

21   turn to that and that is whether or not Lupin is going to be

22   able to have a likelihood of demonstrating that our patent is

23   invalid.  We believe that Lupin is unlikely to prove the

24   invalidity of our patent claims by clear and convincing

01:12   25   evidence.  The 866 Patent is entitled to a presumption of

1   validity, and Lupin can only overcome that presumption by

2   establishing invalidity through clear and convincing evidence.

3   And Lupin relies primarily on prior art that was already

4   considered by the Patent Office, and thus bears what the

5   Federal Circuit has labeled an added burden.

6       Now, your Honor, there is some debate in the Federal

7   Circuit about the standard that applies for establishing

8   invalidity at the preliminary injunction stage.  There are

9   Federal Circuit cases that say the Court should consider the

10  clear and convincing evidence standard would apply at trial.

11  There's the more recent case, the Abbott case where they've

12  said that the defendant merely needs to show a substantial

13  question of invalidity.  Now, while we believe that the clear

14  and convincing evidence standard is the right standard,

15  ultimately, that that's ultimately where the law will end up,

16  the fact remains that Lupin's validity challenges fail under

17  either standard.

18      First of all, let us address Lupin's primary argument

19  head on.  The 866 Patent is presumed valid.  All of the claims

20  in the 866 Patent, including Claim 1 and Claim 3 were allowed

21  and issued from the Patent Office.

22          THE COURT:  I appreciate that.  What happened?

23          MR. BASSETT:  Good question.  I'll get right to that,

24  your Honor.

25          THE COURT:  It's not real clear to me.

1          MR. BASSETT:  I understand.  And I'll tell you, your

2     Honor, it's not real clear, wasn't real clear to me the first

3     time you read it through, too.  But if we could turn to slide

4     64.  We've set forth a chronology of sort of dot key events

01:14     5     from the convoluted and long filed history.  On May 21, 2003,

6     there was an office action rejecting the claims in light of

7     the cited prior art and the prior art and which Lupin still

8     relies.  On November 20th, there was an office interview with

9     the examiner, and I would show you in a moment what the

01:14     10     examiner said about that interview.  But the bottom line is

11     the examiner was convinced during that interview that the

12     claim should be allowed over the prior art.  And on

13     December 19th he issues an Order, a Notice of Allowance,

14     rather, that allows the claim over the prior art, including

01:15     15     Claim 1 and Claim 3.  Now --

16          THE COURT:  What was -- you kind of apparently

17     attempt to withdraw or modify or something Claim 1.

18          MR. BASSETT:  No.  I was just going to get to that,

19     your Honor.  As this time line shows, between November 20th

01:15     20     and December 19th where the examiner allowed the claims over

21     the prior art, on November 21st, Shionogi, the applicant,

22     filed an attempt to what they call it, an attempt to cancel

23     Claim 1, by the way, not Claim 3.  Claim 3 was never touched

24     in any of this.  But in Claim 1 that was not because of prior

01:15     25     art, it was because they had a six month deadline that expired

1    that day that was non-extendable.  So in order to make sure

2    that the prosecution didn't lapse or create or have any

3    problems, they had to try to withdraw that claim.  The

4    examiner either ignored that or didn't see it and issued the

)1:16    5    claims or allowed the claim anyway after that.

6         Now the examiner later saw that, that filing from

7    November 21st and issued a revised Notice of Allowance that

8    removed Claim 1.  Ultimately Claim 1 does issue.  The bottom

9    line, your Honor, is that the examiner looked at the prior

)1:16    10   art, considered whether the claim should be allowed over that

11   prior art and it determined, yes, it should.  And that's what

12   the examiner said on December 19, 2003.  The substantive

13   reason that there's a presumption of validity for an issued

14   patent is that the PTO is an agency that's entitled to

)1:16    15   deference where you assume that the examiner did his or her

16   job and understood the issues.  There is no doubt that

17   substantively the examiner looked at the prior art and

18   determined these claims should be allowed over the prior art.

19        THE COURT:  If I were to be convinced that they made

)1:17    20   a mistake, do I have the authority to change it?  Do I have

21   the authority to change it?  What authority do I have to look

22   into this matter as to whether there's a mistake and order

23   that they change it?

24        MR. BASSETT:  Okay.  First of all, to address that

)1:17    25   question.  There is no mistake here.  What the examiner did

1   was issued this Notice of Allowance not realizing or ignoring

2   the attempt to cancel Claim 1 that later got corrected and

3   then the claim was later ultimately issued because the

4   examiner had found that that claim was allowable.  There is no

01:17   5   reason to do anything to this.  The ultimate issue would be if

6   you determine the claims were invalid, that's what the Court,

7   you know, District Courts do all of the time.  There is no

8   mechanism to go in and correct or tinker with what happened

9   during the patent, the filed history.  But I would suggest to

01:17   10   the Court that there is no reason to do that here.  All that

11   matters for these purposes is whether or not that claim was

12   substantively examined by the examiner.  Whether the examiner

13   determined substantively that this claim is allowable over the

14   prior art.  And there is no doubt that he did that.  There's

01:18   15   just absolutely no doubt.

16   THE COURT:  There's no question he did it.  He

17   allowed them, that's for sure.

18   MR. BASSETT:  Right.  And I would suggest to your

19   Honor --

01:18   20   THE COURT:  He or she.

21   MR. BASSETT:  He or she.  I would suggest, your

22   Honor, that that is all that matters.  And the argument that

23   Lupin is trying to make is a mere technicality.  They're

24   trying to rip that up into something to overcome the

01:18   25   substantive point that the examiner did, in fact, examine

1    these claims, looked at the prior art and determined they were

2    allowable.

3         If we could turn to Slide 65.  This is the Office

4    Action from December 13th.  There is no doubt the examiner

01:18    5    allowed all of the claims, including Claim 1 over the prior

6    art.  A fact so indisputable that Lupin's own patent law

7    expert has acknowledged it.  This allowance didn't come out of

8    nowhere, your Honor.  As I suggested there was a November 20th

9    interview in which the applicants discussed the prior art and

01:19    10   convinced the examiner that this claim, these claims should be

11   allowed.  It is true that the applicants attempted to cancel

12   Claim 1, but that was based again on a procedural issue, not

13   based on prior art.  And Claim 1 was still allowed over the

14   prior art ultimately based on the first Notice of Allowance.

01:19    15   So as I said, the substantive issue is whether the claims were

16   examined and allowed.  And there is no doubt that they were.

17   That's exactly what happened here.  And Lupin's own patent law

18   expert admits that all of the claims of the 866 Patent were

19   issued.  Our suggestion, your Honor, this Court's inquiry ends

01:19    20   there.  There is no reason to go behind that further.  The

21   fact is substantively the examiner found these claims

22   allowable over the prior art and that is what creates the

23   presumption, that's what creates the entitlement of the 866

24   Patent to a presumption of validity just like every issued

01:20    25   patent.  It's clear why Lupin is trying to rely on this

1  technicality because otherwise they know they face an

2  insurmountable burden in overcoming the presumption of

3  validity.  They want to suggest that even though the 866

4  Patent issued, even though it was examined, even though the

01:20    5  examiner found that the very prior art they're relying on

6  doesn't invalidate the patent, that they're entitled to

7  somehow find this Court to find they're likely to prove

8  invalidity because there is no presumption.  But there is a

9  presumption.  And when the Federal Circuit has said -- and go

01:20   10  to claim or Slide 73.  That when the prior art was before the

11  examiner, during prosecution application, there is a

12  particularly heavy burden in establishing invalidity.  That's

13  what Lupin is trying to avoid here.  And the prior art that

14  was relied upon by Lupin was, in fact, before the examiner.

01:21   15      We can go one more slide.  Lupin's invalidity

16  contentions cited a number of other prior art references for

17  sure.  But Lupin's opposition brief to this motion does not

18  even mention those other pieces of prior art, and there's a

19  reason.  Because they're peripheral.  They're cumulative.  The

01:21   20  only two prior art references that it relies on substantively

21  are something called Timmins and Cheng.  And those two pieces

22  of prior art no doubt were before the examiner and

23  substantively considered by the examiner.

24      If we could turn to Slide 79.  Both of these pieces of

01:21   25  prior art were before the examiner and were thoroughly

1   considered.  Both appear on the front page of the 866 Patent.

2   Timmins discussed in the text of the 866 Patent.  Cheng is

3   discussed in the text of the 866 Patent.  The examiner

4   initialed the respected entries for Timmins and Cheng showing

01:22   5   that they had been substantively examined.  The first Office

6   Action the Patent Office rejected the claims as obvious in

7   Cheng.  Over Cheng.  In the second Office Action they did it

8   again.  Then the third Office Action the Patent Office again

9   maintained the obviousness rejection.  Okay.  The inventors

01:22   10   overcame these rejections.  The Patent Office then withdrew

11   those objections and issued the 866 Patent.  And I would just

12   remind the Court that this presumption argument that Lupin has

13   been making here to try to defeat our preliminary injunction

14   motion, was never made in its invalidity contention.  It was

01:22   15   never raised during the Markman hearing.  This is the first

16   time they've raised it, and they're doing it because they know

17   that if they're faced with the presumption of validity, that

18   they cannot prevail because they're relying solely or

19   primarily, I should say, on the prior art that Lupin -- that

01:23   20   was already considered by the examiner and that was overcome

21   during prosecution.  As a result, your Honor, we believe

22   Shionogi clearly has a likelihood at least of a success on the

23   merits of proving infringement, of at least one claim of the

24   866 Patent that was valid.  Which leads us to the issue of

01:23   25   irreparable harm.  Because Shionogi we believe is likely to

1    succeed on the merits of its infringement claim, that success

2    is relevant to the irreparable harm analysis.  The Federal

3    Circuit addressed this issue very recently in the <u>Bosch</u>

4    opinion which we focused on in our brief.  And I think it's

5    worth reading the language of the -- what the Federal Circuit

6    says about what use of the presumption of irreparable harm.

7         Although E-Bay abolishes our general rule that an

8    injunction normally will issue when it happens, is found to

9    have been valid and infringed, it does not swing the pendulum

10   in the opposite direction.  In other words, even though its

11   successful patent infringement, plaintiffs can no longer rely

12   on presumptions or other shortcuts, it does not follow the

13   Court should entirely ignore a fundamental nature of patents

14   as property rights granting the owner the right to exclude.

15   And, your Honor, there is no doubt that Lupin's stealth launch

16   has and will irreparably harm Shionogi.  As we've established

17   already, or discussed already, Shionogi did not delay in

18   seeking this relief.  Lupin chose Shionogi as a target for its

19   first ever at risk launch for a reason and I will get to that

20   in just a moment.  Lupin has suffered and will suffer --

21             THE COURT:  What difference does the reason make?

22             MR. BASSETT:  Pardon?

23             THE COURT:  What difference does the reason make?

24             MR. BASSETT:  Because, your Honor, in the balance, in

25   the balance of harms, which is part of this Court's analysis.

1          THE COURT:  It's a self-inflicted wound.

2          MR. BASSETT:  Okay.  Fair enough.  One of the points

3     I wanted to make.  So I will move on from that.  This is

4     Lupin's first at risk launch.  They did it we said.  They

5     called it a stealth launch.  They brought a third of the total

6     market needs into the country in one fell swoop, and then

7     flooded the market with those low cost copies of our client's

8     product.  As a result, Shionogi will suffer irreparable harm.

9     And in analyzing harm, Courts have considered things like lost

10    market share, loss of business opportunity.  Loss of the work

11    force.  Loss for funding for R&D.  And all of those elements

12    are in play in this case, your Honor.  As I said, we have

13    submitted a number of declarations in support of our motion.

14          I'd like to direct the Court's attention, in

15    particular, in this context to the declaration of -- from

16    Doctor Christopher Vellturo.  If you could turn to Slide 119.

17    Doctor Vellturo is the president of Pharmacy Economic

18    Solutions, professor of Boston University School of

19    Management.  And Mr. -- or Doctor Vellturo explains in his

20    declaration what should be, I believe, intuitive to many

21    people objectively looking at this situation that this launch

22    of such a massive amount of low cost product will cause

23    significant and irreparable harm to Shionogi.  Obviously

24    there's the lost sales.  Those potentially irreparable, and

25    we're not suggesting to the contrary.  But there's also a loss

1   of market share, potential loss of formulary status, loss of

2   market development funds, loss of good will, potential loss of

3   jobs, all of which are clearly irreparable.  We've also

4   submitted a declaration from the C.O.O. of Shionogi setting

01:27   5   forth this impact that these -- that the flooding of the

6   market on this product could have and will likely have on

7   Shionogi, all of which we would argue is irreparable.

8         THE COURT:  Let me stop you for a minute.  They've

9   been selling this product for a couple of months now.  Right?

01:27   10        MR. BASSETT:  Your Honor, no.  What happened was that

11   they launched this product, we, secretly we discovered it.  We

12   filed this motion, and as part of this motion, we reached a

13   second Standstill Agreement.  That product is in the market.

14   It's in the -- it's out there.  We don't know because we

01:27   15   didn't get discovery about exactly where it went or how much

16   has been sold yet.  But we want to stop it whatever is out

17   there and bring it back.

18        THE COURT:  I understand all that.

19        MR. BASSETT:  Okay.

01:27   20        THE COURT:  In that period of time that their product

21   is out there, you may not know how much they sold, but you

22   certainly know the effect on your sales, don't you?

23        MR. BASSETT:  Yes.  Our sales have dropped

24   dramatically, your Honor.

01:27   25        THE COURT:  How much?  What's the number?

1          MR. MANSPEIZER:  I believe we sold about three

2     millions dollars.

3          MR. BASSETT:  What's the percentage?

4          MR. MANSPEIZER:  It dropped by at least a half.

01:28     5          MR. BASSETT:  That's what I understand as well, your

6     Honor.  So we believe --

7          MR. MANSPEIZER:  I'm sorry.  And a good portion of

8     that was filling back orders.

9          MR. BASSETT:  Right.  The sales have dropped by at

01:28    10     least 50 percent and perhaps more because many of the sales

11     we've had in this last year which has been about three million

12     dollars, represent back orders that were in the pipeline

13     before the product came to the market.

14          Historically, your Honor, when a generic comes to

01:28    15     market, it captures somewhere in the order of 90 percent of

16     the market plus.  And that usually takes three to six months

17     if they're continually supplying the market.  We see nothing

18     in this case that suggests the pattern is going to be any

19     different, and, in fact, we've started to feel that impact

01:28    20     immediately.  As I said, they flooded the market with a third

21     of the full year supply at one time.  And as the Court knows,

22     most States have mandatory substitution laws that require

23     prescriptions to be filled with the lower cost generic.  Last

24     year Shionogi earned net profit of nearly 57 million dollars

01:29    25     on Fortamet sales in 2010.  That represented almost 19 percent

1    of its total profits for the year.  And even Shionogi -- even

2    Lupin concedes that Shionogi's loss of market share will be

3    significant.  But why aren't those losses entirely calculable?

4    Well despite forecasts and other predictions, Shionogi's

5    losses cannot be estimated with reliable accuracy because

6    there are multiple unknowns still in play.

7         First of all, it's unknown whether Andrx is going to

8    introduce an authorized generic which it is now contractually

9    entitled to do in light of Lupin's at risk launch.  It's also

10   entirely unclear whether if Andrx were to launch that

11   authorized generic, whether it would later withdraw that

12   authorized generic from the market should the Court -- should

13   we win this case on the merits ultimately.  And it's unknown

14   whether we can renegotiate the terms of that agreement with

15   Andrx.  Moreover, Lupin's experts, own expert admits the entry

16   of its generic product could expand the market for an extended

17   release Fortamet, which would allow other generics to enter

18   the market.  If that happens, then as a result, the

19   compensation that we could get from Lupin would not compensate

20   Shionogi for all of its losses at all because there would be

21   other losses due to other third party sales.  There is going

22   to be, there's potentially going to be price erosion that

23   again is a common sense, common occurrence when a low cost

24   generic enters the market.  They can charge lower prices.

25   They don't have RD expenses.  They don't have licensing fees.

1    Their low cost copy may force our client to make additional,

2    offer additional discounts in order to get its product still

3    sold.  Sometimes name brand pharmaceuticals increase their

4    price right after a generic comes to market in an attempt to

01:31    5    try to mitigate loss sales volumes, but that's merely the

6    stated price.  They still then have to offer other discounts

7    and other incentives in order to make the sales occur.  And we

8    may have to compete with Andrx's authorized generic.  There's

9    also the potential and the likelihood that we're going to lose

01:31    10    our formulary position.  Right now Fortamet is in a tier two

11    formulary position and that means that third party payors

12    assess what level of co-pay they're willing to give.

13    Typically once the generic enters a market, the name brand

14    pharmaceutical is moved to a position on the formulary tiers.

01:31    15    And placement of Fortamet on a tier three level would result

16    in a higher co-pay, further lost sales, and perhaps loss of

17    good will with our patients who have been very dedicated and

18    using this product for a long time.  All of our -- many of our

19    third party payor agreements are expired at the end of this

01:32    20    year which will require that re-negotiation with the Lupin

21    product in the market, Shionogi will be in a very bad position

22    in negotiating with the third party payors.  Again, in a way

23    that's unpredictable, in a way that's potentially irreparable.

24    Even if we were to ultimately prevail on the merits, once all

01:32    25    of that has happened, the likelihood that we could then go

1  back to the third party payors and re-establish a higher

2  position, a higher tier on the formulary certainly is

3  speculative, and, frankly, we think unlikely.  And we've

4  submitted a declaration to that extent as well.  There's a

01:32  5  potential for lost jobs and lost development efforts.  As I

6  suggested, Fortamet accounted for about 18.5 percent of

7  Shionogi's total profits in 2010.  Fortamet's profits fund the

8  Shionogi research and development efforts.  At least in part.

9  We submitted declarations to that extent.  That work is based

01:33  10  in New Jersey.  And that is a primary component of Shionogi's

11  business here in New Jersey.  If we lose those profits, it's

12  likely to hinder Shionogi's market development efforts and its

13  ability to add new products and may lead to a loss of jobs.

14  And again we've submitted a declaration to that extent, going

01:33  15  to those points.  This is not speculative.  This is based on a

16  very real analysis of what could happen and it's likely to

17  happen in light of that severe cut in the profits that the

18  company has been able to realize.  Despite Lupin's unsupported

19  conjecture to the contrary, Shionogi cannot depend on Shionogi

01:34  20  Japan to make up for the loss of the Fortamet profits.

21  They're two separate companies.  The chief operating officer

22  of Shionogi, Inc., which is the U. S. Company has submitted a

23  sworn declaration saying that is not going to happen.  It's

24  very unlikely that we're ever going to get any more money from

01:34  25  Japan to make up for this.  They've established this company

1  in the U.S. to see if they can succeed here on its own.  It's

2  going to rise or fall based on whether or not it is a viable

3  business in the U.S. without infusion of cash from Japan.  The

4  only party to this litigation is Shionogi, Inc., not Shionogi

5  Japan.  And the loss of the Fortamet profits may force the

6  Japanese parent to re-access the viability of Shionogi, Inc.

7  and may ultimately seek a different partner for U.S. activity.

8  And again that's all in a sworn declaration that we've

9  submitted to the Court.

10        There's also the potential loss and likely loss of good

11  will.  Dissatisfied customers may loose faith in Fortamet and

12  in Shionogi and try different products altogether.  This isn't

13  just generic bashing, your Honor.  The issue here about the

14  quality control of the Lupin product is real.  It's based on

15  their own documents that show they've had severe problems

16  getting their product to work and to be manufactured in an

17  acceptable way.  If customers buy, get a prescription for

18  Fortamet, it goes to get filled at the pharmacy by the

19  generic, the patient may have no idea that they've gotten a

20  generic as opposed to a Shionogi created manufactured product.

21  They go home.  They take it.  There's something wrong with it.

22  It doesn't work well.  They could blame Shionogi for that.

23  They could blame Fortamet.  They could then switch to a

24  different product.  That loss of good will is never

25  recoverable.  It is irreparable.  It's unpredictable.  We

1    don't know the extent to which that will happen.  It's a very

2    real risk based on their own document.  The good will can also

3    be damaged by the price fluctuation for a remedy that that

4    could result from this.  Obviously, consumers generally want

01:36   5    lower priced products.  We all do.  Obviously, however,

6    there's a statutory scheme in place that understands that

7    research and development is important and named brand

8    pharmaceuticals need to make money to be able to have future

9    products.  Short term interest of consumers don't always jive

01:36   10   with those long-term interests of society and supplying of

11   such products.  However, when -- if we win in this case,

12   Lupin's off the market.  It will be almost impossible for

13   Shionogi to re-increase its price to the levels that it was

14   before, or if it does, it's certainly going to face some very

01:36   15   unhappy patients who have been paying lower prices for a year

16   or two and they're going to lose that good will.  Again,

17   irreparable.  May lose those customers.  We don't know.  We

18   can't predict.

19        That leads to the balance of hardships, your Honor.

01:37   20   There is no dispute, I believe no legitimate dispute that

21   Fortamet is more important to Shionogi's business than Lupin's

22   generic is to Lupin.  The two companies are very different in

23   size.  Lupin is ranked fifth by the number of prescriptions in

24   the United States.  In the third quarter of this year alone,

01:37   25   it had filled 39 million prescriptions.  Shionogi by

1    comparison in the same time frame had 441,000.  The Fortamet

2    sales accounted for 18.5 percent of Shionogi's net profits.

3    But for Lupin's stealth launch, Fortamet would continue to be

4    one of Shionogi's most profitable and important products.

01:37    5    They've lost that.  The alleged harm to Lupin's own good will

6    is unsupported by any evidence before this Court and should be

7    given no weight.  Lupin argued successfully to this Court the

8    information regarding its own customers is irrelevant to this

9    motion.  So its argument that it may lose good will with its

01:38    10    customers should be given no weight according to its own

11    argument that in the absence of proof, unsupported claims and

12    speculations of harm to good will should be disregarded.  Any

13    harm to Lupin, as your Honor suggested, is a result of its own

14    calculated risks to launch this product prejudgment.  Lupin

01:38    15    knew its stealth launch was an at risk launch and it knew the

16    risks when it took that step.

17         The Federal Circuit has considered such a balancing

18    analysis many times.  And in the Pfizer versus Tether case

19    said:  Simply put, an alleged infringer's loss of market share

01:38    20    and customer relationships without more does not rise to the

21    level necessary to overcome the loss of exclusivity

22    experienced by a patent owner due to infringing conduct.

23         Finally, your Honor, there's the public interest.  The

24    public interest supports strong enforcement of patent rights.

01:39    25    Courts have repeatedly held that interest outweighs that of

1   the public's in getting expedited access to generic drugs.

2   The public will get access.  It's a question of what time, and

3   Courts have said that timing is not relevant, or does not

4   outweigh.

)1:39   5        Finally, your Honor, we do believe that a recall is

6   necessary as we discussed earlier.  Lupin has already sold at

7   least a three or four month supply, put it into the market

8   place.  The current Standstill Agreement between the parties

9   expires at midnight tonight, which means Lupin could launch

)1:39   10   another set of products into the market place as early as

11   tomorrow.

12        So we do believe that getting the injunction in place

13   and having a recall to pull back whatever else is invalid

14   hasn't been sold, but is still able to be brought back is

)1:39   15   necessary to at least limit the irreparable harm that Shionogi

16   is suffering.

17        THE COURT:  What exactly is it that you seek that the

18   Court restrain them from?

19        MR. BASSETT:  I'm sorry.

)1:40   20        THE COURT:  What exactly is it that you seek this

21   Court to restrain and enjoin Lupin from doing?

22        MR. BASSETT:  From making any further sales.

23        THE COURT:  When you say sales, not sales to the

24   customer, not sales to you and I when we walk in the drug

)1:40   25   store.

**1**      MR. BASSETT:  No, sir.  That's already -- that's not

**2**  Lupin doing that directly, right.

**3**      THE COURT:  So Lupin is selling to its distributors

**4**  or whoever, these third party payors.

)1:40  **5**      MR. BASSETT:  Exactly.

**6**      THE COURT:  So you want them to stop now.

**7**      MR. BASSETT:  Exactly.

**8**      THE COURT:  And you want them to stop shipping any

**9**  more products.

)1:40  **10**      MR. BASSETT:  Right.

**11**      THE COURT:  Now, the recall, though, involves them

**12**  doing what?  If I were to order a recall, what is it you want

**13**  me to order them to do?

**14**      MR. BASSETT:  What we would like, your Honor, is for

)1:40  **15**  them to go to their customers and say send us back anything

**16**  you haven't yet sold to your customers.  Your Honor, I could

**17**  give you a more detailed answer.

**18**      THE COURT:  What level?  All the way -- you want me

**19**  to direct them to go all the way to the CVS drug store on the

)1:41  **20**  corner by my house and say, send back that drug.

**21**      MR. BASSETT:  Your Honor, we would like them to take

**22**  all reasonable measures to bring back any product that is

**23**  improperly in the market place.  I can't answer your question

**24**  in more detail because we would have given that discovery.  I

)1:41  **25**  don't know what product, what customers Lupin has sold this

1  to.  I don't know where they've sold it.  I don't know how

2  many they've sold it to.  We did not get that discovery.  So I

3  don't know.  But the honest answer is they know, they know

4  what they can do.  If the Court should order that this product

01:41  5  be brought back, that they take all reasonable measures to do

6  to so, and we're happy to be reasonable, your Honor.  If they

7  say, well, we can't go to the corner CVS because that's going

8  to be too burdensome, then that may be correct.  But they

9  certainly can go to their immediate customers.  They can ask

01:41  10  their immediate customers to go to the pharmacy distribution

11  centers and say send back anything that's still sitting there

12  on their shelves.  This product has a two-year shelf life.

13  There's no reason to believe that it's all gone.  It's sitting

14  there on shelves somewhere.  Many of it in warehouses, in

01:42  15  storage facilities where it could be brought back easily.  If

16  to the extent there's individual cartons sitting on a shelf in

17  some pharmacist's -- in a small pharmacy in North Dakota,

18  we're not trying to be unreasonable, your Honor.  We

19  understand there's going to be limits to that.  But we have no

01:42  20  way of knowing how difficult that would be because we haven't

21  gotten that discovery yet from Lupin.

22       THE COURT:  Why is it sufficient to your client, if I

23  were to just order them to stop today selling anymore to their

24  customers, because you have these -- let's assume there's a

01:42  25  lot of this drug out in the pipe line out there.  Why would

1    the pharmacies and the ultimate recipients of this drug, the

2    retail sale want to continue to sell their product when they

3    know there's not going to be any more because of my

4    injunction?

5    01:42         MR. BASSETT:  Because they can still sell it more

6    cheaply, your Honor.  Because State statutes require

7    pharmacies to do that when they have such generic product

8    available to them.  In most States this isn't even a matter of

9    choice.  A pharmacist is obligated as a matter of law to fill

10   01:43   a prescription for Fortamet with the generic alternative if

11   it's available.  So if the pharmacist has it sitting there or

12   if he can get it or she can get it from his or her supplier,

13   then they're obligated to do that legally, and in most

14   situations.  So, the irreparable harm and irreparable harm

15   01:43   that my client is suffering, needs to be stopped by ending

16   what we can of those ongoing sales that could occur next week,

17   next month, a year from now because this stuff is sitting on

18   the shelves.

19         THE COURT:  Well sure they can sell it.  But why

20   01:43   would Lupin want them to continue to sell it when Lupin can no

21   longer supply it.  Isn't Lupin going take a hit to its

22   reputation?  When they've got these product out there and they

23   say, oh, I'm sorry, we can't give you any more.  That's it.

24   No more.

25   01:44         MR. BASSETT:  You'd have to ask that question of

1    Lupin, your Honor.

2            THE COURT:  What's your opinion on it?

3            MR. BASSETT:  I will tell you, your Honor.  Thank you

4    for asking.  Generics do this all the time, your Honor.  This

01:44  5    is matter of the business model of generic drug suppliers.

6    They will often flood the market one time only with a lot of

7    product, make whatever money they can, crater the market and

8    then they move on to the next product.  Again, I'm not trying

9    to bash generics or their model.  They serve a valuable

01:44  10   purpose in our society.  I understand that.  But from my

11   client's perspective, when you look at the impact that it has,

12   generics have no motivation to build good will client.

13   Certainly with their customers that -- and that is the

14   distribution centers that buy their product, they have good

01:44  15   relations with them and they want to maintain those

16   arrangements.  But everybody understands that sometimes

17   generic suppliers are going to be sporadic.  They're going to

18   come in waves.  Then there's not going to be generic available

19   next month.  Then it will come again later.  This isn't set up

01:45  20   for that.  It distributes what comes in.  And I don't believe

21   they would suffer any loss of good will as a result of a

22   decision to not pull back their product simply because there's

23   not going to be more coming down the pike.  Their customers

24   are going to be happy with whatever they can get because most

01:45  25   pharmacies make more money selling generics than they do

1    selling the name brand pharmaceutical.  Their margin is a

2    little higher.  Most pharmacies are going to be happy to sell

3    whatever generic they can get.  They may want more.  They may

4    be disappointed they don't get a little more, but it's not

01:45   5    going to be the same kind of issues that are faced by Shionogi

6    if they're not going to be able to continue to supply the

7    market.

8            THE COURT:  Let's talk about a bond.  It's mandatory

9    if you win.

01:45   10           MR. BASSETT:  We understand --

11           THE COURT:  There's big numbers out there.

12           MR. BASSETT:  Yes.

13           THE COURT:  There's four different scenarios in this

14   one declaration of Mr. Hoffman as to what they're going to

01:46   15   lose if I do this.

16           MR. BASSETT:  We understand that and would expect

17   that we would be obligated to post a bond.  We were talking

18   about that beforehand, and I don't have a number to suggest to

19   the Court, but I'm happy to do so.  If I could have a moment

01:46   20   to talk with my client, we will.  But I understand that that

21   issue -- that's a fair point.  That's how the system works.

22   We understand that.  We believe we're entitled to that

23   injunction.  So, we will, to the extent the Court believes

24   that a bond is appropriate and necessary, then we will be

01:46   25   happy to discuss what we believe would be an appropriate

1  amount.  And in light of the numbers that have been submitted

2  by Lupin.

3          THE COURT:  Well, if you want to take a few moments

4  to speak to your client right now and address that issue, I'd

01:46  5  appreciate it.

6          MR. BASSETT:  Thank you, your Honor.

7              (Brief pause)

8          MR. BASSETT:  Thank you, your Honor.  I appreciate

9  the opportunity to consult with my client.

01:51  10         Our sense is that an appropriate bond would be equal to

11  approximately one year of Lupin's profit from the sale of this

12  product.  The fact is we can't put a number, a precise number

13  on that because we don't know what Lupin's price is.  We don't

14  know what its sales have been.  And we also don't know whether

01:51  15  or not an authorized generic is going to be launched by Watson

16  Andrx which obviously would greatly affect the price.

17         We would suggest, in light of all that, we would need

18  to have a bond hearing, to ask the Court to enter a TRO, have

19  a bond hearing early next week.  Having said that to put some

01:52  20  meat on the bones, we could think that the right number is

21  somewhere in the 10 to 15 million dollar range based on

22  Shionogi's experience with the sale of this product.  We

23  understand they've submitted numbers that are much higher than

24  that.  But, again, we have no basis to know -- whether how to

01:52  25  question those more specifically at this point because we

1  haven't yet gotten that information from Lupin.

2          THE COURT:  Well, not all their numbers are higher.

3  They have a scenario D with this six million dollar numbers in

4  it.

01:52      5          MR. BASSETT:  Yes, that's closer to what I think we

6  would consider appropriate, your Honor.

7          THE COURT:  All right.  Anything else you want to

8  add?

9          MR. BASSETT:  No.

01:53     10          THE COURT:  Thank you.

11          MR. BASSETT:  Not unless you have a question.

12          THE COURT:  No more questions.  Thank you.  I'll hear

13  from defense counsel.

14          MR. HOCHSTETLER:  Your Honor, with the Court's

01:53     15  permission, we are go going to divide our presentation in the

16  likelihood of success on the merits I was going to handle and

17  Miss Jacob was going to handle the non-patent factors.

18          THE COURT:  Fine.  Thank you.

19          MR. HOCHSTETLER:  If it please the Court, I have five

01:53     20  main points and two binders.  If I could present the binders.

21          THE COURT:  Thank you.  The larger one is first.

22          MR. HOCHSTETLER:  Otherwise the larger binder are the

23  slides going to go through on likelihood of success and the

24  smaller binder addresses the Court's question about what is it

01:54     25  that happened during the patent prosecution about these

1    claims.  And I inadvertently got -- we have a table of

2    contents and each document and I would propose to trek through

3    the prosecution history with the Court, so the Court can see

4    what, exactly what happened.  What you're going to see happen,

01:54    5    Judge, is that the patent attorney three times asked for all

6    of the claims to be changed.  The examiner signed off on it

7    and only then was the patent finally allowed the second time.

8    And so that the argument that you hear that the examiner must

9    have decided during the interview the claims up to 7.5 would

01:55    10    be allowable.  The contemporaneous documents and the actions

11    of the people involved are inconsistent with that position.

12    But I would propose, unless the Court would otherwise prefer

13    the bigger binder on likelihood of success.

14            THE COURT:  Fine.

01:55    15            MR. HOCHSTELER:  Because your Honor's first question

16    of plaintiff's counsel was the Doctor Shepard study.  And the

17    Shepard study is the only study after dinner on Lupin's

18    product.  It shows the Tmax is 12 hours.  That doesn't

19    infringe.  Plaintiff talks about, well, you didn't submit it

01:55    20    to the FDA.  It's not a bioequivalent study.  The generic is

21    supposed to submit all bioequivalent studies, but it's not a

22    bioequivalent study.  The -- and with respect to its

23    reliability, slide I think it's 53 of Plaintiff's, Plaintiff's

24    slides contrast the standard deviation of the FDA approved

01:56    25    study and the after dinner study of Lupin's.  And the standard

1    deviation is bigger, according to their slide on the FDA

2    approved study than on the after dinner study.  Doctor

3    Shepard, a true expert in this field, has looked at the study

4    and concluded it provides in the declaration that the study

5    is, in fact, valid scientific proof that the Tmax of Lupin's

6    product is 12 hours, and it simply does not infringe this

7    patent.

8         The second point, the plaintiff then talks about the

9    FDA submitted after breakfast study and the argument kind of

10   goes like this.  Lupin's product after breakfast they say it's

11   like Fortamet.  Therefore, after dinner it would be like

12   Fortamet, too.  And what I'm going to show you in a couple

13   minutes, your Honor, a graph which plaintiff omitted from the

14   presentation to you which is going to show that Lupin's

15   product is, in fact, is a very different Tmax.  Two hours

16   longer than Fortamet.  The package insert, the third point,

17   your Honor.  We cited the cases that establishes what seems

18   like kind of the odd proposition that a generic label is not a

19   representation.  In Pliva the argument was that the

20   representation by the generics was inaccurate.  Here the

21   plaintiff says the representation is accurate.  But neither

22   one is right because a generic does not make a representation

23   about the accuracy of the data it has copied from the brand

24   label.  And let me give you a quick example just from our own

25   experience.  If you get a prescription, Judge, and the doctor

1  writes it out, he may or may not -- you're going to, you know,

2  that you're going to go down to the CVS to fill it, but he

3  does know, the doctor, what generic drug company your CVS

4  pharmacy is buying from at that time.  If the doctor has to

01:58  5  worry about the label being different for each generic

6  company, then he can't safely allow a generic substitution

7  because he doesn't know what the label is going to say if it's

8  going to be important.  Then he would write do not substitute

9  which is exactly what the Hatch-Waxman Act is designed to

01:58  10  avoid.  Congress wanted to encourage generic substitution.

11       So what this -- this whole system is set up so that the

12  generic drug has to be shown to be just as safe and just as

13  effective as the brand drug using the brand label.  And if it

14  is not just as safe and just as effective, it doesn't get

01:58  15  approved.  My presentation I'm going to go through the

16  statements supporting that, but that's the fundamental

17  proposition, and that's why --

18       THE COURT:  Well, you're not suggesting that this

19  labeling requirement is a mere formality, and you can have

01:59  20  your product, your tests show that your product performs

21  differently than the label.

22       MR. HOCHSTETLER:  What I'm suggesting, Judge, is that

23  the label is not a formality, but what a generic firm has to

24  show -- maybe I should jump to, into a slide.  I don't know

01:59  25  how to jump ahead, Judge.  I'm going to have to just scroll on

1  this.

2       Let me start here.  I don't think there's any dispute

3  that Lupin's label is a copy of the Fortamet label.  The names

4  are changed.

02:00    5          THE COURT:  Right.

6          MR. HOCHSTETLER:  And, in fact, just kind of make an

7  interesting point.  It's changed so completely that the tense

8  didn't even change.  Fortamet was administered by Metformin.

9  Hydrochloride was administered.  It is the same data and, of

02:00   10  course, the FDA knows that.  And the FDA gets test data from

11  Lupin on a variety of parameters particularly Cmax and AUC.

12  And the reason they do that is because under the statute, the

13  generic has several obligations.  The number one obligation is

14  the active ingredient has to be exactly the same.  Okay.  Has

02:01   15  to be Metformin.  And that, in fact, becomes the distinction

16  between the Abbott case they rely on so much, Judge.  In the

17  Abbott case the generics that we represent that that's the

18  active, the same active ingredient.  And the Abbott Court held

19  them to it.  But a generic goes also, only has to show the

02:01   20  drug is bioequivalent and the statute is explicit and it is

21  clear that it's not supposed to be a copy.  It's only supposed

22  to be bioequivalent.

23          THE COURT:  It doesn't say it's not supposed to be.

24  It says it can be.

02:02   25          MR. HOCHSTETLER:  Okay.  Right.  Okay.  But as a

```
 1   result though, the generic routinely will have different Cmax

 2   and AUC values.  If plaintiff were correct that the generic

 3   label was supposed to contain exactly the same Cmax and AUC

 4   and Tmax and other pharmacokinetic parameters that were shown

 5   in the ANDA, the generics provided, then all of the ANDA

 6   labels would be different within the brand.  And that's not

 7   what happened.  Instead what happens is the FDA looks to see

 8   whether the differences matter.  If the differences matter,

 9   then the generic drug does not get approved.  If the label

10   differences do not matter, then the generic drug is approved

11   and it's approved with the brand's label.

12          THE COURT:  But the label.  And I know you have to,

13   the generic has to use the same label.  But isn't that because

14   the public has a right to expect that the generic drug will

15   perform exactly as the label indicates it will?

16          MR. HOCHSTETLER:  No.

17          THE COURT:  No?

18          MR. HOCHSTETLER:  The label, it's directed to medical

19   professionals.  And using my CVS example before.  It's the

20   public or the doctor is entitled to presume that any labeling

21   difference, any differences between the actual

22   pharmacokinetics of the generic and the brands, are not

23   important.  Because the drug is still bioequivalent.  So --

24          THE COURT:  Right.  I understand that.

25          MR. HOCHSTETLER:  Okay.  All right.  So in this case
```

02:02

02:02

02:03

02:03

02:03

1    where they're focusing on the package insert of Lupin's

2    product, the AUC of Lupin's product is not exactly 26,811.

3    It's not exactly a Cmax or whatever it was and the Tmax is not

4    the same.  But the FDA has determined that those differences

02:04    5    between the performance and the brand label don't matter.  And

6    that determination is entitled to deference.

7            THE COURT:  Don't you have the ability to ask the FDA

8    to permit you to change your label?

9            MR. HOCHSTETLER:  Lupin --

02:04    10            THE COURT:  In reality?

11            MR. HOCHSTETLER:  Lupin believes the answer to that

12    is no, Your Honor.  And again the, the Federal Circuit in the

13    Abbott case dropped a footnote that said, that Abbott -- that

14    the generic could have filed what's called a suitability

02:04    15    petition to change the label.  But we've cited it in the

16    Federal Register portion and it's included in your binder,

17    your Honor, where the FDA says a suitability petition is not

18    appropriate for such labeling changes.  So it's not at all

19    clear, your Honor, that, in fact, Lupin could change the label

02:05    20    and perhaps more importantly, though, we know that the FDA had

21    in front of them data that was inconsistent with the package

22    insert data and approved Lupin's products regardless

23    reflecting an administrative determination that the

24    differences were not important for safety.

02:05    25            THE COURT:  I understand that.  But the FDA didn't

1   say, okay, so you don't have to worry about your labeling.

2   Rights.  You can use the same label, even though it's

3   different.  They never told you that.  They told you the drug

4   you can sell the drug because differences aren't substantial

02:05   5   enough.  But they never commented on your label, did they?

6           MR. HOCHSTETLER:  Oh, no, no, your Honor.  I'm sorry.

7   Yes.  And you have to submit side by side.  That one --

8           THE COURT:  Right.  Do you have to submit the same

9   label?

02:05   10          MR. HOCHSTETLER:  But the FDA has to approve it, your

11  Honor.  The whole point --

12          THE COURT:  Why would they not approve it if it's

13  exactly the same?

14          MR. HOCHSTETLER:  Why would they not approve it.  I'm

02:06   15  sorry?

16          THE COURT:  Why wouldn't they approve it if you

17  submitted the exact same label as the patented drug.

18          MR. HOCHSTETLER:  Well, in fact, the statute wants

19  the label to be the same.

02:06   20          THE COURT:  Exactly.

21          MR. HOCHSTETLER:  For the reason, though, that I

22  described because of the differences in this case between the

23  pharmacokinetics, between the performance of the generic drug

24  and the brand drug don't matter.  So, that's why when Lupin

02:06   25  includes the Fortamet data in their package insert, it's not a

1    representation if the AUC is exactly 26,811 or that the Tmax

2    is six hours.  All it is is the representation that this is

3    the data that it was provided in the Fortamet label.

4         THE COURT:  But don't doctors assume that it is the

02:06    5    same?

6         MR. HOCHSTETLER:  The doctors would assume that it

7    wouldn't matter.  The differences wouldn't matter.  And, in

8    fact, we submitted the declaration of Doctor Shepard who said

9    for this product it does not matter.

02:07    10        THE COURT:  I'm not challenging the FDA's approval of

11   the sale of your generic at all.  That's not the issue here.

12   The issue is what effect does your label have on your argument

13   that you raise a substantial question here.

14        MR. HOCHSTETLER:  And my short answer is, your Honor,

02:07    15   is that the label is, at most, some evidence but is outweighed

16   by the other evidence that is properly understood is labeled,

17   is not an admission that the Tmax is six hours.  That's -- and

18   this is a little later in the presentation, but they refer to

19   the Research Foundation case where is one where the label was

02:07    20   viewed as an admission of infringement.  There was a trial

21   held in that case, your Honor.  And the District Judge then

22   taking all the evidence said that his reliance on the label

23   did not withstand scrutiny.  And this is before Pliva.  And

24   Pliva, your Honor, I would respectfully suggest changes,

02:08    25   changes the law because the Supreme Court said that the duty

*United States District Court*
*Camden, New Jersey*

1    of a generic is to copy the brand label.  It's the job of the

2    brand company to make sure that the label is accurate.

3          With respect to, if I could switch to validity now and

4    then I'll -- unless the Court would --

02:08    5          THE COURT:  No.  That's fine.  Please do.  Of course,

6    you're dealing here with a presumption of validity of the PPO.

7          MR. HOCHSTETLER:  Right.  I'm going to address at

8    some -- if I may, let me continue with the infringement and

9    then I will go through validity, if that's okay.

02:09   10          All right.  Sometimes I wish we still had the Elmo.

11    I'm sorry, your Honor.  I should have brought my teenagers.

12    Very good.

13          All right.  In the prosecution of the patent, a

14    distinction was made between dinner and breakfast.  The prior

02:10   15    art change reference discloses the same structure by, in that

16    it provided a Tmax right in this range of five and a half to

17    seven and a half, but only after breakfast.  So the claims

18    were changed to limit them to dinner.  And this is an excerpt

19    from the prosecution history.  Particularly just the examiner

02:10   20    had asked what's the difference between these two, the prior

21    art and the invention.  And the answer was we have two laser

22    drilled holes.  And that's something that, the underlining

23    there is not underlining.  It's actually in the prosecution

24    history.  And your Honor's Markman opinion touched on this

02:10   25    that the parties all agree that after dinner is when this

1   patent invention is really supposed to work.  So the

2   limitation of dinner is not some technicality, it's actually

3   fundamental, which is why because these claims are expressly

4   limited to dinner, and there's one study on the Lupin product

5   following dinner.  That's the Doctor Shepard reviewed study.

6   That study is powerful evidence on non-infringement and

7   certainly satisfies Lupin's burden of showing that they have a

8   substantial case of non-infringement.

9         The plaintiff has relied on the breakfast study that

10  was submitted to the FDA.  And in their brief they say that

11  Lupin's product of Fortamet are nearly identical.  They stood

12  up here before you and essentially said the same thing,

13  there's a problem, though.  Judge, they presented to you, but

14  -- and I'd ask you to look at slide seven.  If you could clear

15  it up.  There are two figures on the page that they drew their

16  graph from.  They only gave you one.  They gave you the one

17  with the logarithm scale.  There's also a linear scale.  And

18  it -- your Honor, I don't know whether you covered logarithms

19  when you were in school, but you may recall if you did, that

20  the number 1000 could be expressed as ten times ten times ten

21  or 10 to the third which is a log three.  One hundred would be

22  ten times ten or ten squared.  Log two, ten, log one and by

23  convention one is considered to be ten to the zero and thus

24  log zero.  A log scale is applied here means that for each

25  factor of ten on this graph, they move an equal distance by

1    the inch or so.  The Richter scale, your Honor, is an example

2    of a logarithmic scale where if you have a Richter scale

3    earthquake of eight, it's actually ten times stronger than an

4    earthquake with a Richter measurement of seven.

5           Now, here's -- and we colorized it.  Here's the graph

6    with a log scale that they're pointing to and the time, it's

7    going to be same on both.  And the vertical access is the mean

8    concentration.  It's in the blood.  All right?  But look at

9    what's going on.  They don't start at zero.  You start at one

10   because this is a log scale.  And the same distance as you go

11   from one to ten, this is anagrams from the liter, and it's the

12   same distance as when you go from ten to a hundred anagrams

13   from the liter and then the same distance when you go from one

14   hundred to a thousand anagrams.

15          Now the effect of this is to squash all the data at the

16   top which is where the rubber meets the road.  The issue is

17   Tmax.  Now, remember I said this was one of two graphs on the

18   same page.  The other graph, it's the same data.  And we've

19   added the other.  We've added the color.  You can see that the

20   Fortamet has a Tmax earlier than the Lupin.  It's two hour's

21   difference.  This is the data that we have and actually

22   included that in binder, Judge.  And again here, here the

23   scale is not the long scale.  This is the linear scale.  So

24   the same distance as you go from zero to 100 anagrams, 100 to

25   200.  Same distance, 200, 300, 400.  As a result you're not

1    squashing everything at the top where the maximum levels are.

2    The maximum levels for both products are right about 880

3    anagrams a millimeter, give or take.  So the effect of their

4    presentation is to make it look as if the Fortamet and Lupin

02:15    5    products are as they put it, their expert said, almost an

6    identical Tmax.  This is the great Doctor Flekenstein who has

7    all of these wonderful credentials, but he then says based on

8    the long scale that that's -- when, in fact, the graph, the

9    Tmax, the maximum plasma level for Fortamet is two hours

02:15    10    earlier than for Lupin's product.  And, again, this is the

11    back of slide 20, your Honor.  We have the data that we

12    referred to the Lupin, pages 94 and 95.  The data, actual data

13    that is depicted 2396, and these two graphs are on Lupin

14    production Document 2396.

02:16    15        So, we respectfully submit that the linear scale, the

16    proper scale disproves Doctor Flekenstein's assertion that the

17    two products have almost an identical Tmax.  And it's the same

18    that Doctor Flekenstein who turns around and has all of these

19    criticisms of Lupin's after dinner study.  The study that has

02:16    20    a better standard deviation than the study that the FDA

21    approved.  And Doctor Shepard has concluded, looking at the

22    data and the study that the after dinner study of Lupin, the

23    only after dinner study in the record of Lupin's product shows

24    scientifically, in a scientifically valid manner, that Lupin's

02:17    25    product does not infringe.  The Tmax is way outside by a Tmax

1    of 12.  And there is no contrary evidence on the part of

2    plaintiff.

3        I don't propose, unless the Court would like to hear

4    them, to go through all of the criticisms that Doctor

02:17  5    Flekenstein offers, but --

6        THE COURT:  No.  Thank you.

7        MR. HOCHSTETLER:  All right.  Some of them are just

8    silly.  The question is how could you use glucose both in

9    Lupin's after breakfast study that went to the FDA and also in

02:17  10   the after dinner study.  And FDA specifies you use glucose.

11   It's right in the recommendations which really isn't too

12   surprising because this is a drug that is supposed to lower

13   glucose levels in the blood.  You're giving it to healthy

14   people.  You want to make sure you're not hurting people by --

02:18  15   okay.  So the conclusion on the non-infringement is, the only

16   data that we have is the Tmax after dinner of Lupin's product

17   is 12 and a head to head comparison, the one that plaintiff

18   wants to rely on, the after breakfast study shows that Lupin's

19   product is two hours longer in terms of Tmax.  And that's --

02:18  20       Now, let's talk about the package insert.  Three

21   elements of this.  Judge, wrong task, wrong product.  And also

22   I would like to talk more about the case law involving Pliva.

23   First on the wrong product.  I think your Honor already has

24   acknowledged, I believe that you recognize the data that's

02:19  25   reported in Lupin's package inserts is the data on the

1    Fortamet product, not the Lupin product.  Right?

2        THE COURT:  Yeah.

3        MR. HOCHSTETLER:  Okay.  Okay.  Right.  So let me

4    talk about the -- this I covered them and then the table

02:19    5    describes the tests therefore conducted were steady state

6    after four weeks.  So that's what the package insert says.

7    And so the issue is whether as plaintiff posited, that's an

8    admission that the claim limitation that requires a Tmax of

9    five and a half to seven and a half which, to occur after only

02:19    10   a single dose is given.

11       Now, I do not presume obviously to tell the Court what

12   it was intending to rule when it construed single dose.  The

13   Court may recall that Lupin joined plaintiff in the proposed

14   definition of single dose and the plaintiff summed up what

02:20    15   single dose meant.  That it was a total amount of drug taken

16   at one time, is essentially what Plaintiff's position is.  Now

17   Mylan's counsel raised the question about whether this would

18   encompass in effect drug held over in the body for a while.

19   And the Court had an exchange that as we were sitting there,

02:20    20   we understood in view of the Court's ruling to seem to address

21   Mylan's concern that the claim term is going to be limited to

22   a total amount of drug taken at one time and not to the

23   situation that was worrying Mylan's counsel where we keep

24   giving the drug after some period of weeks and then a steady

02:21    25   state developed.  So that's what I would take Lupin understood

1   your Honor ruled that obviously your Honor knows what it

2   intended.  I would only say if it was the Court's intention to

3   adopt what plaintiff is arguing now, which is that a single

4   dose could encompass multiple doses, then the Court has been

02:21   5   led into error because intrinsic evidence is directly contrary

6   to that.  And with that proposition, then the package insert

7   statement about a Tmax of 6.1 is not an admission of

8   infringement because it is not data on a single dose.

9       Let me, if I could talk a bit about Pliva.  Rendered in

02:21   10   June after the cases that the plaintiff's relying upon and

11   it's different facts, but the facts actually helped prove our

12   point.  When you look at the District Court cases from which

13   the Pliva arose, the allegations were very similar to what you

14   have here.  The one plaintiff was saying that the risk ratio

02:22   15   in the generic label is not accurate.  Another District Court

16   had said it's a generic duty to make sure its label is

17   accurate.  And the Supreme Court adhered to the FDA rules that

18   said the generic could not change the label, and reversed

19   those views.

02:22   20       Now, the subject matter of Pliva was a tarta

21   dyskinesia.  It's a terrible side effect, Judge.  It's not --

22   years ago we had an image of schizophrenics who would -- you

23   know, uncontrollable emotions and you know twist their heads

24   and things like that.  And it was believed that was due to

02:23   25   schizophrenia.  It turned out that it was actually a side

          1    effect of schizophrenia and drugs.  And what that side effect
          2    was called tarta-dyskinesia.  And it's irreversible.  It's a
          3    terrible thing.  My point about going into that is that
          4    plaintiff's Doctor Flekenstein again says that the Tmax is
02:23     5    really important.  Our Doctor Shepard says Tmax difference,
          6    differences in label for a product like this, an extended
          7    release product it's designed to go all day.  It says the Tmax
          8    difference doesn't make any, it doesn't make any difference.
          9    But almost certainly though you'd have to say the
02:24    10    tarta-dyskinesia is a more serious concern and it be more
         11    important to get it right than the Tmax differences.  And so
         12    in Pliva the generic did not have an obligation to make sure
         13    Pliva is accurate, accurate then there was no obligation on
         14    Lupin here regarding the Tmax.  Let's assume for a moment that
02:24    15    plaintiff is right.  Let's assume for the moment that, in
         16    fact, Tmax is really, really important.  Then the FDA has
         17    taken the position and we have forwarded here, and again the
         18    patron Federal Register included in the binder that says if
         19    the generic drug presents a different safety issue for which a
02:24    20    labeling change would be necessary, we're not going to approve
         21    the drug.  That's not what the generic approval process is all
         22    about.  The whole idea of the FDA is the generic drug is
         23    supposed to be just as safe and just as effective with the
         24    brand label.  And if it's not, then the drug doesn't get
02:25    25    approved.  And difference is due to the FDA determining in

1   this case that the, that the parameters are close enough.

2   That the label can be safely used.  And deference is also on

3   the FDA's construction of its own regulation that limits

4   greatly the extent of the stated -- allows only a narrow

02:25   5   variation for a manufacturer, generic manufacture to vary from

6   the brand label.  I have to smile a little bit when -- in a

7   footnote that the plaintiff called a reading of Pliva bizarre.

8   Because the Pliva Court actually in the majority opinion

9   actually defended itself and said it's not our job to, you

02:25   10   know, to decide whether the statutory scheme is even bizarre.

11   And here the FDA regulations are furthering the statutory

12   purpose to generic substitution.  And an integral part of that

13   is to have the generic label be the same as the brand label.

14       Now I'm starting to repeat myself.  I touched on this

02:26   15   before.  Just to remind the Court real quickly because it ties

16   into the Abbott case.  The generic has to show that the active

17   ingredient is the same.  But that the tablet itself is only

18   bioequivalent.  And generic firms consistently, Judge, use the

19   brand label.  And don't tinker with their package insert to

02:26   20   reflect little changes in the Cmax and other factors.  This is

21   just the normal way the generics do it.  And as to Lupin,

22   that's the way Lupin always does it.  And as the plaintiff's

23   counsel pointed out, they're doing a lot of prescriptions here

24   in the United States and every one of those are drugs that the

02:27   25   FDA has approved and the labeling Lupin uses was approved.

1   And here again this is just a what I said the before by the

2   FDA that if the drug is not as safe and effective with the

3   brand label, then it doesn't get approved.  We're not going to

4   approve a generic drug and then tinker with the label.  We

5   need to do that for safety.

6       Okay.  The Abbott case.  If I could start with that.

7   Abbott involved a representation by the generic that its

8   active ingredient was the same.  The Abbott Court held them to

9   it.  Although interesting the Abbott Court also considered

10  other evidence.  But again going back to the statutory

11  requirements.  Lupin here had an obligation to say that the

12  active ingredient wasn't the same.  I mean if the issue was

13  whether our product contained Metformin, then your Honor would

14  be entitled under Abbott to say you said your product, your

15  active ingredient is Metformin.  I will hold you to that.  But

16  now then it comes to bioequivalent.  It's not a representation

17  that the Lupin drug is just the same as the Fortamet drug.

18      THE COURT:  The representation is that it performs

19  the same.

20      MR. HOCHSTETLER:  It performs -- no.  It's a

21  representation that it performs --

22      THE COURT:  That's what it says.

23      MR. HOCHSTETLER:  Substantially?

24      THE COURT:  It doesn't say that.  It says the same.

25  It is the same.

1          MR. HOCHSTETLER:  I don't believe --

2          THE COURT:  It says what it says.  It says exactly

3    what the other label says.

4          MR. HOCHSTETLER:  Yes, Your Honor.

02:29    5          THE COURT:  It doesn't say or substantially like this

6    other drug.  It says we are this other drug.

7          MR. HOCHSTETLER:  Your Honor, I respectfully suggest

8    that medical professionals understand that the, that the

9    generic drug, that the parameters will vary and can vary

02:29   10   because the drugs are only bioequivalent.  They're not

11   identical.

12        The other two cases that they cited Rambacy, basically

13   the understanding that the change is being effective

14   regulation.  The Pliva case address would permit the generic

02:29   15   to correct an inaccurate statement.  And Pliva said otherwise

16   that wasn't an option.  And here in a research foundation

17   case, the Court looked at the label.  The generic's counsel

18   had represented that everything in the label was accurate.

19   And the Court still though considered evidence outside the

02:30   20   label.  And then when the Court had a trial, it then, that its

21   reliance on the label at the preliminary injunction stage did

22   not withstand scrutiny, because looking at all the evidence

23   there was not infringement.

24        Summary of the non-infringement, your Honor.  The only

02:30   25   data on Lupin's product, a test of Lupin's product shows

1   non-infringement, Lupin's product performs differently than

2   Fortamet.  And that's what the data shows, and it's a matter

3   of facts because it's -- it was not a single dose test

4   reported in the package insert.  And also as a matter of law,

5   the package insert is not a representation that Lupin's Tmax

6   after dinner in a single dose is six hours.

7        Your Honor, I would continue on validity or what's your

8   pleasure?

9        THE COURT:  Let's go to irreparable harm, if you

10  would.  What kinds of damages that the plaintiff claims from

11  the alleged infringement.

12       MR. HOCHSTETLER:  Your Honor, Miss Jacob will take

13  over for me.

14       THE COURT:  All right.

15       MS. JACOB:  Your Honor, I also have handouts.

16       THE COURT:  Oh, good.

17       MS. JACOB:  If I may approach?

18       THE COURT:  Sure.  Thanks.

19       MS. JACOB:  Your Honor, this structure that has the

20  slide bound separately and then the documents that are

21  referred to in the slides are in the binders.

22       THE COURT:  Thank you.

23       MS. JACOB:  Your Honor, my name is Beth Jacob.  I'm

24  appearing on behalf of the Lupin defendants to discuss the

25  second of what's really the second, third and fourth of the

02:30 (line 5)
02:31 (line 10)
02:31 (line 15)
02:32 (line 20)
02:33 (line 25)

1    preliminary injunction factors, which is, the first one is

2    irreparable injury is whether Shionogi has shown that Lupin

3    causes immediate irreparable injury and that that injury will

4    be prevented if Lupin is enjoined.

5             THE COURT:  Well, Lupin -- I mean Shionogi claims

6    price erosion, loss of market share, reputational injury.

7    Aren't they typically things that are found to be irreparable

8    harm?

9             MS. JACOB:  Your Honor, they are things that

10   sometimes are found, sometimes are not found, depending on the

11   facts of the case.  They cited cases.  We, yes, cited cases

12   where the Courts found -- I mean, for example, the Altona case

13   which we cited was a Federal Circuit affirmed of a District

14   Court which rejected all of those claims as showing

15   irreparable harm in that case.  There are other cases that we

16   cited which point out that if every time someone had an R&D

17   department and they claim they were going to lose assets that

18   they could use to support the R&D, it would mean that the

19   preliminary injunction must routinely be granted, if not

20   always be granted every time you have a generic brand or any

21   sort of patent infringement.  And the fact of the matter is

22   that preliminary injunctions are not a routine remedy.  They

23   are an extraordinary remedy because they distort in the normal

24   way of a case proceeding and they're asking the Court to take

25   a drastic step based solely on only preliminary and not fully

 1   flushed out information.  So, yes, when a showing has been

 2   made in some circumstances you can find irreparable injury,

 3   obviously injunctions are granted from time-to-time.  But it's

 4   not the norm.  It's not in every case and it's not enough for

 5   the plaintiff to say, oh, Judge, loss of jobs, without more,

 6   and have the Court then enjoin this matter.  I'm sort of

 7   jumping.  But, for example, all they have said is lost jobs,

 8   and then they say in New Jersey.  And this is an Indian

 9   company.  So somehow that should be relevant to the court.  In

10   the cases where that has been a fact, that has been

11   considered, there has been evidence that exactly why the jobs

12   will be lost.  Sometimes how many would be lost.  And there is

13   some relation between the harm and the jobs.

14        Here as I will go through, Shionogi doesn't have

15   employees working on Fortamet.  They stopped promoting this

16   product in August 2010.  They don't manufacture it.  Andrx

17   manufactures it.  And I mean maybe they're saying there's one

18   person who does the accounting.  I don't know.  But there are

19   no jobs that are tied to this particular product and the size

20   of this market.  And they have not shown any evidence, any

21   facts.  They've not given any explanation of why they are

22   saying that this would be a loss of jobs, other than they want

23   us to cite this because it has been a factor that some cases

24   have considered.

25        THE COURT:  Do you agree that they're going to lose

1    market share?

2         MS. JACOB:  Yes, I think that's -- I mean obviously

3    because if they didn't, then Lupin would not be selling the

4    product.  But a loss of market share, the loss of sales as

02:36    5    their own expert conceded is as they conceded this morning,

6    that is reparable.  A number can be put on that.

7         THE COURT:  How about the price of erosion.  Do you

8    agree that they face that because of your competition?

9         MS. JACOB:  Well, your Honor, I think it's slide --

02:36    10   it's document 20 or 21 in the binder.  But it turns out that

11   what Shionogi has done over the course of its history has been

12   to steadily raise the prices on its product.  There was one in

13   April 2011, and then there was another in -- on November 8th,

14   I believe, 2011 where Shionogi, after Lupin was on the market

02:37    15   after the generic competition.  It's tab 20, your Honor.  We

16   have a summary chart and then we have the printout of the

17   public data and Lupin -- I'm sorry, Shionogi raised the price

18   of a thousand milligrams at 25 percent on November 8th.  And

19   it raised its price of 500 milligrams 62 percent on November

02:37    20   8th.

21        THE COURT:  But that's really typical in this

22   industry when a generic is going to come on the market, isn't

23   it?

24        MS. JACOB:  Well, Your Honor, I know that Mr. Bassett

02:37    25   said that but he said that without any support.  And I don't

1  think it is typical that they have argued in their papers that

2  what's going to happen is their price will be eroded and they

3  will have to decrease their price in response to Lupin's

4  launch.  Lupin's expert said, well, you know, that's not

02:37    5  always the case.  Sometimes the brands raise their price.

6  That they'll have a smaller market and they're going to get

7  more money.  And sometimes it doesn't affect the price.  Their

8  response was, in this case, our price will be eroded and we

9  will have to lower it.  And shortly after they filed its

02:38   10  papers, they raised their price.  So there's no indication,

11  and they have done that steadily over the years.  So there's

12  no indication that this particular market and this situation,

13  that there's going to be any price erosion.  There will be a

14  loss of market share, but it appears that they will continue

02:38   15  their practice of raising prices, which also relates to their

16  claim that they have price sensitive customers, because what

17  they have shown over their history is that their customers, I

18  assume they believe will continue to make purchases of their

19  product despite the steady increase in price and despite the

02:38   20  fact that they are already competing in a generic-size market.

21  This was our summary that was quantifiable because even if

22  they do set their harms, if those harms can get a dollar

23  figure, and an estimate or a prediction of a dollar figure is

24  enough, as I'm sure the Court is well aware, there are many

02:39   25  cases when damages are awarded looking to the future.  The

1  fact that the future can't be a hundred percent definitely

2  determined doesn't mean that you can't determine damages.  It

3  also shows that Shionogi gave up on the Fortamet market

4  before, long before Lupin launched.  This is not a market or a

02:39  5  product which is significant to Shionogi, except for, perhaps,

6  in this courtroom.  And I think that is, that is important.

7  It goes to the balance of hardships.  But it also goes to the

8  irreparability of the harm.

9         THE COURT:  How about the loss of good will?

02:39  10         MS. JACOB:  Your Honor, they had two reasons for

11  asserted loss of good will.  One was they're going to have to

12  raise prices.  I think the documents that I have presented to

13  the Court and the record shows is that they raise prices all

14  the time.  They raised prices not even a month ago.  That

02:40  15  doesn't seem to be a good will issue for Shionogi.  The second

16  is the supposed inferiority of Lupin's products.  They say

17  that people are going to buy Lupin's products and somehow it

18  won't be as good and they'll hate Shionogi for that.  That

19  argument is a little inconsistent because there they're

02:40  20  assuming that people will not know that it's Lupin's product.

21  And in their other good will aspect they assume people will

22  know that it's Shionogi who is raising their prices and they

23  can't have the generic anymore.  But in any event, if you read

24  the e-mails, aside from some colorful language indicating that

02:40  25  Lupin, like many other companies, seem to have a little bit of

1   interoffice feuding going on.

2          THE COURT:  When will they learn to put these things

3   --

4          MS. JACOB:  And they use e-mails that they shouldn't

5   use.  But leaving that aside, your honor.  What happened there

6   is in one day they had an issue with one of the parameters of

7   coating, the amount of water included that you take all the

8   colorful language away, Doctor Kilconey went in, identified

9   what the issue was, which was as it says in the e-mail, the

10  parts that they didn't quote to the Court, and I don't have it

11  right in front of me, but in effect he said it was a question

12  of I believe the patent was not quite close enough.  It was a

13  little too far and it was in this rainy season.  They solved

14  it easily in a day.  They were able, therefore, to go forward,

15  coat the tablets, meet the parameters and launch their

16  product.  It is not as it Lupin is out there manufacturing

17  product without any oversight.  They have FDA's oversight.

18  They have quality parameters and quality control.  When the

19  product was shipped to the United States, they have quality

20  assurance documents which goes through all these parameters

21  and represents based on testing of the data that they meet the

22  parameters.  So the suggestion that there is an issue because

23  the generic product, the Lupin's product somehow is not going

24  to perform properly, or somehow is not going to perform as

25  well as, at least as well as the brand, has no basis and

         1    really is not a consideration at all.

         2         The good will issue here is not to be affected what

         3    people take and those people who have taken it for the last

         4    two months.  There has been no issue or no concern or no

02:42    5    complaint either by the regulators or by the sales people or

         6    by the doctors or by the patients that somehow Lupin's

         7    Metformin product is not performing as expected or as well.

         8    So I think that's just a false issue.  I think it's a fun

         9    e-mail for plaintiffs to see.  But otherwise, it really

02:42   10    doesn't show anything, other than people losing their temper a

        11    little bit perhaps in the rainy season in India.

        12         THE COURT:  Are you going to talk about recall?  Is

        13    that part of your presentation?

        14         MS. JACOB:  Yes.  I'm going to go without slides,

02:43   15    your Honor, because I'm not able to jump through the slides

        16    quite as adeptly as I should.  But the recall slide.  I

        17    thought it would be easier.  But recall basically is slide 28,

        18    your Honor, if it matters.  But recall is an unusual, very

        19    unusual remedy.  The suggestion in Plaintiff's papers that

02:44   20    courts just routinely in these situations grant recalls is not

        21    really the case.  They have managed to find, I think I found

        22    two cases or three cases.  I wanted to mention a few of them.

        23    One is the Plavix case which has been discussed by the experts

        24    at some length.  Doesn't show the market will bounce back or

02:44   25    how fast it will bounce back.  But Plavix is a case where

1   plaintiff say, see, generics flooded the market.  There

2   perhaps they did, unlike Lupin which put three months onto the

3   market.  They said the Apotex in that case flooded according

4   to the case, the decision was nine months I believe.  Recall

02:44   5   was requested in that case.  It was not given.  And the

6   Cyclobenzaprine case.  But in that case, that was after trial.

7   Judge Robinson of the District of Delaware granted a recall.

8   Two days later, I don't remember what the Order was issued on

9   the weekend or the day after, the Federal Circuit stayed the

02:45   10   recall.  They let the rest of it stay in place.  Left the

11   injunction in place.  They stayed the recall.  That's not a

12   case where a recall was granted, or was granted and was upheld

13   by the Federal Circuit.  So we're left with two cases.  The

14   Ortho McNeil case.  In that one, the case said the product had

02:45   15   not been sold.  It hadn't gone into the distribution chain.

16   So that a recall was not really the sort of burden on Teva

17   that it would be perhaps on Lupin.  In that case also I know

18   plaintiff said we didn't delay.  We did it I think as

19   expeditiously as possible.  I would like to get to that.  But

02:45   20   if you look at the chronology on the Ortho McNeil case.  On

21   June 29th, Teva got final approval and shipped its product to

22   its distributor.  On July 1st, a couple days later the

23   preliminary injunction application was brought to the Court.

24   On July 15th pursuant to an agreement, I don't think there was

02:46   25   a formal standstill in that case, but there was an agreement

1  between the parties that Teva wouldn't do more than let its

2  product sit with the distributor.  The case was argued and not

3  even a week later it was decided.  So that was the case where

4  the argument of the brand company that it needed a recall,

02:46  5  they had first of all very specific information about how this

6  would affect their operations, about how it would affect the

7  job hiring.  But it also went very rapidly before the product

8  had gotten out in the market, which supported the brand's

9  position that this was a critical product to them and the

02:46  10  recall was going to be a problem.

11       In the Abbott case, there's really very little

12  discussion about recall in that case.  They just say at the

13  end they're going to grant the request for a recall for the

14  bond.  That case the Court had found that the product was

02:47  15  infringed.  I believe, I may be wrong, I think that one was

16  after a summary judgment ruling.  But that's it.  Let's look

17  at here where the recall was warranted in this particular

18  case.  When this even more extraordinary, exceptional remedy,

19  leaving aside the burdensomeness, whether it would be

02:47  20  effective because a product is out in the market.  I mean they

21  keep on -- they like to use the word flooded the market and

22  that's not really what happened here.

23       THE COURT:  I don't know what happened here.  I have

24  no data to reach any conclusion about what's in the market,

02:47  25  other than your product is in the market to some extent.

```
 1          MS. JACOB:  Well, your Honor, the information that's
 2   in the record is that Lupin launched about three months worth
 3   of the product.  And that I guess there isn't much more about
 4   how it is going through the distribution chain.  There is no
 5   evidence in the record except for what we had just put in that
 6   the price increases about what the effect has been on
 7   Shionogi.  We've tried to find it, but there's a time lag
 8   apparently between that.
 9          THE COURT:  And that's why I asked the question as to
10   what the effect has been and I got an answer from counsel.
11          MS. JACOB:  But, your Honor, we have no opportunity
12   to review that or go behind that answer.  Going back to what
13   saying a little earlier is that for Shionogi this is a
14   declining market and that's another reason why recall really
15   would not be, would not be appropriate.  There's also no
16   evidence that any future harm would be forestalled by a
17   recall, or that I would think the Court was questioning about,
18   that if the product is there or being sold, I don't think we
19   have a question about inferior product.  If there is a price
20   issue, Shionogi has already raised its prices dramatically in
21   response to the generic launch.  Once the product is sold and
22   then if the market then at that point does not have a generic,
23   Lupin's generic in it, the prices will do what they will do
24   and the product will or will not be available, which is
25   another issue which hasn't been discussed yet.  That Shionogi
```

02:48
02:48
02:48
02:49
02:49

1   attacks Lupin for having a manufacturing issue that would

2   solve in a day.  Andrx Watson had a manufacturing issue in

3   which they said they haven't told us anything about it except

4   that it took them one year for the 500 milligram product to

02:49   5   figure out how to resolve it and get that product back on the

6   market, which either is because it's something extremely

7   serious or it's another indication that this is just not a

8   very important product for the plaintiff, and that they saw no

9   compulsion to resolve this and get this on the market.  The

02:50   10   500 milligram is back ordered.  The customers in the market

11   had no idea what the issue was.  They thought it was just not

12   being provided.

13       Another point I just lost for a second, your Honor.

14   But that also is an issue, the declining market that they have

02:50   15   withdrawn their support for.  They are raising prices.

16   They're not giving the product.  They're not supporting the

17   product.  There's a public interest in having the product if

18   there is, then perhaps you actually do some generic

19   participation to make sure the product is provided and to make

02:50   20   sure that the market it exists and continues to exist which is

21   another, yet another issue on where the hardships lie.

22       THE COURT:  Isn't it also a very strong public

23   interest in enforcing patents?  I mean I thought patents are

24   granted pursuant to the Constitution of the United States.

02:50   25       MS. JACOB:  There's a strong interest in enforcing

patents, your Honor, as the Patent Office issues them.  So

here I don't think we have the type of strong interest in

enforcing a patent that you would have in a case where there

wasn't the irregularity you have here where this plaintiff

02:51   didn't bother to correct the patent.  The patent that is

printed that is before the Court is not the patent that the

patent examiner approved and issued.  And what that means for

infringement or invalidity, what it does mean is that this

isn't the patent that the Constitution talks about as having a

02:51   strong public interest.  There is a countervailing public

interest, and that is --

         THE COURT:  I'm sorry.  You have to back up a minute.

You're saying the patent at issue in this case is not the one

issued by the Patent Office?  They're relying on was not

02:51   issued by the Patent Office?

         MS. JACOB:  The patent that they're relying on was

printed up by a printer's error which printed not the claims

which were ultimately allowed, but the claims that were

allowed by mistake.  And Mr. Hochstetler knows this better

02:51   than I do.  But my understanding is that we have the claims

that were allowed by mistake in December.  They were then, the

prosecuting attorney went back to the Patent Office to say

that this was a mistake.  Please issue the correct one.  The

Patent Examiner said yes, that's right.  Here are the correct

02:52   ones.  Here are the claims that should issue.  And what was

1    printed up was the ones that were originally allowed, not the

2    ones that were ultimately allowed.

3         So it's not the patent that the Patent Examiner

4    intended.  And, therefore, we don't have the type of very

02:52    5    strong public interest in enforcing the patent rights which

6    are balanced by the strong interests in having low price

7    generic drugs available on the market, especially in a case as

8    here where the market is not being supported by Shionogi.  So

9    without Lupin's presence, we didn't have a 500 milligram

02:52    10    product because Shionogi and Watson had just abandoned that

11    market for a year.  There are also arguments and I can go

12    through it or ask the Court to look at the slides and look at

13    the backup documents and read the briefs.  But this market has

14    been in decline.  Shionogi itself predicted a 25 percent

02:53    15    decline.

16             THE COURT:  No, I agree with that.

17             MS. JACOB:  So it's not the sort of situation that is

18    present in the cases or would suggest that there's not a

19    public interest that's in the negative.  It is a situation

02:53    20    where the public interest would be more strongly in favor in

21    having the generic on the market than otherwise, and in some

22    other cases.

23         One other point on that in terms of preventing harm.

24    Since Lupin launched, Watson's intent the right to launch the

02:53    25    generic and that's clear in the license agreement which is in

1    the materials that I've submitted.  And it's agreed to by

2    plaintiffs.  Whether Lupin is enjoined or not, Watson still

3    has a right to go on the market.  Enjoining Lupin does not

4    mean that Shionogi will not face all of the generic

5    competition problems that they claim are all going to flow

6    from Lupin's presence.  And in the binder that I gave to the

7    Court this morning, there are -- we haven't gotten very little

8    discovery, understandably, but the bit we have gotten, there

9    are a series e-mails, two different groups of e-mails which

10   show that Watson is getting ready to launch.  They're

11   preparing.  There is an e-mail between Watson and Shionogi

12   where they're splitting up what the ordered product Shionogi

13   had ordered and they said, well, half of it goes to the brand

14   and half of it is going to go to the generic and the market

15   information as Mr. Hoffman said in his declaration, the market

16   information is that Watson before the Standstill Agreement was

17   out there talking to customers and promising them that they

18   were going to be providing product.  So whatever that might

19   mean to whether if at the end of the day, we think unlikely,

20   but if it should happen at the end of the day that the Court

21   decides that Lupin does infringe a valid patent, and if at

22   that point plaintiffs say well, you're responsible for the

23   losses of our sales to Watson as well to you, maybe.  But what

24   it shows with respect to a preliminary injunction that the

25   harm is going to happen whether Lupin's enjoined or not.

```
 1          So there's no reason to have an injunction that's not

 2   going to be effective.  It's going to hurt Lupin significantly

 3   and not help Shionogi.

 4          THE COURT:  Okay.  Are you able to talk about the

 5   bond issue?

 6          MS. JACOB:  I haven't.

 7          THE COURT:  But you gave me about that much in the

 8   declaration.

 9          MS. JACOB:  Well, the declaration was based, we have

10   four different possible scenarios about what might happen.  We

11   base your request for the bond on one year --

12          THE COURT:  No, I don't mean to be critical.  At

13   least you addressed the bond.  Plaintiff never did.

14          MS. JACOB:  Well, your Honor, I hope that counts for

15   us because obviously we're very unhappy to be discussing it

16   all.

17          THE COURT:  It has to be discussed.  I mean whether

18   you win or lose, we have to discuss it before I make a

19   decision on this.

20          MS. JACOB:  One year -- I have to look at it.  But

21   what we ask for the bond that we have of one year of what our

22   profits would be if we were in the market by ourselves.  If --

23          THE COURT:  And why did you pick one year?

24          MS. JACOB:  We picked one year in the hope that --

25   well, two reasons.  One is because in about one year Mylan,
```

02:55

02:55

02:55

02:56

02:56

1   Mylan's 30 month stay expires.  If they get final approval at

2   that point, they would have an option of being able to launch.

3   Well, it would just seem a time before which probably the

4   parties would try to get the Court -- the case to trial.  But

02:56    5   that's why we figured one year.

6         THE COURT:  You think it's going to take a year to

7   get the case to trial?

8         MS. JACOB:  I'm hoping sooner.

9         THE COURT:  Any reason why it can't be sooner?

02:56    10         MS. JACOB:  Because it always takes longer than we

11   all hope.  In this case we have not -- we had a Markman

12   hearing, but we have not had -- we haven't had any fact

13   discovery.  I don't know the document production is pretty

14   much complete, but I think the parties have to go back and

02:57    15   revisit this.  Despite the fact that we have expert

16   declarations on this motion, we are haven't started expert

17   discovery.  We don't even have a scheduling order because this

18   motion trumped our appointed meeting with Magistrate Judge

19   Schneider.  So, just being reasonable about it, it seemed to

02:57    20   us that the chances of us getting a verdict by September,

21   before September of 2012 weren't all that good.  Plus that

22   doesn't really take into account the time for appeal, but that

23   should be considered as well.  Our declaration, our -- Mr.

24   Hoffman in sales at Lupin in his four different scenarios gave

02:58    25   numbers for one year and then for the next year.  So this

1    information if you think it's going to take longer for a two

2    year bond.  But I think to assume that it's going to be less

3    than one year before this plays out and we can get back on the

4    market if we're enjoined now is a little optimistic.  And it's

02:58    5    just to protect us for the damages, we would still have to

6    prove obviously what our damages are.  But my understanding is

7    that the bond is based on we can collect.

8            THE COURT:  Normally yes.

9            MS. JACOB:  So if the bond is unduly low, it could be

02:58    10    that Lupin would have damages that, not because we didn't ask

11    for it.  It just wasn't granted.  We could not collect.

12            THE COURT:  All right.  Okay.

13            MS. JACOB:  Your Honor, one of the points or a number

14    of points, every point in my slide is very important.  But

02:58    15    would it make sense for me to go through the evidence that we

16    have showing that market was declining?  Showing that Shionogi

17    --

18            THE COURT:  No.  I agree.  I think the plaintiff

19    agrees that the market was declining.

02:59    20            MS. JACOB:  Okay.

21            THE COURT:  You don't need to convince me of that.

22            MS. JACOB:  One other thing.  I think I did mention

23    it to some extent, but the claims of the non-economic injury?

24    But I just wanted to point out that Shionogi points to four

02:59    25    non-economic harms.  But there is really nothing in the record

02:59

03:00

03:00

03:00

03:01

1   that backs that up.  In fact, to the contrary.  They talk
2   about the Japanese Parent might shift to another marketing
3   partner.  First the Crestor.  Crestor was on the market.  They
4   were marketing it before they acquired Sciele which became
5   Schionogi.  So whatever their decision would have been, I
6   don't think that's a particularly good piece of evidence that
7   suggests that they're backing off according to Shionogi the
8   annual report and the annual report for 2011 and the revised
9   earning statement that they published on October 28th or
10  October 31st.  I don't remember if it's in the materials
11  referred to, Organizational and Management Issues at Shionogi
12  U.S.  That they said they were taking steps to correct.  So,
13  one, it appears that the Japanese Parent is not backing off
14  from its subsidiaries.  And, two, they are aware there are
15  problems there that they have corrected.  They are correcting
16  and presumably to go forward as they state in their annual
17  report that they intend to go forward.  And, in fact, in the
18  October 2011 revised earning statement, financial statement,
19  this was a month after Lupin had launched its generic
20  competition and it's not mentioned.  They don't point to that
21  as being any sort of issue or any sort of problem, which is
22  more of an indication of what we're saying that this is not an
23  irreparable harm on Shionogi.  Money damages at best.  It's
24  not really affecting their ability to go forward in all these
25  non-economic ways that they've been pointing to.

1          THE COURT:  Okay.  Thank you.

2          MS. JACOB:  Excuse me, your Honor.  I have a little

3    disappointment I wasn't able to run through my slides, but

4    maybe the Court will look at it in chambers so it's not

03:01    5    entirely lost.  Thank you, your Honor.

6          THE COURT:  Thank you very much.  Did you want to add

7    some things?

8          MR. HOCHSTETLER:  Yes, Your Honor.  Validity.  May I

9    discuss validity.

03:01   10          THE COURT:  Please.

11          MR. HOCHSTETLER:  Before I switch to that, one point

12   I would like to make, your Honor, is clearly bothered by

13   Lupin's package insert.

14          THE COURT:  I'm not bothered by it.

03:01   15          MR. HOCHSTETLER:  All right.

16          THE COURT:  I'm not losing any sleep over it, I can

17   tell you that.

18          MR. HOCHSTETLER:  In the cases that plaintiff cites,

19   in none of those cases did the Court ignore the actual test

03:02   20   data on the product.  They looked at package insert, but in

21   every case they looked also at the test data that was

22   available.  And in this case, all the test data shows that

23   Lupin's Tmax does not infringe.  If your Honor were to find

24   that the package insert means that Lupin does not have a

03:02   25   substantial defense of non-infringement, you would be making a

1   groundbreaking decision, your Honor.  I have several slides on

2   validity, but let me do this.  Let me summarize it quickly,

3   and then I would like, if I could, take you through this small

4   binder because what happened in the patent prosecution, I

03:03   5   believe the Court should understand and the Court can deduce

6   what it wants to.

7        There's no dispute that our primary prior art is the

8   same that was in front of the patent examiner.  The difference

9   is the law changed and the patent issued in 2005, the Supreme

03:03   10   Court issued the case KSR decision in 2007, and that is --

11   that's the C change, your Honor, with respect to how that

12   prior art should be looked at.  The Microsoft case also is

13   important for understanding the presumption of validity as

14   well.  And with the Court's permission, I will address that

03:03   15   later, but I do want to make this point as strongly as I can.

16        The prior art references Cheng and Timmins were in

17   front of the patent examiner.  The issue of obviousness comes

18   down to whether one with ordinary skill would be motivated to

19   put them together to modify them.  The Federal Circuit had a

03:04   20   fairly rigid test for determining that whether or not it

21   should be combined.  The KSR decision by the Supreme Court

22   loosened that, made it more realistic.  Make it more common

23   sense.  Our expert pointed out, for example, that a person

24   with ordinary skill would have been motivated to modify it,

03:04   25   because the Timmins reference was Bristol Meyers who would

|     |     |
| --- | --- |
| 1 | make the Gold Standard Glucophage product and they were the |
| 2 | ones that had the Tmax of 8 and that would be motivation |
| 3 | motivation.  But the law changed, your Honor.  So it's not -- |
| 4 | this isn't a situation where you're revisiting what the |
| 03:04 | 5 | examiner did.  With the law saying the same.  The law is very |
| 6 | different after KSR.  But let me first throw -- if I could, |
| 7 | let's go through the patent prosecution, if I may.  And if you |
| 8 | could pull the small binder out, your Honor, I would |
| 9 | appreciate it.  At the very beginning, your Honor, we have a |
| 03:05 | 10 | table of contents, and both Andrx and Lupin produced copies of |
| 11 | it.  We're going to work off of Lupin only because the two are |
| 12 | identical, except Lupin's has and we produced it on the left |
| 13 | hand side of the slide in front of you numbers of the |
| 14 | documents, and that will help us go through and determine what |
| 03:05 | 15 | it is that happened during the prosecution. |
| 16 | So we'll start, your Honor, with Tab 12.  You'll see |
| 17 | that in the table of contents there's a reference to Amendment |
| 18 | B dated March 4, 2003.  You see that, your Honor? |
| 19 | THE COURT:  Yes. |
| 03:06 | 20 | MR. HOCHSTETLER:  Okay.  And this was an Amendment |
| 21 | submitted by the patent applicant.  And you'll see that the |
| 22 | document numbered line with the B lines up.  And at the bottom |
| 23 | of the, of the first page of the Amendment, you will see that |
| 24 | the Tmax is five and a half to seven and a half hours after |
| 03:06 | 25 | administration following dinner.  And this Amendment was an |

1    effort to distinguish over the chain reference.  As I

2    mentioned earlier, your Honor, the chain reference gave the

3    requisite Tmax after breakfast.  So they limited the claims to

4    the following day.

5         If your Honor would then go to Number 13.  And the date

6    on that is 5/21/03.  And turn to the next page in the booklet,

7    your Honor, you'll see that Document 13 dated 5/21/03 and it's

8    an office communication.  This was a rejection of the pending

9    claims.  And the claims were rejected as obvious.  And they

10   were rejected as obvious in view of, among other things,

11   change.  So these are the claims that are in the issued patent

12   right now.  They were rejected as obvious.  The only question

13   is what happened next.

14        Go to Tab 14, your Honor.  Document 14 is not

15   particularly important for our purposes.  I'm just doing this

16   for completeness.  It refers to a -- an information disclosure

17   statement.

18        Turn to the next page, you'll see the document Number

19   14.  Document 15, however, your Honor, is important.  Turn to

20   Tab 15.  You will see that Tab 15, Document 15 refers to an

21   interview summary dated November 20, 2003.  You see that, your

22   Honor?

23             THE COURT:  Yes.

24             MR. HOCHSTETLER:  All right.  And if you turn to the

25   next page, Document 15 is an applicant initiated interview

1    request form.  That's right up there.  And the proposed date

2    of the interview is November 20th.  And the participants,

3    talking about three participants.  One is a Clifford Davidson

4    who was the patent attorney for the plaintiff, and Thurman

03:09   5    Page is the primary supervising examiner for the patent.  You

6    then turn to the next page, your Honor.  This is the summary

7    of the interview, and you'll see again on this page, and this

8    is Andrx Document 202, under Tab 15.  Are you with me, your

9    Honor?

03:09   10           THE COURT:  Yep.

11           MR. HOCHSTETLER:  Okay.  You'll see that, again

12   you'll see again the participants in the interview was Mr.

13   Davidson, there's a Mr. Whitlock and Mr. Page.  The date of

14   the interview is November 20th.  And the description of the

03:10   15   subject matter is recorded.  Importance of Tmax presented and

16   the relationship with gluconeogenesis.  Closest prior art

17   suggest that general teaching of the Tmax of 8.  Applicant to

18   request reconsideration and reconsideration to be given in

19   view of the working examples.

03:10   20           Okay.  Now, your Honor, we go to the somewhat orderly

21   numbered Document, 15 and a half.  And I think you'll see what

22   happened and why it has the odd number in a moment.  We're

23   going to end and then come back to this document twice.  The

24   -- if you can turn to the first page in the Tab behind Tab 15,

03:10   25   your Honor, you will see a facsimile page.

1        THE COURT:  Yes.

2        MR. HOCHSTETLER:  But what I wanted you to see for

3   right now is Document 15 and a half involved an Amendment of

4   all of the claims.  This is dated November 21, 2003, one after

03:11   5   the interview.  Claim one is a seven and a half in Claims 2

6   and 3 and 4 are all cancelled.  In Claim 5 is rewritten.  And

7   the upper limit of the Tmax and all the claims is now changed

8   to seven.  Also -- this is the day after the interview, Judge.

9   This would be the next page I think in the Tab, your Honor.

03:12   10  Highlighted it.

11       The undersigned gratefully acknowledges the courtesies

12  extended by Supervisory Examiner Page to the undersigned and

13  Ted Whitlock, Esquire during the interview conducted at the

14  USPTO on November 20th, 2003.  And then proceed to describe

03:12   15  the interview, your Honor.  And on Page 272 which is on the

16  screen now.  He reports what happened during the interview.

17  This is the next day.  And it says:

18       The examiner considered the closest prior art to Tmax

19  of 8.  The examiner agreed that Tmax of 7 would be patentable.

03:13   20  The examiner agreed to consider the patentability of seven and

21  a half if applicants were to provide a working example of that

22  value as well.  And then the next sentence.

23       In view of the deadline for filing this response, claim

24  1 has been cancelled.  In other words, they provided no

03:13   25  working example.  And they limited all of the claims to a Tmax

1  of 7, or so they thought.

2       Turn now to Tab 16, your Honor.  We're going to come

3  back to this document.  This is the notice of allowance

4  document, number 16, December 19th, 2003.  And it says that

03:14   5  the claims were allowed, including the claims that we just saw

6  have been cancelled.  You'll notice on the Notice Allowability

7  it says:  This communication is responsive to interview

8  conducted November 20th, 2003.  There is no reference to the

9  Amendment submitted the next day in which the claims were

03:14  10  changed.

11       Now this is kind of where the plaintiff would like to

12  stop.  But we see a lot more, Judge, as we go through the

13  prosecution.

14       The next document Tab 17 is for this purpose not a

03:15  15  particularly relevant document, your Honor.  Just for purposes

16  of completeness.  You'll see behind the Tab is document number

17  17 with the same date.  But document number 18, your Honor, is

18  important.  Document number 18 now this is dated January 8,

19  2004, and it's request corrected notice.  And you'll see if

03:15  20  you turn the tab, your Honor, this is number 18 requesting

21  corrective notice.  And this is written about by Mr. Davidson

22  who is involved in that interview.  And he said:

23       A notice of allowance for the above referenced

24  application was mailed on December 19, 2003.  Just a couple

03:16  25  weeks before.  Upon review of the Notice of Allowability and

1   accompanying documents, Applicant's attorney determined that

2   certain claims that were indicated as allowable were

3   cancelled.  For example, claims 1 and 4 and certain claims

4   which were pending, claims 30 and 43 were not acknowledged in

03:16   5   the Notice of Allowance.  As required by the examiner, he

6   continues, a listing of the pending claims is provided below.

7   And then further on, Judge, are the new claims.  And you'll

8   see, Judge, claim 7, Tmax of 7 is the maximum on all of these

9   claims.  And then at the end, this man who was in the

03:16   10   interview with the examiner says:  Applicants respectfully

11   request that the examiner provide a supplemental notice of

12   allowance indicating the properly allowed claims.

13          May I go to the next tab?

14          THE COURT:  Yes, please.

03:17   15          MR. HOCHSTETLER:  Tab 19, your Honor.  This is only

16   four days later, January 12th.  The patent applicant is asking

17   again in response to the Notice of Allowance dated

18   December 19, 2003.  Applicants respectfully request that the

19   following claim set be published in the printed patent.  And

03:18   20   the patent -- and the claims follow, your Honor, and a Tmax of

21   7 is the maximum of all the claims.  All of these claims were

22   changed.  That was the November 21st amendment purported to

23   change all of the claims.  So that a Tmax of 7 was the

24   maximum.  All of the claims were changed.  And even claim 5

03:18   25   was changed as well.  Now that's also in January.

1          Now, your Honor, if you would go back to 15 and a half.

2               THE COURT:  All right.

3               MR. HOCHSTETLER:  You can now see what probably

4      happens.  Why is it 15 and a half?  Because it got squeezed

03:19   5      in.  If you look at the page after, what you see is that in

6      the opening fax as requested by examiner Micah Paul Young.

7      Transmitted herewith is a duplicate copy of the Amendment

8      filed on November 21, 2003 in the above identified case and

9      the postcard stamped by the USPTO.  He wanted the postcard to

03:19  10      show that, in fact, that amount had been received by USPTO.

11      And that November 21st amendment, and this is dated September,

12      September 04, your Honor.  And this is again the November 21st

13      amendment is changed.  All of the claims, all the claims are

14      changed to specify a maximum of seven hours.  And then you see

03:20  15      kind of scribbled here, your Honor, on this page.  This would

16      be page AND265.  That's I believe what it says, your Honor, is

17      okay to enter MPY.  That's the examiner Micah Paul Young

18      11/29/04.

19          Now if you then turn to Tab 20, your Honor.  You will

03:21  20      see a Supplemental Notice of Allowance dated 11/30/04.  And

21      now the claims that were amended on November 21st, 03 are

22      being allowed.  And the Notice, the Notice of, Supplemental

23      Notice of Allowability.  If you'll look at the bottom of it,

24      your Honor.  A Thurman Page signature and he signed off on

03:21  25      that.  His signature.  But for reasons that aren't entirely

1    clear, the Patent Office Printing Department apparently

2    printed the claims from the first Notice of Allowance, not the

3    second.

4        Now, the plaintiff has posited from parts of this story

03:22    5    that the examiner must have after the interview thought, well,

6    I guess maybe a Tmax of seven and a half would be okay to

7    allow them after all.  But the patent attorney didn't think.

8    He kept coming back to change it.  The patent attorney talked

9    to the examiner and the examiner signed off on the

03:22    10   Supplemental Notice.  And if the Patent Office had done what

11   it should have done, we would be fighting about a patent with

12   a Tmax of 7 rather than seven and a half.

13       Your Honor, I've never encountered a situation like

14   this, and I don't believe our expert has either.  But we have

03:22    15   here a patent where the claims are not what the patent

16   examiner intended to allow, and not what the patent attorney

17   thought they were entitled to.  So the irony here is on the

18   presumption of validity is based on the presumption of

19   administrative regularity.  But here we have evidence in the

03:23    20   documents that shows that the PTO's administrative process was

21   not regulated in this case.  We're being sued on a patent that

22   the patent examiners did not intend to be in this patent.

23       THE COURT:  Okay.  Thank you.  You have five minutes

24   to respond, at most.

03:23    25   MR. BASSETT:  Thank you, your Honor.  I'll go right

1    to the final point.  Spent a lot of time going through this

2    file history.  It is irregular.  I never seen anything like it

3    myself either, your Honor.  But several points.  There's no

4    dispute that the upper limit is 7.0 is supposed to be in

03:24    5    there.  Lupin still loses.  They still infringe.  Their label

6    still says that they fall within the range to have the upper

7    limit of 7.0.  So all of that argument substantively means

8    nothing.

9         Secondly, your Honor, to the extent there was a

03:24    10    printing error, this Court can correct it.  So, that's not --

11    that doesn't invalidate a patent.  That simply is a

12    ministerial issue that can be corrected.  Claim 3 of this

13    patent has an upper limit of 7.0.  No dispute that that's what

14    the claim, upper claim limit should have been.  And there's no

03:24    15    dispute that their label says that they fall within it.  I

16    don't think that's -- I think all of this is an issue that

17    means nothing.

18         Secondly, they still can't dispute the fact that the

19    examiner on December 19th allowed the claims with a 7.5 upper

03:24    20    limit.  That's what the examiner substantively intended.

21    These other things were procedural issues that had to do with

22    a deadline that they were afraid that they blew up as of

23    November 21st and they wanted to fix it.  It has nothing to do

24    with the substantive point, your Honor.

03:25    25         I am impressed when Lupin continues to push this

1    argument that the Court should simply ignore what's in their

2    label.  I think the only point that I would add to what we've

3    already argued is that Lupin continues to suggest that it must

4    have copied the label.  It was required to copy the label.  He

03:25    5    was only required to copy the label, let's be honest, so it

6    could get into the market and make money.  It wanted to enter

7    the market.  So it copied the label.  That doesn't mean it was

8    appropriate for them to do so.  I cannot believe that they

9    think that it's appropriate to include in their label

03:25    10   something that they think is inaccurate in order to get that

11   claim to get the label approved.  That they have to be able to

12   come into this Court and argue that we shouldn't be able to

13   prove infringement because that label is inaccurate.  That

14   can't be an appropriate standard and an appropriate argument.

03:26    15   And I don't, I would suggest that I don't think the Court

16   should countenance that kind of argument.  They never gave the

17   FDA the opportunity to evaluate whether the Tmax was

18   appropriate or not.  They could have.  There's procedures in

19   place to do it.  They chose not to do it because they wanted

03:26    20   to be able to sell their product and make money.  It wasn't

21   because they were required to do so by the regulation.

22        I think with that, your Honor, I would stop, unless you

23   have any questions.

24        THE COURT:  I don't.  Thank you.

03:26    25        MR. BASSETT:  Thank you very much.

1       THE COURT:  All right.  Well, I know I told you at

2  the beginning that I was prepared to rule today.  I am not.

3  But we will have a decision out Monday or Tuesday of next

4  week.  I'll get to it as fast I can.  I have other things that

03:26    5  I'm involved with at the moment, and for the rest of the

6  afternoon I'm in the middle of a complex trial, criminal trial

7  next week also.  So, but we'll get this out Monday or Tuesday

8  of next week.

9       MR. BASSETT:  I appreciate that, your Honor.  The

03:27   10  only issue that I would raise is that the Standstill Agreement

11  expires at midnight tonight.  Could that be extended until the

12  Court issues the ruling?

13       MS. JACOB:  Your Honor, as I did before the phone

14  conversation, I have also discussed this with my client before

03:27   15  we came in and Lupin is willing to extend the Standstill

16  through next week to give the Court an opportunity to decide.

17       THE COURT:  Thank you.

18       MR. BASSETT:  I appreciate that.  Thank you.

19       THE COURT:  Thank you for your presentations,

03:27   20  counsel.  If I do grant the request for the injunction, and

21  feel it necessary to have a bond hearing, it would be at the

22  end of next week sometime.  I'm not sure I need any other

23  information, but let me look into that.  And, of course, you

24  still have to prevail.

03:27   25       MR. BASSETT:  Understood.

1        THE COURT:  Thank you, everybody.  We'll talk to you

2   soon.  Where do you want to go from here, or do you want time

3   to think about whether you want me to send this back to a

4   Delaware Judge or do you want me to keep this?

)3:28    5        MR. BASSETT:  Your Honor, I haven't had a chance to

6   discuss this, but from our perspective, I think we would be

7   perfectly happy staying here with your Honor.

8        MR. HOCHSTETLER:  We have not had an opportunity to

9   confer with our client and we would respectfully would like

)3:28   10   that opportunity.

11        THE COURT:  Sure.  Why don't you do that.  Everybody

12   do that and just send me letters as to what you feel about how

13   you want to proceed.  I mean it's unusual that you get an

14   opportunity to Judge shop, but here you have it.

)3:28   15        MR. HOCHSTETLER:  May I say one thing in response to

16   Mr. Bassett?

17        THE COURT:  No.  Thank you.  No.

18        MR. HOCHSTETLER:  Okay.

19        THE COURT:  No.  Trust me.  I read your papers before

)3:28   20   today.  I know what your arguments are.  Thank you very much,

21   everybody.

22            (The matter was then concluded)

23

24

25

1          C E R T I F I C A T E.

2

3

4

5      I, **Carl J. Nami, C.S.R.**, Official United States Court

6  Reporter and Certified Shorthand Reporter of the State of New

7  Jersey, do hereby certify that the foregoing is a true and

8  accurate transcript of the testimony as taken stenographically

9  by and before me at the time, place and on the date

10  hereinbefore set forth.

11      I do further certify that I am neither a relative nor

12  employee nor attorney nor counsel of any of the parties to

13  this action, and that I am neither a relative nor employee of

14  such attorney or counsel and that I am not financially

15  interested in this action.

16

17

18

19  S/Carl J. Nami, CSR_____

20                      **CARL J. NAMI, C.S.R.**

21                      Certificate No. 557

22                      Date: December 28, 2011

23

24

25

## #

**#557** [1] - 2:12

## 0

**03** [1] - 91:21
**04** [1] - 91:12
**08101** [1] - 1:10
**09-00037** [1] - 1:6

## 1

**1** [16] - 11:11, 11:16, 11:24, 20:20, 21:15, 21:17, 21:23, 21:24, 22:8, 23:2, 24:5, 24:12, 24:13, 88:24, 90:3
**1.7** [1] - 18:25
**10** [2] - 43:21, 54:21
**10.3** [2] - 16:6, 18:23
**100** [2] - 55:24
**1000** [1] - 54:20
**11/29/04** [1] - 91:18
**11/30/04** [1] - 91:20
**119** [1] - 28:16
**12** [5] - 45:18, 46:6, 57:1, 57:17, 85:16
**12.8** [1] - 18:25
**12th** [1] - 90:16
**13** [2] - 86:5, 86:7
**13th** [1] - 24:4
**14** [3] - 86:14, 86:19
**15** [13] - 9:6, 43:21, 86:19, 86:20, 86:25, 87:8, 87:21, 87:24, 88:3, 91:1, 91:4
**15th** [1] - 72:24
**16** [2] - 89:2, 89:4
**16.9** [1] - 16:14
**17** [2] - 89:14, 89:17
**18** [3] - 89:17, 89:18, 89:20
**18.5** [2] - 33:6, 36:2
**19** [5] - 22:12, 30:25, 89:24, 90:15, 90:18
**19th** [2] - 21:13, 21:20, 89:4, 93:19
**1st** [2] - 7:24, 72:22

## 2

**2** [2] - 1:11, 88:5
**20** [5] - 56:11, 67:10, 67:15, 86:21, 91:19
**200** [2] - 55:25

**2003** [11] - 21:5, 22:12, 85:18, 86:21, 88:4, 88:14, 89:4, 89:8, 89:24, 90:18, 91:8
**2004** [1] - 89:19
**2005** [1] - 84:9
**2007** [1] - 84:10
**2010** [4] - 7:22, 30:25, 33:7, 66:16
**2011** [12] - 1:11, 7:14, 7:17, 7:23, 7:24, 8:10, 8:15, 67:13, 67:14, 82:8, 82:18, 97:22
**2012** [1] - 80:21
**202** [1] - 87:8
**20th** [7] - 21:8, 21:19, 24:8, 87:2, 87:14, 88:14, 89:8
**21** [4] - 21:5, 67:10, 88:4, 91:8
**21st** [7] - 21:21, 22:7, 90:22, 91:11, 91:12, 91:21, 93:23
**22** [1] - 8:9
**22nd** [1] - 8:12
**2396** [2] - 56:13, 56:14
**23rd** [1] - 9:13
**25** [3] - 19:3, 67:18, 77:14
**26,811** [2] - 50:2, 52:1
**272** [1] - 88:15
**28** [2] - 71:17, 97:22
**28th** [2] - 9:17, 82:9
**29th** [2] - 9:20, 72:21

## 3

**3** [9] - 11:11, 11:17, 12:6, 20:20, 21:15, 21:23, 88:6, 93:12
**3.2** [1] - 16:7
**3.3** [1] - 18:24
**3.7** [1] - 16:13
**30** [6] - 7:14, 8:15, 12:20, 16:12, 80:1, 90:4
**300** [1] - 55:25
**30th** [3] - 7:17, 8:12, 9:25
**31st** [1] - 82:10
**32** [1] - 16:12
**39** [1] - 35:25

## 4

**4** [3] - 85:18, 88:6, 90:3
**4.0** [1] - 12:21
**400** [1] - 55:25
**43** [1] - 90:4
**441,000** [1] - 36:1

## 5

**5** [2] - 88:6, 90:24
**5.5** [5] - 12:3, 12:7, 12:22, 17:16
**5/21/03** [2] - 86:6, 86:7
**50** [2] - 19:3, 30:10
**500** [4] - 67:19, 75:4, 75:10, 77:9
**52** [1] - 18:18
**53** [1] - 45:23
**557** [1] - 97:21
**57** [1] - 30:24

## 6

**6.1** [2] - 12:21, 59:7
**62** [1] - 67:19
**64** [1] - 21:4
**65** [1] - 24:3

## 7

**7** [8] - 12:22, 88:19, 89:1, 90:8, 90:21, 90:23, 92:12
**7.0** [4] - 12:7, 93:4, 93:7, 93:13
**7.5** [5] - 12:3, 12:22, 17:16, 45:9, 93:19
**73** [1] - 25:10
**79** [1] - 25:24
**7th** [1] - 9:9

## 8

**8** [4] - 85:2, 87:17, 88:19, 89:18
**866** [23] - 11:9, 11:17, 12:25, 15:20, 16:2, 16:15, 16:24, 17:5, 17:14, 17:17, 17:25, 19:18, 19:25, 20:19, 20:20, 24:18, 24:23, 25:3, 26:1, 26:2, 26:3, 26:11,

26:24
**880** [1] - 56:2
**8th** [3] - 67:13, 67:18, 67:20

## 9

**90** [1] - 30:15
**94** [1] - 56:12
**95** [3] - 16:8, 16:13, 56:12

## A

**abandoned** [1] - 77:10
**Abbott** [13] - 20:11, 48:16, 48:17, 48:18, 50:13, 61:16, 62:6, 62:7, 62:8, 62:9, 62:14, 73:11
**ability** [3] - 33:13, 50:7, 82:24
**able** [15] - 3:20, 19:11, 19:22, 33:18, 35:8, 37:14, 42:6, 70:14, 71:15, 79:4, 80:2, 83:3, 94:11, 94:12, 94:20
**abolishes** [1] - 27:7
**absence** [1] - 36:11
**absolutely** [1] - 23:15
**acceptable** [1] - 34:17
**access** [4] - 34:6, 37:1, 37:2, 55:7
**accompanying** [1] - 90:1
**according** [4] - 36:10, 46:1, 72:3, 82:7
**account** [2] - 15:21, 80:22
**accounted** [2] - 33:6, 36:2
**accounting** [1] - 66:18
**accumulation** [1] - 14:20
**accuracy** [2] - 31:5, 46:23
**accurate** [9] - 12:13, 46:21, 53:2, 59:15, 59:17, 60:13, 63:18, 97:8
**achieved** [1] - 13:21
**acknowledged** [4] - 11:16, 24:7, 57:24,

90:4
**acknowledges** [1] - 88:11
**acquired** [1] - 82:4
**Act** [1] - 47:9
**acted** [1] - 17:10
**ACTION** [1] - 1:5
**action** [2] - 21:6, 97:13, 97:15
**Action** [4] - 24:4, 26:6, 26:7, 26:8
**actions** [1] - 45:10
**active** [7] - 48:14, 48:18, 61:16, 62:8, 62:12, 62:15
**activity** [1] - 34:7
**actual** [4] - 14:18, 49:21, 56:12, 83:19
**add** [4] - 33:13, 44:8, 83:6, 94:2
**added** [2] - 20:5, 55:19
**additional** [2] - 32:1, 32:2
**address** [9] - 7:8, 13:8, 20:18, 22:24, 43:4, 53:7, 58:20, 63:14, 84:14
**addressed** [2] - 27:3, 79:13
**addresses** [2] - 11:18, 44:24
**adeptly** [1] - 71:16
**adhered** [1] - 59:17
**administered** [5] - 12:17, 12:19, 14:4, 48:8, 48:9
**administration** [3] - 12:3, 15:1, 85:25
**administrative** [3] - 50:23, 92:19, 92:20
**admission** [4] - 52:17, 52:20, 58:8, 59:7
**admits** [2] - 24:18, 31:15
**admitted** [1] - 14:23
**adopt** [1] - 90:3
**affect** [4] - 43:16, 68:7, 73:6
**affected** [1] - 71:2
**affecting** [1] - 82:24
**affirmed** [1] - 65:13
**afraid** [1] - 93:22
**afternoon** [2] - 17:8, 95:6
**afterwards** [1] - 5:20
**agency** [1] - 22:14
**ago** [2] - 59:22, 69:14

**agree** [6] - 6:3, 53:25, 66:25, 67:8, 77:16, 81:18

**agreed** [4] - 10:14, 78:1, 88:19, 88:20

**Agreement** [8] - 8:13, 10:2, 10:12, 10:15, 29:13, 37:8, 78:16, 95:10

**agreement** [7] - 7:15, 7:16, 7:18, 31:14, 72:24, 72:25, 77:25

**agreements** [1] - 32:19

**agrees** [1] - 81:19

**ahead** [1] - 47:25

**AL** [2] - 1:4, 1:7

**allegations** [1] - 59:13

**alleged** [3] - 36:5, 36:19, 64:11

**allotment** [1] - 5:12

**allow** [5] - 18:12, 31:17, 47:6, 92:7, 92:16

**Allowability** [3] - 89:6, 89:25, 91:23

**allowable** [6] - 23:4, 23:13, 24:2, 24:22, 45:10, 90:2

**allowance** [4] - 24:7, 89:3, 89:23, 90:12

**Allowance** [8] - 21:13, 22:7, 23:1, 24:14, 90:5, 90:17, 91:20, 92:2

**allowed** [21] - 20:20, 21:12, 21:20, 22:5, 22:10, 22:18, 23:17, 24:5, 24:11, 24:13, 24:16, 45:7, 76:18, 76:19, 76:21, 77:1, 77:2, 89:5, 90:12, 91:22, 93:19

**allows** [3] - 15:6, 21:14, 61:4

**almost** [7] - 11:2, 13:5, 30:25, 35:12, 56:5, 56:17, 60:9

**alone** [2] - 11:22, 35:24

**alter** [1] - 3:22

**alternative** [1] - 40:10

**altogether** [1] - 34:12

**Altona** - 65:12

**amended** [1] - 91:21

**Amendment** [7] - 85:17, 85:20, 85:23,

85:25, 88:3, 89:9, 91:7

**amendment** [3] - 90:22, 91:11, 91:13

**amount** [7] - 14:3, 28:22, 43:1, 58:15, 58:22, 70:7, 91:10

**anagrams** [5] - 55:11, 55:12, 55:14, 55:24, 56:3

**analysis** [4] - 27:2, 27:25, 33:16, 36:18

**analyzing** [1] - 28:9

**AND265** [1] - 91:16

**ANDA** [6] - 15:12, 16:11, 18:2, 18:4, 49:5

**Andrx** [9] - 11:20, 31:7, 31:10, 31:15, 43:16, 66:16, 75:2, 85:10, 87:8

**Andrx's** [1] - 32:8

**annual** [5] - 9:15, 10:4, 82:8, 82:16

**answer** [8] - 38:17, 38:23, 39:3, 50:11, 52:14, 53:21, 74:10, 74:12

**Anthony** [1] - 5:6

**anyway** [1] - 22:5

**Apotex** [1] - 72:3

**appeal** [1] - 80:22

**appear** [1] - 26:1

**appearance** [1] - 5:9

**appearances** [1] - 4:4

**appearing** [1] - 64:24

**applicant** [5] - 21:21, 85:21, 86:25, 87:17, 90:16

**Applicant's** [1] - 90:1

**applicants** [4] - 24:9, 24:11, 88:21, 90:18

**Applicants** [1] - 90:10

**application** [3] - 25:11, 72:23, 89:24

**applied** [3] - 6:15, 13:10, 54:24

**applies** [2] - 13:21, 20:7

**apply** [3] - 10:19, 16:10, 20:10

**appointed** [1] - 80:18

**appreciate** [6] - 20:22, 43:5, 43:8, 85:9, 95:9, 95:18

**approach** [1] - 64:17

**appropriate** [11] - 42:24, 42:25, 43:10,

44:6, 50:18, 74:15, 94:8, 94:9, 94:14, 94:18

**approval** [5] - 11:20, 52:10, 60:21, 72:21, 80:1

**approve** [6] - 51:10, 51:12, 51:14, 51:16, 60:20, 62:4

**approved** [22] - 11:14, 12:8, 12:15, 14:24, 15:2, 15:13, 17:19, 19:13, 45:24, 46:2, 47:15, 49:9, 49:10, 49:11, 50:22, 56:21, 60:25, 61:25, 62:3, 76:7, 94:11

**April** [1] - 67:13

**argue** [3] - 13:15, 29:7, 94:12

**argued** [4] - 36:7, 68:1, 73:2, 94:3

**argues** [1] - 13:20

**arguing** [1] - 59:3

**argument** [26] - 10:8, 11:2, 13:9, 13:18, 13:22, 14:2, 14:8, 14:14, 14:22, 14:23, 19:2, 20:18, 23:22, 26:12, 36:9, 36:11, 45:8, 46:9, 46:19, 52:12, 69:19, 73:4, 93:7, 94:1, 94:14, 94:16

**arguments** [4] - 13:14, 14:6, 77:11, 96:20

**arithmetic** [1] - 16:5

**arose** [1] - 59:13

**arrangements** [1] - 41:16

**ARSHT** [1] - 1:15

**Arsht** [1] - 4:8

**art** [35] - 11:3, 20:3, 21:7, 21:12, 21:14, 21:21, 21:25, 22:10, 22:11, 22:17, 22:18, 23:14, 24:1, 24:6, 24:9, 24:13, 24:14, 24:22, 25:5, 25:10, 25:13, 25:16, 25:18, 25:20, 25:22, 25:25, 26:19, 53:15, 53:21, 84:7, 84:12, 84:16, 87:16, 88:18

**article** [1] - 9:19

**articles** [2] - 8:7, 9:16

**aside** [3] - 69:24, 70:5, 73:19

**aspect** [1] - 69:21

**asserted** [3] - 11:9, 13:5, 69:11

**assertion** [1] - 56:16

**assess** [1] - 32:12

**assets** [1] - 65:17

**associated** [1] - 14:16

**assume** [9] - 22:15, 39:24, 52:4, 52:6, 60:14, 60:15, 68:18, 69:21, 81:2

**assuming** [1] - 69:20

**assurance** [1] - 70:20

**attacks** [1] - 75:1

**attempt** [5] - 21:17, 21:22, 23:2, 32:4

**attempted** [1] - 24:11

**attempts** [1] - 11:21

**attention** [1] - 28:14

**attorney** [9] - 45:5, 76:22, 87:4, 90:1, 92:7, 92:8, 92:16, 97:12, 97:14

**attorneys** [1] - 6:2

**ATTORNEYS** [9] - 1:16, 1:19, 1:21, 1:23, 1:25, 2:2, 2:4, 2:8, 2:10

**AUC** [5] - 48:11, 49:2, 49:3, 50:2, 52:1

**August** [4] - 8:19, 8:25, 9:5, 66:16

**authority** [3] - 22:20, 22:21

**authorized** [5] - 31:8, 31:11, 31:12, 32:8, 43:15

**available** [6] - 40:8, 40:11, 41:18, 74:24, 77:7, 83:22

**avoid** [2] - 25:13, 47:10

**awarded** [1] - 68:25

**aware** [4] - 5:11, 10:19, 68:24, 82:14

---

**B**

---

**backing** [1] - 82:7, 82:13

**backs** [1] - 82:1

**backup** [1] - 77:13

**bad** [1] - 32:21

**balance** [5] - 6:17, 27:24, 27:25, 35:19, 69:7

**balanced** [1] - 77:6

**balancing** [1] - 36:17

**base** [1] - 79:11

**based** [22] - 7:20, 10:15, 11:2, 15:7, 17:19, 17:21, 19:12, 24:12, 24:13, 24:14, 33:9, 33:15, 34:2, 34:14, 35:2, 43:21, 56:7, 65:25, 70:21, 79:9, 81:7, 92:18

**bash** [1] - 41:9

**bashing** [1] - 34:13

**basic** [2] - 14:9, 18:10

**basis** [2] - 43:24, 70:25

**BASSETT** [53] - 1:17, 3:4, 3:12, 3:24, 5:16, 5:21, 6:13, 6:23, 7:1, 7:6, 8:3, 8:9, 11:11, 20:23, 21:1, 21:18, 22:24, 23:18, 23:21, 27:22, 27:24, 28:2, 29:10, 29:19, 29:23, 30:3, 30:5, 30:9, 37:19, 37:22, 38:1, 38:5, 38:7, 38:10, 38:14, 38:21, 40:5, 40:25, 41:3, 42:10, 42:12, 42:16, 43:6, 43:8, 44:5, 44:9, 44:11, 92:25, 94:25, 95:9, 95:18, 95:25, 96:5

**Bassett** [3] - 4:9, 67:24, 96:16

**Bay** [1] - 27:7

**BAYARD** [1] - 2:3

**Bayard** [1] - 4:25

**bears** [1] - 20:4

**became** [1] - 82:4

**becomes** [2] - 5:13, 48:15

**beforehand** [1] - 42:18

**began** [1] - 7:21

**beginning** [3] - 6:18, 85:9, 95:2

**behalf** [3] - 4:13, 4:19, 64:24

**behave** [1] - 17:15

**behind** [4] - 24:20, 74:12, 87:24, 89:16

**believes** [2] - 42:23, 50:11

**below** [1] - 90:6

**best** [1] - 82:23

**BETH** [1] - 2:6

**Beth** [2] - 5:3, 64:23

**better** [2] - 56:20,

76:19

**between** [17] - 14:14, 14:25, 16:13, 19:17, 21:19, 37:8, 48:16, 49:21, 50:5, 51:22, 51:23, 53:14, 53:20, 66:13, 73:1, 74:8, 78:11

**big** [1] - 42:11

**bigger** [2] - 45:13, 46:1

**binder** [10] - 44:22, 44:24, 45:13, 50:16, 55:22, 60:18, 67:10, 78:6, 84:4, 85:8

**binders** [3] - 44:20, 64:21

**bioequivalent** [9] - 45:20, 45:21, 45:22, 48:20, 48:22, 49:23, 61:18, 62:16, 63:10

**bit** [7] - 5:25, 11:12, 59:9, 61:6, 69:25, 71:11, 78:8

**bizarre** [2] - 61:7, 61:10

**blame** [2] - 34:22, 34:23

**blew** [1] - 93:22

**blood** [2] - 55:8, 57:13

**body** [1] - 58:18

**body's** [1] - 14:18

**bond** [15] - 42:8, 42:17, 42:24, 43:10, 43:18, 43:19, 73:14, 79:5, 79:11, 79:13, 79:21, 81:2, 81:7, 81:9, 95:21

**bones** [1] - 43:20

**booklet** [1] - 86:6

**Bosch** [1] - 27:3

**Boston** [1] - 28:18

**bother** [1] - 76:5

**bothered** [2] - 83:12, 83:14

**bottom** [4] - 21:10, 22:8, 85:22, 91:23

**bounce** [2] - 71:24, 71:25

**bound** [1] - 64:20

**Brady** [1] - 4:16

**brand** [22] - 5:24, 32:3, 32:13, 35:7, 42:1, 46:23, 47:13, 49:6, 50:5, 51:24, 53:1, 53:2, 60:24, 61:6, 61:13, 61:19, 62:3, 65:20, 70:25, 73:4, 78:13

**brand's** [2] - 49:11, 73:8

**brands** [2] - 49:22, 68:5

**breakfast** [9] - 17:7, 46:9, 46:10, 53:14, 53:17, 54:9, 57:9, 57:18, 86:3

**brief** [6] - 7:8, 18:10, 25:17, 27:4, 43:7, 54:10

**briefs** [2] - 8:5, 77:13

**bring** [2] - 29:17, 38:22

**bringing** [1] - 7:9

**brings** [1] - 10:13

**Bristol** [1] - 84:25

**brought** [6] - 28:5, 37:14, 39:5, 39:15, 53:11, 72:23

**build** [1] - 41:12

**burden** [6] - 11:1, 20:5, 25:2, 25:12, 54:7, 72:16

**burdensome** [1] - 39:8

**burdensomeness** [1] - 73:19

**business** [5] - 28:10, 33:11, 34:3, 35:21, 41:5

**buy** [3] - 34:17, 41:14, 69:17

**buying** [1] - 47:4

**BY** [9] - 1:15, 1:17, 1:21, 1:23, 1:25, 2:2, 2:4, 2:6, 2:9

# C

**C.O.O** [1] - 29:4

**C.S.R** [2] - 97:5, 97:20

**calculable** [1] - 31:3

**calculated** [1] - 36:14

**calories** [1] - 18:7

**Camden** [2] - 1:10, 6:6

**cancel** [3] - 21:22, 23:2, 24:11

**cancelled** [4] - 88:6, 88:24, 89:6, 90:3

**cannot** [7] - 17:24, 17:25, 19:7, 26:18, 31:5, 33:19, 94:8

**captures** [1] - 30:15

**Carl** [2] - 2:11, 97:5

**CARL** [1] - 97:20

**cartons** [1] - 39:16

**case** [66] - 5:13, 5:15, 6:3, 6:7, 6:8, 16:23, 20:11, 28:12, 30:18, 31:13, 35:11, 36:18, 48:16, 48:17, 49:25, 50:13, 51:22, 52:19, 52:21, 54:8, 57:22, 61:1, 61:16, 62:6, 63:14, 63:17, 65:11, 65:12, 65:15, 65:24, 66:4, 68:5, 68:8, 71:21, 71:23, 71:25, 72:3, 72:4, 72:5, 72:6, 72:12, 72:14, 72:17, 72:20, 72:25, 73:2, 73:3, 73:11, 73:12, 73:14, 73:18, 76:3, 76:13, 77:7, 80:4, 80:7, 80:11, 83:21, 83:22, 84:10, 84:12, 91:8, 92:21

**cases** [19] - 5:23, 20:9, 46:17, 59:10, 59:12, 63:12, 65:11, 65:15, 66:10, 66:23, 68:25, 71:22, 72:13, 77:18, 77:22, 83:18, 83:19

**cash** [1] - 34:3

**cast** [1] - 5:1

**causes** [1] - 65:3

**centers** [2] - 39:11, 41:14

**certain** [3] - 18:9, 90:2, 90:3

**certainly** [8] - 3:21, 29:22, 33:2, 35:14, 39:9, 41:13, 54:7, 60:9

**certainty** [1] - 19:7

**Certificate** [1] - 97:21

**Certified** [1] - 97:6

**certify** [2] - 97:7, 97:11

**CFR** [1] - 15:5

**chain** [4] - 72:15, 74:4, 86:1, 86:2

**challenges** [1] - 20:16

**challenging** [1] - 52:10

**chambers** [1] - 83:4

**chance** [2] - 16:9, 96:5

**chances** [1] - 80:20

**change** [18] - 14:17, 15:9, 16:24, 22:20,

22:21, 22:23, 48:8, 50:8, 50:15, 50:19, 53:15, 59:18, 60:20, 63:13, 84:11, 86:11, 90:23, 92:8

**changed** [13] - 45:6, 48:4, 48:7, 53:18, 84:9, 85:3, 88:7, 89:10, 90:22, 90:24, 90:25, 91:13, 91:14

**changes** [4] - 50:18, 52:24, 52:25, 61:20

**characters** [1] - 5:1

**charge** [1] - 31:24

**chart** [2] - 16:22, 67:16

**cheaply** [1] - 40:6

**Cheng** [6] - 25:21, 26:2, 26:4, 26:7, 84:16

**chief** [1] - 33:21

**choice** [2] - 15:3, 40:9

**chose** [3] - 18:21, 27:18, 94:19

**Christopher** [2] - 4:9, 28:16

**CHRISTOPHER** [1] - 1:18

**chronology** [2] - 21:4, 72:20

**Circuit** [15] - 12:12, 13:2, 13:13, 20:5, 20:7, 20:9, 25:9, 27:3, 27:5, 36:17, 50:12, 65:13, 72:9, 72:13, 84:19

**circumstances** [1] - 66:2

**cite** [2] - 19:1, 66:23

**cited** [9] - 21:7, 25:16, 46:17, 50:15, 63:12, 65:11, 65:13, 65:16

**cites** [1] - 83:18

**CIVIL** [1] - 1:5

**Claim** [19] - 11:16, 11:17, 11:24, 20:20, 21:15, 21:17, 21:23, 21:24, 22:8, 23:2, 24:5, 24:12, 24:13, 88:6

**claim** [40] - 11:8, 11:10, 11:11, 11:15, 11:23, 11:24, 12:1, 12:6, 12:21, 13:5, 13:6, 13:24, 21:12, 21:14, 22:3, 22:5, 22:10, 23:3, 23:4, 23:11, 23:13, 24:10,

25:10, 26:23, 27:1, 58:8, 58:21, 65:17, 68:16, 78:5, 88:5, 88:23, 90:8, 90:19, 90:24, 93:12, 93:14, 94:11

**claimed** [10] - 12:16, 12:25, 13:16, 15:20, 16:1, 16:15, 16:22, 16:23, 19:17

**claims** [57] - 19:24, 20:19, 21:6, 21:20, 22:5, 22:18, 23:6, 24:1, 24:5, 24:10, 24:15, 24:18, 24:21, 26:6, 36:11, 45:1, 45:6, 45:9, 53:17, 54:3, 64:10, 65:5, 65:14, 76:17, 76:18, 76:20, 76:25, 81:23, 86:3, 86:9, 86:11, 88:4, 88:7, 88:25, 89:5, 89:9, 90:2, 90:3, 90:4, 90:6, 90:7, 90:9, 90:12, 90:20, 90:21, 90:23, 90:24, 91:13, 91:21, 92:2, 92:15, 93:19

**Claims** [2] - 11:11, 88:5

**clear** [14] - 11:1, 19:24, 20:2, 20:10, 20:13, 20:25, 21:2, 24:25, 48:21, 50:19, 54:14, 77:25, 92:1

**clearly** [4] - 12:16, 26:22, 29:3, 83:12

**CLERK** [1] - 3:2

**client** [9] - 32:1, 39:22, 40:15, 41:12, 42:20, 43:4, 43:9, 95:14, 96:9

**client's** [2] - 28:7, 41:11

**Clifford** [1] - 87:3

**close** [2] - 61:1, 70:12

**closer** [1] - 44:5

**closest** [2] - 87:16, 88:18

**Cmax** [5] - 48:11, 49:1, 49:3, 50:3, 61:20

**co** [2] - 32:12, 32:16

**co-pay** [2] - 32:12, 32:16

**coat** [1] - 70:15

**coating** [1] - 70:7

**cocounsel** [1] - 5:3

**Cohen** [1] - 1:9

**colleague** [1] - 5:6
**colleagues** [1] - 5:4
**collect** [2] - 81:7, 81:11
**color** [1] - 55:19
**colorful** [2] - 69:24, 70:8
**colorized** [1] - 55:5
**combined** [1] - 84:21
**coming** [2] - 41:23, 92:8
**commented** [1] - 51:5
**common** [3] - 31:23, 84:22
**communication** [2] - 86:8, 89:7
**companies** [3] - 33:21, 35:22, 69:25
**company** [9] - 8:22, 33:18, 33:22, 33:25, 47:3, 47:6, 53:2, 66:9, 73:4
**compare** [1] - 18:13
**compared** [2] - 12:20, 17:25
**comparison** [3] - 19:5, 36:1, 57:17
**compensate** [1] - 31:19
**compensation** [1] - 31:19
**compete** [1] - 32:8
**competing** [1] - 68:20
**competition** [4] - 67:8, 67:15, 78:5, 82:20
**complaint** [1] - 71:5
**complete** [1] - 80:14
**completely** [1] - 48:7
**completeness** [2] - 86:16, 89:16
**complex** [1] - 95:6
**component** [1] - 33:10
**compulsion** [1] - 75:9
**conceded** [2] - 67:5
**concedes** [1] - 31:2
**concentration** [3] - 12:2, 14:17, 55:8
**concern** [3] - 58:21, 60:10, 71:4
**concluded** [3] - 46:4, 56:21, 96:22
**conclusion** [2] - 57:15, 73:24
**condition** [1] - 12:10
**conduct** [1] - 36:22

**conducted** [5] - 17:13, 18:5, 58:5, 88:13, 89:8
**confer** [1] - 96:9
**confirms** [1] - 12:23
**Confoy** [1] - 5:7
**CONFOY** [2] - 2:9
**Congress** [1] - 47:10
**conjecture** [1] - 33:19
**consider** [2] - 20:9, 44:6, 88:20
**consideration** [1] - 71:1
**considered** [15] - 11:3, 20:4, 22:10, 25:23, 26:1, 26:20, 28:9, 36:17, 54:23, 62:9, 63:19, 66:11, 66:24, 80:23, 88:18
**consistently** [1] - 61:18
**Constitution** [2] - 75:24, 76:9
**construction** [4] - 12:6, 13:24, 14:5, 61:3
**construed** [1] - 58:12
**consult** [1] - 43:9
**consumers** [2] - 35:4, 35:9
**contain** [1] - 49:3
**contained** [2] - 15:16, 62:13
**contemporaneous** [1] - 45:10
**contention** [1] - 26:14
**contentions** [1] - 25:16
**contents** [3] - 45:2, 85:10, 85:17
**context** [2] - 12:5, 28:15
**continually** [1] - 30:17
**continue** [8] - 36:3, 40:2, 40:20, 42:6, 53:8, 64:7, 68:14, 68:18
**continues** [4] - 75:20, 90:6, 93:25, 94:3
**contractual** [1] - 8:24
**contractually** [3] - 8:18, 8:25, 31:8
**contracturally** [1] - 9:12

**contradicts** [3] - 14:2, 14:9, 14:24
**contrary** [7] - 13:24, 14:1, 28:25, 33:19, 57:1, 59:5, 82:1
**contrast** [1] - 45:24
**control** [3] - 9:2, 34:14, 70:18
**convention** [1] - 54:23
**conversation** [1] - 95:14
**convince** [1] - 81:21
**convinced** [3] - 21:11, 22:19, 24:10
**convincing** [5] - 11:1, 19:24, 20:2, 20:10, 20:14
**convoluted** [1] - 21:5
**copied** [3] - 46:23, 94:4, 94:7
**copies** [4] - 6:24, 15:7, 28:7, 85:10
**copy** [12] - 12:9, 15:14, 16:19, 17:6, 17:10, 32:1, 48:3, 48:21, 53:1, 91:7, 94:4, 94:5
**copying** [1] - 16:16
**corner** [2] - 38:20, 39:7
**correct** [10] - 11:10, 23:8, 39:8, 49:2, 63:15, 76:5, 76:23, 76:24, 82:12, 93:10
**corrected** [4] - 23:2, 82:15, 89:19, 93:12
**correcting** [1] - 82:15
**corrective** [1] - 89:21
**cost** [5] - 28:7, 28:22, 30:23, 31:23, 32:1
**counsel** [12] - 4:4, 4:14, 44:13, 45:16, 58:17, 58:23, 61:23, 63:17, 74:10, 95:20, 97:12, 97:14
**Count** [1] - 11:11
**countenance** [1] - 94:16
**countervailing** [1] - 76:10
**country** [2] - 10:5, 28:6
**counts** [1] - 79:14
**couple** [6] - 7:19, 8:6, 29:9, 46:12, 72:22, 89:24
**course** [7] - 7:24,

19:1, 19:19, 48:10, 53:5, 67:11, 95:23
**COURT** [124] - 1:1, 3:2, 3:3, 3:10, 3:13, 4:3, 4:11, 4:17, 4:23, 5:8, 5:19, 5:22, 6:14, 6:25, 7:3, 8:1, 8:8, 11:10, 20:22, 20:25, 21:16, 22:19, 23:16, 23:20, 27:21, 27:23, 28:1, 29:8, 29:18, 29:20, 29:25, 37:17, 37:20, 37:23, 38:3, 38:6, 38:8, 38:11, 38:18, 39:22, 40:19, 41:2, 42:8, 42:11, 42:13, 43:3, 44:2, 44:7, 44:10, 44:12, 44:18, 44:21, 45:14, 47:18, 48:5, 48:23, 49:12, 49:17, 49:24, 50:7, 50:10, 50:25, 51:8, 51:12, 51:16, 51:20, 52:4, 52:10, 53:5, 57:6, 58:2, 62:18, 62:22, 62:24, 63:2, 63:5, 64:9, 64:14, 64:16, 64:18, 64:22, 65:5, 66:25, 67:7, 67:21, 69:9, 70:2, 71:12, 73:23, 74:9, 75:22, 76:12, 77:16, 79:4, 79:7, 79:12, 79:17, 79:23, 80:6, 80:9, 81:8, 81:12, 81:18, 81:21, 83:1, 83:6, 83:10, 83:14, 83:16, 85:19, 86:23, 87:10, 88:1, 90:14, 91:2, 92:23, 94:24, 95:1, 95:17, 95:19, 96:1, 96:11, 96:17, 96:19
**Court** [75] - 2:12, 4:1, 9:9, 10:10, 10:18, 14:3, 15:15, 17:20, 19:14, 20:9, 23:6, 23:10, 25:7, 26:12, 27:13, 30:21, 31:12, 34:9, 36:6, 36:7, 37:18, 37:21, 39:4, 42:19, 42:23, 43:18, 44:19, 45:3, 45:12, 48:18, 52:25, 53:4, 57:3, 58:11, 58:13, 58:19, 59:4, 59:12, 59:15, 59:17, 61:8, 61:15, 62:8, 62:9, 63:17, 63:19, 63:20, 65:14, 65:24, 66:6, 68:24, 69:13, 70:10,

72:23, 73:14, 74:17, 76:6, 77:12, 78:7, 78:20, 80:4, 83:4, 83:19, 84:5, 84:10, 84:21, 93:10, 94:1, 94:12, 94:15, 95:12, 95:16, 97:5
**court** [3] - 3:1, 8:22, 66:9
**Court's** [11] - 13:24, 14:2, 14:5, 24:19, 27:25, 28:14, 44:14, 44:24, 58:20, 59:2, 84:14
**courtesies** [1] - 88:11
**Courthouse** [1] - 1:9
**courtroom** [1] - 69:6
**Courts** [4] - 23:7, 28:9, 37:3, 65:12
**courts** [2] - 36:25, 71:20
**covered** [2] - 54:18, 58:4
**covers** [2] - 16:14, 16:23
**covert** [2] - 9:22, 10:5
**crater** [1] - 41:7
**create** [1] - 22:2
**created** [1] - 34:20
**creates** [2] - 24:22, 24:23
**credentials** [1] - 56:7
**Crestor** [2] - 82:3
**criminal** [1] - 95:6
**critical** [2] - 73:9, 79:12
**criticisms** [2] - 56:19, 57:4
**CSR** [3] - 2:11, 2:12, 97:19
**cumulative** [1] - 25:19
**current** [1] - 37:8
**curve** [2] - 16:18, 16:19
**customer** [2] - 36:20, 37:24
**customers** [17] - 34:11, 34:17, 35:17, 36:8, 36:10, 38:15, 38:16, 38:25, 39:9, 39:10, 39:24, 41:13, 41:23, 68:16, 68:17, 75:10, 78:17
**cut** [1] - 33:17
**CVS** [5] - 38:19, 39:7, 47:2, 47:3, 49:19

**Cyclobenzaprine** [1] - 72:6

# D

**Dakota** [1] - 39:17
**damaged** [1] - 35:3
**damages** [7] - 64:10, 68:25, 69:2, 81:5, 81:6, 81:10, 82:23
**dare** [1] - 3:13
**data** [27] - 15:23, 46:23, 48:9, 48:10, 50:21, 50:22, 51:25, 52:3, 55:15, 55:18, 55:21, 56:11, 56:12, 56:22, 57:16, 57:24, 57:25, 59:8, 63:25, 64:2, 67:17, 70:21, 73:24, 83:20, 83:21, 83:22
**Date** [1] - 97:22
**date** [7] - 10:13, 10:14, 86:5, 87:1, 87:13, 89:17, 97:9
**dated** [9] - 8:9, 85:18, 86:7, 86:21, 88:4, 89:18, 90:17, 91:11, 91:20
**David** [2] - 4:8, 4:9
**DAVID** [2] - 1:17, 1:18
**Davidson** [3] - 87:3, 87:13, 89:21
**days** [6] - 7:19, 9:17, 10:7, 72:8, 72:22, 90:16
**deadline** [3] - 21:25, 88:23, 93:22
**dealing** [1] - 53:6
**debate** [1] - 20:6
**December** [12] - 1:11, 7:22, 21:13, 21:20, 22:12, 24:4, 76:21, 89:4, 89:24, 90:18, 93:19, 97:22
**decide** [3] - 6:9, 61:10, 95:16
**decided** [2] - 45:9, 73:3
**decides** [1] - 78:21
**decision** [8] - 41:22, 72:4, 79:19, 82:5, 84:1, 84:10, 84:21, 95:3
**declaration** [20] - 14:9, 14:13, 15:15, 15:17, 17:3, 18:11, 28:15, 28:20, 29:4,

33:4, 33:14, 33:23, 34:8, 42:14, 46:4, 52:8, 78:15, 79:8, 79:9, 80:23
**declarations** [3] - 28:13, 33:9, 80:16
**declared** [1] - 12:12
**decline** [2] - 77:14, 77:15
**declining** [4] - 74:14, 75:14, 81:16, 81:19
**decrease** [1] - 68:3
**dedicated** [1] - 32:17
**deduce** [1] - 84:5
**defeat** [1] - 26:13
**defendant** [1] - 20:12
**DEFENDANTS** [5] - 1:25, 2:2, 2:4, 2:8, 2:10
**defendants** [4] - 4:20, 4:25, 6:19, 64:24
**Defendants** [1] - 1:8
**defended** [1] - 61:9
**defense** [2] - 44:13, 83:25
**deference** [3] - 22:15, 50:6, 61:2
**defines** [1] - 13:4
**definitely** [1] - 69:1
**definition** [2] - 14:7, 58:14
**Delaware** [9] - 4:8, 5:11, 5:13, 5:14, 5:23, 6:1, 72:7, 96:4
**DELAWARE** [1] - 1:2
**delay** [2] - 27:17, 72:18
**delayed** [2] - 7:9, 10:8
**delivered** [2] - 10:1, 10:5
**deliveries** [1] - 10:6
**demonstrates** [1] - 15:23
**demonstrating** [1] - 19:22
**department** [1] - 65:17
**Department** [2] - 14:11, 92:1
**depicted** [1] - 56:13
**DEPUTY** [1] - 3:2
**describe** [1] - 88:14
**described** [2] - 17:17, 51:22
**describes** [2] - 12:9, 58:5
**description** [1] - 87:14

**designed** [2] - 47:9, 60:7
**despite** [9] - 8:24, 8:25, 9:11, 11:20, 31:4, 33:18, 68:19, 80:15
**detail** [1] - 38:24
**detailed** [2] - 15:15, 38:17
**detailing** [1] - 15:15
**determination** [2] - 50:6, 50:23
**determine** [3] - 23:6, 69:2, 85:14
**determined** [7] - 22:11, 22:18, 23:13, 24:1, 50:4, 69:2, 90:1
**determining** [2] - 60:25, 84:20
**developed** [1] - 58:25
**development** [5] - 29:2, 33:5, 33:8, 33:12, 35:7
**deviated** [1] - 17:4
**deviation** [7] - 15:21, 16:3, 16:7, 45:24, 46:1, 56:20
**deviations** [1] - 16:10
**difference** [11] - 15:9, 27:21, 27:23, 49:21, 53:20, 55:21, 60:5, 60:8, 60:25, 84:8
**differences** [12] - 15:7, 49:8, 49:10, 49:21, 50:4, 50:24, 51:4, 51:22, 52:7, 60:6, 60:11
**different** [19] - 18:7, 18:22, 30:19, 34:7, 34:12, 34:24, 35:22, 42:13, 46:15, 47:5, 49:1, 49:6, 51:3, 59:11, 60:19, 78:9, 79:10, 80:24, 85:6
**differently** [2] - 47:21, 64:1
**difficult** [2] - 19:6, 39:20
**dinner** [19] - 12:4, 12:5, 45:17, 45:25, 46:2, 46:11, 53:14, 53:18, 53:25, 54:2, 54:4, 54:5, 56:19, 56:22, 56:23, 57:10, 57:16, 64:6, 85:25
**direct** [2] - 28:14, 38:19

**directed** [1] - 49:18
**direction** [1] - 27:10
**directly** [4] - 7:10, 11:18, 38:2, 59:5
**disappointed** [1] - 42:4
**disappointment** [1] - 83:3
**discloses** [1] - 53:15
**disclosure** [1] - 86:16
**discounts** [2] - 32:2, 32:6
**discovered** [1] - 29:11
**discovery** [9] - 7:21, 9:4, 29:15, 38:24, 39:2, 39:21, 78:8, 80:13, 80:17
**discuss** [7] - 4:1, 5:10, 42:25, 64:24, 79:18, 83:9, 96:6
**discussed** [9] - 24:9, 26:2, 26:3, 27:17, 37:6, 71:23, 74:25, 79:17, 95:14
**discussing** [1] - 79:15
**discussion** [1] - 73:12
**discussions** [3] - 3:15, 3:25, 12:4
**disproves** [1] - 56:16
**dispute** [12] - 13:6, 15:25, 16:22, 17:16, 35:20, 48:2, 84:7, 93:4, 93:13, 93:15, 93:18
**disregarded** [1] - 36:12
**dissatisfied** [1] - 34:11
**distance** [6] - 54:25, 55:10, 55:12, 55:13, 55:24, 55:25
**distinction** [3] - 14:25, 48:15, 53:14
**distinguish** [1] - 86:1
**distort** [1] - 65:23
**distributes** [1] - 41:20
**distribution** [4] - 39:10, 41:14, 72:15, 74:4
**distributor** [2] - 72:22, 73:2
**distributors** [1] - 38:3
**DISTRICT** [3] - 1:1, 1:2, 1:12

**District** [6] - 23:7, 52:21, 59:12, 59:15, 65:13, 72:7
**divergence** [1] - 19:8
**divergent** [1] - 19:8
**divide** [1] - 44:15
**doctor** [6] - 17:2, 28:17, 46:25, 47:3, 47:4, 49:20
**Doctor** [21] - 6:22, 14:10, 14:11, 15:15, 17:12, 18:11, 19:4, 28:16, 28:19, 45:16, 46:2, 52:8, 54:5, 56:6, 56:16, 56:18, 56:21, 57:4, 60:4, 60:5, 70:8
**doctors** [2] - 52:4, 52:6, 71:6
**Document** [9] - 56:14, 86:7, 86:14, 86:19, 86:20, 86:25, 87:8, 87:21, 88:3
**document** [14] - 35:2, 45:2, 67:10, 80:13, 85:22, 86:18, 87:23, 89:3, 89:4, 89:14, 89:15, 89:16, 89:17, 89:18
**documents** [10] - 7:20, 34:15, 45:10, 64:20, 69:12, 70:20, 77:13, 85:14, 90:1, 92:20
**dollar** [4] - 43:21, 44:3, 68:22, 68:23
**dollars** [3] - 30:2, 30:12, 30:24
**done** [4] - 67:11, 68:11, 92:10, 92:11
**dosage** [1] - 12:1
**dose** [13] - 13:22, 14:3, 14:7, 14:15, 14:19, 58:10, 58:12, 58:14, 58:15, 59:4, 59:8, 64:3, 64:6
**doses** [1] - 59:4
**dot** [1] - 21:4
**doubt** [7] - 22:16, 23:14, 23:15, 24:4, 24:16, 25:22, 27:15
**DOUGLAS** [1] - 2:6
**Douglas** [1] - 5:3
**down** [3] - 41:23, 47:2, 84:18
**downplay** [1] - 18:15
**dramatically** [1] - 29:24, 74:20
**drastic** [1] - 65:25
**drew** [1] - 54:15
**drilled** [1] - 53:22

drivers [2] - 9:21, 9:22
dropped [4] - 29:23, 30:4, 30:9, 50:13
drug [41] - 12:12, 14:3, 14:17, 14:18, 14:19, 14:20, 37:24, 38:19, 38:20, 39:25, 40:1, 41:5, 47:3, 47:12, 47:13, 48:20, 49:9, 49:10, 49:14, 49:23, 51:3, 51:4, 51:17, 51:23, 51:24, 57:12, 58:15, 58:18, 58:22, 58:24, 60:19, 60:21, 60:22, 60:24, 62:2, 62:4, 62:17, 63:6, 63:9
drugs [6] - 15:7, 37:1, 60:1, 61:24, 63:10, 77:7
due [4] - 31:21, 36:22, 59:24, 60:25
duplicate [1] - 91:7
during [10] - 21:11, 23:9, 25:11, 26:15, 26:21, 44:25, 45:9, 85:15, 88:13, 88:16
duty [2] - 52:25, 59:16
dyskinesia [3] - 59:21, 60:2, 60:10

## E

E-Bay [1] - 27:7
e-mail [3] - 70:9, 71:9, 78:11
e-mails [5] - 9:3, 69:24, 70:4, 78:9
early [5] - 7:22, 7:24, 8:25, 37:10, 43:19
earned [1] - 30:24
earning [2] - 82:9, 82:18
earthquake [2] - 55:3, 55:4
easier [1] - 71:17
easily [2] - 39:15, 70:14
Economic [1] - 28:17
economic [3] - 81:23, 81:25, 82:25
effect [13] - 7:16, 8:15, 29:22, 52:12, 55:15, 56:3, 58:18, 59:21, 60:1, 70:11, 74:6, 74:10
effective [7] - 47:13,

47:14, 60:23, 62:2, 63:13, 73:20, 79:2
effort [2] - 15:1, 86:1
efforts [3] - 33:5, 33:8, 33:12
eight [1] - 55:3
either [6] - 20:17, 22:4, 71:5, 75:6, 92:14, 93:3
elaborate [1] - 11:21
element [6] - 11:13, 11:15, 11:16, 11:17, 11:25, 12:9
elements [3] - 11:25, 28:11, 57:21
Elmo [1] - 53:10
emotions [1] - 59:23
employee [2] - 97:12, 97:13
employees [1] - 66:15
encompass [2] - 58:18, 59:4
encountered [1] - 92:13
encourage [1] - 47:10
end [8] - 20:15, 32:19, 73:13, 78:19, 78:20, 87:23, 90:9, 95:22
ending [1] - 40:15
ends [2] - 13:13, 24:19
enforcement [1] - 36:24
enforcing [4] - 75:23, 75:25, 76:3, 77:5
engaged [1] - 9:10
enjoin [1] - 37:21, 66:6
enjoined [4] - 65:4, 78:2, 78:25, 81:4
enjoining [1] - 78:3
enter [4] - 31:17, 43:18, 91:17, 94:6
entered [3] - 7:14, 8:13, 10:12
enters [2] - 31:24, 32:13
entire [1] - 9:15
entirely [5] - 27:13, 31:3, 31:10, 83:5, 91:25
entitled [9] - 19:25, 22:14, 25:6, 31:9, 42:22, 49:20, 50:6, 62:14, 92:17
entitlement [1] -

24:23
entries [1] - 26:4
entry [1] - 31:15
equal [2] - 43:10, 54:25
equipment [1] - 9:6
eroded [2] - 68:2, 68:8
erosion [4] - 31:22, 65:6, 67:7, 68:13
error [2] - 59:5, 76:17, 93:10
especially [1] - 77:7
Esquire [1] - 88:13
ESQUIRE [15] - 1:15, 1:17, 1:18, 1:18, 1:19, 1:21, 1:23, 1:25, 2:2, 2:4, 2:6, 2:6, 2:7, 2:7, 2:9
essentially [2] - 54:12, 58:16
establish [2] - 13:11, 33:1
established [2] - 27:16, 33:25
establishes [1] - 10:25, 11:22, 46:17
establishing [3] - 20:2, 20:7, 25:12
estimate [1] - 68:23
estimated [1] - 31:5
ET [2] - 1:4, 1:7
evaluate [1] - 94:17
event [1] - 69:23
events [1] - 21:4
evidence [27] - 10:23, 11:2, 11:14, 13:25, 19:12, 19:25, 20:2, 20:10, 20:14, 36:6, 52:15, 52:16, 52:22, 54:6, 57:1, 59:5, 62:10, 63:19, 63:22, 66:11, 66:20, 74:5, 74:16, 81:15, 82:6, 92:19
exact [1] - 51:17
exactly [18] - 24:17, 29:15, 37:17, 37:20, 38:5, 38:7, 45:4, 47:9, 48:14, 49:3, 49:15, 50:2, 50:3, 51:13, 51:20, 52:1, 63:2, 66:11
examine [1] - 23:25
examined [4] - 23:12, 24:16, 25:4, 26:5
examiner [48] - 21:9, 21:10, 21:11, 21:20, 22:4, 22:6, 22:9,

22:12, 22:15, 22:17, 22:25, 23:4, 23:12, 23:25, 24:4, 24:10, 24:21, 25:5, 25:11, 25:14, 25:22, 25:23, 25:25, 26:3, 26:20, 45:6, 45:8, 53:19, 76:7, 84:8, 84:17, 85:5, 87:5, 88:18, 88:19, 88:20, 90:5, 90:10, 90:11, 91:6, 91:17, 92:5, 92:9, 92:16, 93:19, 93:20
Examiner [3] - 76:24, 77:3, 88:12
examiners [1] - 92:22
example [9] - 46:24, 49:19, 55:1, 65:12, 66:7, 84:23, 88:21, 88:25, 90:3
examples [1] - 87:19
except [2] - 12:6, 69:5, 74:5, 75:3, 85:12
exceptional [1] - 73:18
exceptions [2] - 13:8, 13:9
excerpt [1] - 53:18
exchange [1] - 58:19
exclude [1] - 27:14
excludes [2] - 13:20, 14:7
exclusively [1] - 11:3
exclusivity [1] - 36:21
excuse [1] - 83:2
exhibit [1] - 16:13
exist [1] - 75:20
exists [1] - 75:20
expand [1] - 31:16
expect [4] - 8:21, 16:12, 42:16, 49:14
expected [1] - 71:7
expedited [1] - 37:1
expeditiously [1] - 72:19
expenses [1] - 31:25
experience [2] - 43:22, 46:25
experienced [1] - 36:22
expert [11] - 24:7, 24:18, 31:15, 46:3, 56:5, 67:5, 68:4, 80:15, 80:16, 84:23, 92:14
experts [1] - 31:15, 71:23

expired [2] - 21:25, 32:19
expires [4] - 10:16, 37:9, 80:1, 95:11
explained [2] - 16:4, 17:3
explains [1] - 28:19
explanation [2] - 16:24, 66:21
explicit [1] - 48:20
expressed [1] - 54:20
expressly [1] - 54:3
extend [1] - 95:15
extendable [1] - 22:1
extended [6] - 9:15, 12:18, 31:16, 60:6, 88:12, 95:11
extent [11] - 19:14, 33:4, 33:9, 33:14, 35:1, 39:16, 42:23, 61:4, 73:25, 81:23, 93:9
extraordinary [1] - 65:23, 73:18
extremely [1] - 75:6

## F

face [4] - 25:1, 35:14, 67:8, 78:4
faced [2] - 26:17, 42:5
facilities [1] - 39:15
facsimile [1] - 87:25
fact [32] - 10:25, 13:6, 15:8, 16:5, 16:25, 19:17, 20:16, 23:25, 24:6, 24:21, 25:14, 30:19, 43:12, 46:5, 46:15, 48:6, 48:15, 50:19, 51:18, 52:8, 56:8, 60:16, 65:21, 66:10, 68:20, 69:1, 80:12, 80:15, 82:1, 82:17, 91:10, 93:18
factor [2] - 54:25, 66:23
factors [6] - 6:15, 6:17, 17:4, 44:17, 61:20, 65:1
facts [7] - 6:2, 16:11, 59:11, 64:3, 65:11, 66:21
fail [1] - 20:16
fair [4] - 5:19, 11:12, 28:2, 42:21
fairly [1] - 84:20

**faith** [1] - 34:11
**fall** [7] - 15:19, 16:9, 17:16, 19:17, 34:2, 93:6, 93:15
**falls** [3] - 12:16, 16:1, 16:23
**false** [2] - 15:3, 71:8
**familiarity** [1] - 6:2
**far** [1] - 70:13
**fast** [2] - 71:25, 95:4
**fasting** [1] - 12:21
**favor** [1] - 77:20
**fax** [1] - 91:6
**FDA** [45] - 11:14, 11:18, 11:19, 12:8, 12:14, 12:15, 14:24, 15:2, 15:13, 15:19, 15:22, 17:18, 17:20, 18:5, 18:18, 18:20, 18:21, 18:24, 19:13, 19:16, 45:20, 45:24, 46:1, 46:9, 48:10, 49:7, 50:4, 50:7, 50:17, 50:20, 50:25, 51:10, 54:10, 56:20, 57:9, 57:10, 59:17, 60:16, 60:22, 60:25, 61:11, 61:25, 62:2, 94:17
**FDA's** [3] - 52:10, 61:3, 70:17
**Federal** [17] - 12:12, 13:2, 13:12, 20:5, 20:6, 20:9, 25:9, 27:2, 27:5, 36:17, 50:12, 50:16, 60:18, 65:13, 72:9, 72:13, 84:19
**fees** [1] - 31:25
**fell** [1] - 28:6
**feuding** [1] - 70:1
**few** [3] - 9:19, 43:3, 71:22
**field** [1] - 46:3
**fifth** [1] - 35:23
**fighting** [1] - 92:11
**figure** [3] - 68:23, 75:5
**figured** [1] - 80:5
**figures** [1] - 54:15
**file** [1] - 93:2
**filed** [10] - 7:18, 8:16, 10:7, 21:5, 21:22, 23:9, 29:12, 50:14, 68:9, 91:8
**filing** [2] - 22:6, 88:23
**fill** [2] - 40:9, 47:2
**filled** [3] - 30:23, 34:18, 35:25
**filling** [1] - 30:8

**final** [5] - 9:24, 15:1, 72:21, 80:1, 93:1
**finally** [6] - 9:25, 14:23, 17:18, 36:23, 37:5, 45:7
**financial** [1] - 82:18
**financially** [1] - 97:14
**fine** [3] - 44:18, 45:14, 53:5
**Fineman** [1] - 4:13
**FINEMAN** [2] - 1:21, 4:12
**Finger** [1] - 4:13
**FINGER** [1] - 1:20
**firm** [3] - 4:21, 4:25, 47:23
**firms** [1] - 61:18
**First** [1] - 14:1
**first** [32] - 7:17, 8:9, 9:25, 11:6, 11:20, 11:23, 13:15, 13:19, 13:23, 15:12, 15:18, 16:2, 19:13, 20:18, 21:2, 22:24, 24:14, 26:5, 26:15, 27:19, 28:4, 31:7, 44:21, 45:15, 57:23, 65:1, 73:5, 82:3, 85:6, 85:23, 87:24, 92:2
**five** [5] - 44:19, 53:16, 58:9, 85:24, 92:23
**fix** [1] - 93:23
**flawed** [4] - 13:22, 17:23, 18:2, 19:9
**flaws** [3] - 17:13, 18:12, 18:16
**Flekenstein** [10] - 14:10, 14:11, 15:15, 17:2, 17:12, 19:4, 56:6, 56:18, 57:5, 60:4
**Flekenstein's** [2] - 18:11, 56:16
**flood** [1] - 41:6
**flooded** [5] - 28:7, 30:20, 72:1, 72:3, 73:21
**flooding** [1] - 29:5
**flow** [1] - 78:5
**fluctuation** [1] - 35:3
**flushed** [1] - 66:1
**focused** [2] - 11:9, 27:4
**focuses** [1] - 16:4
**focusing** [2] - 11:25, 50:1
**follow** [2] - 27:12, 90:20

**following** [5] - 12:3, 54:5, 85:25, 86:4, 90:19
**food** [3] - 12:17, 12:19, 18:8
**footnote** [3] - 13:19, 50:13, 61:7
**FOR** [10] - 1:2, 1:16, 1:19, 1:21, 1:23, 1:25, 2:2, 2:4, 2:8, 2:10
**force** [3] - 28:11, 32:1, 34:5
**forecasting** [1] - 7:22
**forecasts** [1] - 31:4
**foregoing** [1] - 97:7
**foremost** [1] - 11:20
**forestalled** [1] - 74:16
**form** [2] - 12:1, 87:1
**formal** [1] - 72:25
**formality** [2] - 47:19, 47:23
**formulary** [5] - 29:1, 32:10, 32:11, 32:14, 33:2
**Fortamet** [44] - 12:10, 15:14, 15:25, 16:1, 16:16, 16:17, 16:18, 16:19, 16:23, 16:25, 17:6, 17:7, 17:10, 30:25, 31:17, 32:10, 32:15, 33:6, 33:20, 34:5, 34:11, 34:18, 34:23, 35:21, 36:1, 36:3, 40:10, 46:11, 46:12, 46:16, 48:3, 48:8, 51:25, 52:3, 54:11, 55:20, 56:4, 56:9, 58:1, 62:17, 64:2, 66:15, 69:3
**Fortamet's** [1] - 33:7
**forth** [4] - 16:2, 21:4, 29:5, 97:10
**forward** [4] - 70:14, 82:16, 82:17, 82:24
**forwarded** [1] - 60:17
**Foundation** [1] - 52:19
**foundation** [1] - 63:16
**four** [7] - 37:7, 42:13, 58:6, 79:10, 80:24, 81:24, 90:16
**fourth** [1] - 64:25
**frame** [3] - 11:13, 12:7, 36:1
**frankly** [1] - 33:3

**front** [6] - 26:1, 50:21, 70:11, 84:8, 84:17, 85:13
**full** [2] - 15:6, 30:21
**fully** [1] - 65:25
**fun** [1] - 71:8
**fund** [1] - 33:7
**fundamental** [3] - 27:13, 47:16, 54:3
**fundamentally** [2] - 17:23, 19:9
**funding** [1] - 28:11
**funds** [1] - 29:2
**furthering** [1] - 61:11
**future** [4] - 35:8, 68:25, 69:1, 74:16

## G

**GARRY** [1] - 1:23
**Gary** [1] - 4:14
**general** [2] - 27:7, 87:17
**generally** [1] - 35:4
**generic** [83] - 7:18, 7:23, 9:18, 9:23, 13:3, 13:4, 15:6, 30:14, 30:23, 31:8, 31:11, 31:12, 31:16, 31:24, 32:4, 32:8, 32:13, 34:13, 34:19, 34:20, 35:22, 37:1, 40:7, 40:10, 41:5, 41:17, 41:18, 42:3, 43:15, 45:20, 46:18, 46:22, 47:3, 47:5, 47:6, 47:10, 47:12, 47:23, 48:13, 48:19, 49:1, 49:2, 49:9, 49:10, 49:13, 49:14, 49:22, 50:14, 51:23, 52:11, 53:1, 59:15, 59:16, 59:18, 60:12, 60:19, 60:21, 60:22, 61:5, 61:12, 61:13, 61:16, 61:18, 62:4, 62:7, 63:9, 63:14, 65:20, 67:15, 67:22, 68:20, 69:23, 70:23, 74:21, 74:22, 74:23, 75:18, 77:7, 77:21, 77:25, 78:4, 78:14, 82:19
**generic's** [1] - 63:17
**generic-size** [1] - 68:20
**generics** [10] - 31:17, 41:4, 41:9, 41:12, 41:25, 46:20, 48:17, 49:5, 61:21, 72:1

**genuine** [1] - 13:6
**Gerry** [1] - 1:10
**given** [9] - 9:3, 10:10, 36:7, 36:10, 38:24, 58:10, 66:21, 72:5, 87:18
**gluconeogenesis** [1] - 87:16
**Glucophage** [1] - 85:1
**glucose** [4] - 17:7, 57:8, 57:10, 57:13
**Gold** [1] - 85:1
**grant** [3] - 71:20, 73:13, 95:20
**granted** [8] - 65:19, 65:20, 66:3, 72:7, 72:12, 75:24, 81:11
**granting** [1] - 27:14
**graph** [7] - 16:16, 46:13, 54:16, 54:25, 55:5, 55:18, 56:8
**graphs** [2] - 55:17, 56:13
**gratefully** [1] - 88:11
**great** [3] - 5:1, 18:8, 56:6
**greatly** [2] - 19:3, 43:16, 61:4
**groundbreaking** [1] - 84:1
**groups** [1] - 78:9
**guess** [2] - 74:3, 92:6
**guidelines** [1] - 18:5

## H

**Hale** [1] - 4:10
**HALE** [1] - 1:17
**half** [17] - 30:4, 53:16, 53:17, 58:9, 78:13, 78:14, 85:24, 87:21, 88:3, 88:5, 88:21, 91:1, 91:4, 92:6, 92:12
**hand** [3] - 6:24, 10:1, 85:13
**handle** [2] - 44:16, 44:17
**handouts** [1] - 64:15
**happy** [6] - 39:6, 41:24, 42:2, 42:19, 42:25, 96:7
**HARDIN** [1] - 2:5
**Hardin** [1] - 5:4
**hardships** [3] - 35:19, 69:7, 75:21
**harm** [23] - 11:5,

26:25, 27:2, 27:6, 27:16, 28:8, 28:9, 28:23, 36:5, 36:12, 36:13, 37:15, 40:14, 64:9, 65:8, 65:15, 66:13, 69:8, 74:16, 77:23, 78:25, 82:23

**harms** [4] - 27:25, 68:22, 81:25

**HARP** [1] - 2:7

**Harp** [1] - 5:4

**Hatch** [1] - 47:9

**Hatch-Waxman** [1] - 47:9

**hate** [1] - 69:18

**head** [3] - 20:19, 57:17

**heads** [1] - 59:23

**healthy** [1] - 57:13

**hear** [5] - 3:18, 5:15, 44:12, 45:8, 57:3

**Hearing** [1] - 9:10

**hearing** [7] - 10:14, 10:15, 26:15, 43:18, 43:19, 80:12, 95:21

**heavy** [1] - 25:12

**held** [5] - 36:25, 48:18, 52:21, 58:18, 62:8

**help** [2] - 79:3, 85:14

**helped** [1] - 59:11

**hereby** [1] - 97:7

**hereinbefore** [1] - 97:10

**herewith** [1] - 91:7

**high** [2] - 8:20, 17:8

**higher** [8] - 16:22, 17:2, 32:16, 33:1, 33:2, 42:2, 43:23, 44:2

**highlighted** [2] - 9:3, 88:10

**highlights** [2] - 16:17, 16:18

**highly** [1] - 18:1

**hinder** [1] - 33:12

**hiring** [1] - 73:7

**historically** [1] - 30:14

**history** [8] - 21:5, 23:9, 45:3, 53:19, 53:24, 67:11, 68:17, 93:2

**hit** [1] - 40:21

**HOCHSTELER** [1] - 45:15

**Hochstetler** [2] - 5:3, 76:19

**HOCHSTETLER** [43] - 2:6, 3:9, 7:4, 44:14,

44:19, 44:22, 47:22, 48:6, 48:25, 49:16, 49:18, 49:25, 50:9, 50:11, 51:6, 51:10, 51:14, 51:18, 51:21, 52:6, 52:14, 53:7, 57:7, 58:3, 62:20, 62:23, 63:1, 63:4, 63:7, 64:12, 83:8, 83:11, 83:15, 83:18, 85:20, 86:24, 87:11, 88:2, 90:15, 91:3, 96:8, 96:15, 96:18

**Hoffman** [3] - 42:14, 78:15, 80:24

**hold** [1] - 62:15

**holes** [1] - 53:22

**home** [1] - 34:21

**honest** [2] - 39:3, 94:5

**Honor** [152] - 3:4, 3:5, 3:6, 3:7, 3:8, 3:9, 3:24, 4:6, 4:12, 4:18, 4:24, 5:16, 6:13, 6:23, 7:2, 7:6, 7:11, 7:13, 8:4, 8:12, 10:16, 10:21, 11:7, 11:11, 12:4, 13:1, 13:8, 13:23, 15:4, 15:17, 16:3, 19:11, 20:6, 20:24, 21:2, 21:19, 22:9, 23:19, 23:22, 24:8, 24:19, 26:21, 27:15, 27:24, 28:12, 29:10, 29:24, 30:6, 30:14, 34:13, 35:19, 36:13, 36:23, 37:5, 38:14, 38:16, 38:21, 39:6, 39:18, 40:6, 41:1, 41:3, 41:4, 43:6, 43:8, 44:6, 44:14, 46:13, 46:17, 50:12, 50:17, 50:19, 51:6, 51:11, 52:14, 52:21, 52:24, 53:11, 54:18, 55:1, 56:11, 57:23, 59:1, 62:13, 63:4, 63:7, 63:24, 64:7, 64:12, 64:15, 64:19, 64:23, 65:9, 67:9, 67:15, 67:24, 69:10, 71:15, 71:18, 74:1, 74:11, 75:13, 76:1, 79:14, 81:13, 83:2, 83:5, 83:8, 83:12, 83:23, 84:1, 84:11, 85:3, 85:8, 85:9, 85:16, 85:18, 86:2, 86:5, 86:7, 86:14, 86:19, 86:22, 87:6,

87:9, 87:20, 87:25, 88:9, 88:15, 89:2, 89:15, 89:17, 89:20, 90:15, 90:20, 91:1, 91:12, 91:15, 91:16, 91:19, 91:24, 92:13, 92:25, 93:3, 93:9, 93:24, 94:22, 95:9, 95:13, 96:5, 96:7

**honor** [1] - 70:5

**Honor's** [2] - 45:15, 53:24

**HONORABLE** [1] - 1:12

**Hood** [1] - 4:14

**HOOD** [1] - 1:23

**hope** [3] - 79:14, 79:24, 80:11

**hoping** [1] - 80:8

**hour** [1] - 17:16

**hour's** [1] - 55:20

**hours** [23] - 12:3, 12:8, 12:21, 12:22, 12:24, 16:13, 16:14, 18:23, 18:24, 18:25, 45:18, 46:6, 46:15, 52:2, 52:17, 56:9, 57:19, 64:6, 85:24, 91:14

**house** [1] - 38:20

**human** [1] - 14:4

**hundred** [4] - 54:21, 55:12, 55:14, 69:1

**hurt** [1] - 79:2

**hurting** [1] - 57:14

**hydrochloride** [2] - 12:18, 48:9

## I

**idea** [3] - 34:19, 60:22, 75:11

**identical** [11] - 11:12, 12:6, 15:25, 16:20, 17:1, 17:11, 54:11, 56:6, 56:17, 63:11, 85:12

**identified** [2] - 70:8, 91:8

**ignore** [3] - 27:13, 83:19, 94:1

**ignored** [1] - 22:4

**ignoring** [1] - 23:1

**image** [1] - 59:22

**immediate** [3] - 39:9, 39:10, 65:3

**immediately** [1] - 30:20

**impact** [4] - 18:8,

29:5, 30:19, 41:11

**importance** [1] - 87:15

**important** [17] - 12:11, 35:7, 35:21, 36:4, 47:8, 49:23, 50:24, 60:5, 60:11, 60:16, 69:6, 75:8, 81:14, 84:13, 86:15, 86:19, 89:18

**importantly** [1] - 50:20

**impossible** [2] - 19:6, 35:12

**impressed** [1] - 93:25

**improperly** [1] - 38:23

**inaccurate** [4] - 46:20, 63:15, 94:10, 94:13

**inadvertently** [1] - 45:1

**Inc** [3] - 33:22, 34:4, 34:6

**INC** [2] - 1:4, 1:7

**incentives** [1] - 32:7

**inch** [1] - 55:1

**include** [1] - 94:9

**included** [5] - 15:22, 50:16, 55:22, 60:18, 70:7

**includes** [1] - 51:25

**including** [4] - 20:20, 21:14, 24:5, 89:5

**inconsistent** [3] - 45:11, 50:21, 69:19

**increase** [4] - 17:6, 32:3, 35:13, 68:19

**increased** [1] - 12:19

**increases** [1] - 74:6

**India** [3] - 9:13, 10:4, 71:11

**Indian** [1] - 66:8

**indicated** [1] - 90:2

**indicates** [1] - 49:15

**indicating** [2] - 69:24, 90:12

**indication** [5] - 14:5, 68:10, 68:12, 75:7, 82:22

**indisputable** [1] - 24:6

**individual** [1] - 39:16

**industry** [1] - 67:22

**inferior** [1] - 74:19

**inferiority** [1] - 69:16

**inflicted** [1] - 28:1

**information** [14] - 7:25, 12:11, 15:4,

18:10, 36:8, 44:1, 66:1, 73:5, 74:1, 78:15, 78:16, 81:1, 86:16, 95:23

**infringe** [6] - 45:19, 46:6, 56:25, 78:21, 83:23, 93:5

**infringed** [3] - 13:7, 27:9, 73:15

**infringement** [26] - 11:15, 11:23, 12:23, 13:2, 13:11, 15:11, 17:21, 19:2, 19:12, 26:23, 27:1, 27:11, 52:20, 53:8, 54:6, 54:8, 57:15, 59:8, 63:23, 63:24, 64:1, 64:11, 65:21, 76:8, 83:25, 94:13

**infringer's** [1] - 36:19

**infringes** [2] - 10:24, 11:8

**infringing** [1] - 36:22

**infusion** [1] - 34:3

**ingestion** [1] - 14:18

**ingredient** [6] - 48:14, 48:18, 61:17, 62:8, 62:12, 62:15

**initialed** [1] - 26:4

**initiated** [1] - 86:25

**injunction** [18] - 10:7, 10:15, 10:20, 13:10, 20:8, 26:13, 27:8, 37:12, 40:4, 42:23, 63:21, 65:1, 65:19, 72:11, 72:23, 78:24, 79:1, 95:20

**injunctions** [2] - 65:22, 66:3

**injunctive** [1] - 10:9

**injury** [7] - 6:16, 65:2, 65:3, 65:6, 66:2, 81:23

**inquiry** [1] - 24:19

**insert** [13] - 46:16, 50:1, 50:22, 51:25, 57:20, 58:6, 59:6, 61:19, 64:4, 64:5, 83:13, 83:20, 83:24

**inserts** [1] - 57:25

**instead** [1] - 49:7

**instructs** [1] - 12:10

**insurmountable** [1] - 25:2

**integral** [1] - 61:12

**intend** [1] - 82:17, 92:22

**intended** [4] - 59:2, 77:4, 92:16, 93:20

**intending** [1] - 58:12
**intent** [1] - 77:24
**intention** [1] - 59:2
**interest** [15] - 5:1, 6:17, 35:9, 36:23, 36:24, 36:25, 75:17, 75:23, 75:25, 76:2, 76:10, 76:11, 77:5, 77:19, 77:20
**interested** [1] - 97:15
**interesting** [2] - 48:7, 62:9
**interests** [2] - 35:10, 77:6
**interoffice** [1] - 70:1
**interview** [20] - 21:8, 21:10, 21:11, 24:9, 45:9, 86:21, 86:25, 87:2, 87:7, 87:12, 87:14, 88:5, 88:8, 88:13, 88:15, 88:16, 89:7, 89:22, 90:10, 92:5
**intrinsic** [1] - 59:5
**introduce** [1] - 31:8
**intuitive** [2] - 14:12, 28:20
**invalid** [4] - 17:24, 19:23, 23:6, 37:13
**invalidate** [2] - 25:6, 93:11
**invalidity** [11] - 11:1, 11:2, 19:24, 20:2, 20:8, 20:13, 25:8, 25:12, 25:15, 26:14, 76:8
**invention** [2] - 53:21, 54:1
**inventors** [1] - 26:9
**invested** [1] - 5:25
**investigated** [1] - 10:6
**involved** [5] - 45:11, 62:7, 88:3, 89:22, 95:5
**involves** [1] - 38:11
**involving** [1] - 57:22
**Iowa** [1] - 14:10
**irony** [1] - 92:17
**irregular** [1] - 93:2
**irregularity** [1] - 76:4
**irrelevant** [2] - 14:15, 36:8
**irreparability** [1] - 69:8
**irreparable** [23] - 6:16, 11:4, 26:25, 27:2, 27:6, 28:8, 28:23, 28:24, 29:3, 29:7, 32:23, 34:25,

35:17, 37:15, 40:14, 64:9, 65:2, 65:3, 65:7, 65:15, 66:2, 82:23
**irreparably** [1] - 27:16
**irreversible** [1] - 60:2
**issue** [44] - 3:20, 11:18, 13:3, 13:13, 16:3, 22:8, 23:5, 24:12, 24:15, 26:24, 27:3, 27:8, 34:13, 42:21, 43:4, 52:11, 52:12, 55:16, 58:7, 60:19, 62:12, 69:15, 70:6, 70:9, 70:22, 71:2, 71:4, 71:8, 74:20, 74:25, 75:1, 75:2, 75:11, 75:14, 75:21, 76:13, 76:23, 76:25, 79:5, 82:21, 84:17, 93:12, 93:16, 95:10
**issued** [17] - 20:21, 22:4, 22:7, 22:13, 23:1, 23:3, 24:19, 24:24, 25:4, 26:11, 72:8, 76:7, 76:14, 76:15, 84:9, 84:10, 86:11
**issues** [6] - 21:13, 22:16, 42:5, 76:1, 93:21, 95:12
**Issues** [1] - 82:11
**itself** [8] - 5:5, 7:10, 10:9, 15:10, 18:15, 61:9, 61:17, 77:14

**J**

**JACOB** [31] - 2:6, 3:8, 64:15, 64:17, 64:19, 64:23, 65:9, 67:2, 67:9, 67:24, 69:10, 70:4, 71:14, 74:1, 74:11, 75:25, 76:16, 77:17, 79:6, 79:9, 79:14, 79:20, 79:24, 80:8, 80:10, 81:9, 81:13, 81:20, 81:22, 83:2, 95:13
**Jacob** [4] - 5:3, 44:17, 64:12, 64:23
**JACOBS** [2] - 1:15, 4:6
**Jacobs** [1] - 4:7
**JAMES** [1] - 1:24
**James** [1] - 4:19
**January** [3] - 89:18, 90:16, 90:25
**Japan** [4] - 33:20,

33:25, 34:3, 34:5
**Japanese** [3] - 34:6, 82:2, 82:13
**Jason** [1] - 5:4
**JASON** [1] - 2:7
**Jersey** [7] - 1:10, 2:12, 5:6, 33:10, 33:11, 66:8, 97:7
**jive** [1] - 35:9
**job** [4] - 22:16, 53:1, 61:9, 73:7
**jobs** [9] - 29:3, 33:5, 33:13, 66:5, 66:7, 66:11, 66:13, 66:19, 66:22
**John** [1] - 1:10
**joined** [1] - 58:13
**Journal** [2] - 8:7, 9:16
**judge** [2] - 54:13, 72:7
**JUDGE** [1] - 1:12
**Judge** [21] - 5:14, 6:1, 6:4, 45:5, 46:25, 47:22, 47:25, 48:16, 52:21, 55:22, 57:21, 59:21, 61:18, 66:5, 80:18, 88:8, 89:12, 90:7, 90:8, 96:4, 96:14
**judgment** [1] - 73:16
**judicial** [1] - 5:12
**July** [2] - 72:22, 72:24
**jump** [3] - 47:24, 47:25, 71:15
**jumping** [1] - 66:7
**June** [7] - 7:14, 7:24, 8:9, 8:12, 59:10, 72:21
**junk** [1] - 9:7

**K**

**Karen** [2] - 4:7, 5:6
**KAREN** [2] - 1:15, 2:9
**keep** [5] - 5:15, 6:1, 58:23, 73:21, 96:4
**KELLY** [1] - 2:7
**Kelly** [1] - 5:5
**kept** [1] - 92:8
**key** [4] - 11:25, 15:17, 18:6, 21:4
**Kilconey** [1] - 70:8
**kind** [8] - 21:16, 42:5, 46:9, 46:18, 48:6, 89:11, 91:15, 94:16

**kinds** [2] - 12:5, 64:10
**Kirk** [1] - 4:24
**KIRK** [2] - 2:4, 4:24
**knowing** [1] - 39:20
**known** [1] - 8:23
**knows** [4] - 30:21, 48:10, 59:1, 76:19
**Kratz** [1] - 4:20
**KRATZ** [3] - 2:2, 3:6, 4:22
**KSR** [3] - 84:10, 84:21, 85:6
**KUGLER** [1] - 1:12

**L**

**label** [80] - 10:25, 11:14, 11:18, 11:22, 12:8, 12:13, 12:14, 12:15, 12:23, 13:3, 13:12, 13:15, 14:1, 14:24, 15:2, 15:4, 15:9, 15:10, 17:19, 19:13, 46:18, 46:24, 47:5, 47:7, 47:13, 47:21, 47:23, 48:3, 49:3, 49:9, 49:11, 49:12, 49:13, 49:15, 49:18, 50:5, 50:8, 50:15, 50:19, 51:2, 51:5, 51:9, 51:17, 51:19, 52:3, 52:12, 52:15, 52:19, 52:22, 53:1, 53:2, 59:15, 59:16, 59:18, 60:6, 60:24, 61:2, 61:6, 61:13, 61:19, 62:3, 62:4, 63:3, 63:17, 63:18, 63:20, 63:21, 93:5, 93:15, 94:2, 94:4, 94:5, 94:7, 94:9, 94:11, 94:13
**labeled** [2] - 20:5, 52:16
**labeling** [6] - 47:19, 49:20, 50:18, 51:1, 60:20, 61:25
**labels** [3] - 13:13, 15:6, 49:6
**lacked** [1] - 18:9
**lag** [1] - 74:7
**language** [6] - 11:24, 12:6, 13:12, 27:5, 69:24, 70:8
**lapse** [1] - 22:2
**large** [1] - 5:1
**larger** [2] - 44:21, 44:22

**laser** [1] - 53:21
**last** [3] - 30:11, 30:23, 71:3
**Laughter** [1] - 5:18
**launch** [31] - 7:22, 7:23, 8:11, 8:17, 8:19, 8:21, 8:24, 9:2, 9:4, 9:8, 9:11, 9:20, 9:21, 27:15, 27:19, 28:4, 28:5, 28:21, 31:9, 31:10, 36:3, 36:14, 36:15, 37:9, 68:4, 70:15, 74:21, 77:24, 78:10, 80:2
**launched** [9] - 7:18, 8:16, 9:18, 29:11, 43:15, 69:4, 74:2, 77:24, 82:19
**law** [12] - 4:21, 20:15, 24:6, 24:17, 40:9, 52:25, 57:22, 64:4, 84:9, 85:3, 85:5
**Lawrence** [1] - 14:10
**laws** [1] - 30:22
**LAYTON** [1] - 1:20
**Layton** [1] - 4:13
**lead** [1] - 33:13
**leads** [4] - 17:11, 18:14, 26:24, 35:19
**learn** [1] - 70:2
**least** [12] - 6:4, 11:8, 19:11, 26:22, 26:23, 30:4, 30:10, 33:8, 37:7, 37:15, 70:25, 79:13
**leave** [1] - 6:5
**leaving** [2] - 70:5, 73:19
**led** [2] - 3:16, 59:5
**left** [3] - 72:10, 72:13, 85:12
**legally** [1] - 40:13
**legitimate** [1] - 35:20
**length** [1] - 71:24
**less** [1] - 81:2
**letter** [1] - 10:1
**letters** [1] - 96:12
**level** [6] - 8:20, 32:12, 32:15, 36:21, 38:18, 56:9
**levels** [5] - 13:23, 35:13, 56:1, 56:2, 57:13
**license** [1] - 77:25
**licensing** [1] - 31:25
**lie** [1] - 75:21
**life** [1] - 39:12
**light** [5] - 21:6, 31:9, 33:17, 43:1, 43:17
**likelihood** [16] -

6:16, 6:18, 7:7, 7:11, 11:6, 11:8, 11:23, 13:2, 19:20, 19:22, 26:22, 32:9, 32:25, 44:16, 44:23, 45:13
**likely** [15] - 3:19, 10:21, 10:23, 13:11, 15:11, 17:5, 17:21, 19:2, 19:11, 25:7, 26:25, 29:6, 33:12, 33:16, 34:10
**limit** [8] - 37:15, 53:18, 88:7, 93:4, 93:7, 93:13, 93:14, 93:20
**limitation** [4] - 13:5, 13:7, 54:2, 58:8
**limited** [4] - 54:4, 58:21, 86:3, 88:25
**limits** [2] - 39:19, 61:3
**line** [8] - 7:20, 10:17, 12:24, 21:10, 21:19, 22:9, 39:25, 85:22
**linear** [3] - 54:17, 55:23, 56:15
**lines** [1] - 85:22
**listed** [1] - 18:10
**listing** [1] - 90:6
**liter** [2] - 55:11, 55:13
**litigation** [1] - 34:4
**log** [6] - 54:21, 54:22, 54:24, 55:6, 55:10
**Log** [1] - 54:22
**logarithm** [1] - 54:17
**logarithmic** [1] - 55:2
**logarithms** [1] - 54:18
**logic** [1] - 13:25
**long-term** [1] - 35:10
**look** [19] - 7:19, 11:13, 11:24, 13:14, 22:21, 41:11, 54:14, 55:8, 56:4, 59:12, 72:20, 73:16, 77:12, 79:20, 83:4, 91:5, 91:23, 95:23
**looked** [9] - 13:3, 22:9, 22:17, 24:1, 46:3, 63:17, 83:20, 83:21, 84:12
**looking** [5] - 16:2, 28:21, 56:21, 63:22, 68:25
**looks** [1] - 49:7
**loose** [1] - 34:11
**loosened** [1] - 84:22

**lose** [9] - 32:9, 33:11, 35:16, 35:17, 36:9, 42:15, 65:17, 66:25, 79:18
**loses** [1] - 93:5
**losing** [2] - 71:10, 83:16
**loss** [28] - 28:10, 28:11, 28:25, 29:1, 29:2, 31:2, 32:5, 32:16, 33:13, 33:20, 34:5, 34:10, 34:24, 36:19, 36:21, 41:21, 65:6, 66:5, 66:22, 67:4, 68:14, 69:9, 81:9
**losses** [5] - 31:3, 31:5, 31:20, 31:21, 78:23
**lost** [11] - 28:9, 28:24, 32:16, 33:5, 36:5, 66:7, 66:12, 75:13, 83:5
**Louden** [1] - 4:7
**LOUDEN** [1] - 1:15
**low** [6] - 28:7, 28:22, 31:23, 32:1, 77:6, 81:9
**lower** [6] - 30:23, 31:24, 35:5, 35:15, 57:12, 68:9
**LUPIN** [4] - 1:7, 2:4, 2:8, 2:10
**Lupin** [118] - 4:25, 5:5, 7:14, 7:17, 7:21, 7:23, 7:25, 8:4, 8:13, 8:19, 9:10, 9:13, 9:17, 9:18, 9:20, 9:25, 10:11, 10:24, 10:25, 11:8, 13:14, 14:21, 15:8, 16:4, 17:4, 17:13, 17:18, 17:20, 18:2, 18:15, 18:20, 19:1, 19:15, 19:21, 19:23, 20:1, 20:3, 21:7, 23:23, 24:25, 25:13, 25:14, 26:12, 26:19, 27:18, 27:20, 31:2, 31:19, 32:20, 34:14, 35:22, 35:23, 36:7, 36:13, 36:14, 37:6, 37:9, 37:21, 38:2, 38:3, 38:25, 39:21, 40:20, 40:21, 41:1, 43:2, 44:1, 48:11, 50:9, 50:11, 50:19, 51:24, 54:4, 55:20, 56:4, 56:12, 56:13, 56:22, 58:1, 58:13, 58:25, 60:14,

61:21, 61:22, 61:25, 62:11, 62:17, 64:24, 65:2, 65:4, 65:5, 67:3, 67:14, 67:17, 69:4, 69:25, 70:16, 72:2, 72:17, 74:2, 75:1, 77:24, 78:2, 78:3, 78:21, 79:2, 80:24, 81:10, 82:19, 83:24, 85:10, 85:11, 93:5, 93:25, 94:3, 95:15
**Lupin's** [77] - 7:8, 10:8, 11:14, 11:20, 12:8, 12:9, 12:15, 13:8, 13:14, 14:1, 14:5, 14:8, 14:23, 15:1, 15:10, 15:12, 15:23, 16:11, 16:25, 17:10, 19:9, 19:13, 20:16, 20:18, 24:6, 24:17, 25:15, 25:17, 27:15, 28:4, 31:9, 31:15, 33:18, 35:12, 35:21, 36:3, 36:5, 43:11, 43:13, 45:17, 45:25, 46:5, 46:10, 46:14, 48:3, 50:1, 50:2, 50:22, 54:7, 54:11, 56:10, 56:19, 56:23, 56:24, 57:9, 57:16, 57:18, 57:25, 63:25, 64:1, 64:5, 68:3, 68:4, 69:16, 69:17, 69:20, 70:23, 71:6, 74:23, 77:9, 78:6, 78:25, 83:13, 83:23, 85:12

## M

**Magistrate** [1] - 80:18
**mail** [3] - 70:9, 71:9, 78:11
**mailed** [1] - 89:24
**mails** [5] - 9:3, 69:24, 70:4, 78:9
**main** [1] - 44:20
**maintain** [8] - 7:15, 8:14, 8:18, 8:24, 9:1, 9:12, 10:3, 41:15
**maintained** [2] - 8:20, 26:9
**majority** [1] - 61:8
**man** [1] - 90:9
**managed** [1] - 71:21
**Management** [2] - 28:19, 82:11
**mandatory** [2] - 30:22, 42:8

**manner** [2] - 17:14, 56:24
**Manspeizer** [1] - 4:9
**MANSPEIZER** [4] - 1:18, 30:1, 30:4, 30:7
**manufacture** [2] - 61:5, 66:16
**manufactured** [3] - 14:8, 34:16, 34:20
**manufacturer** [1] - 61:5
**manufactures** [1] - 66:17
**manufacturing** [3] - 70:16, 75:1, 75:2
**March** [2] - 7:23, 85:18
**margin** [1] - 42:1
**market** [72] - 9:15, 28:6, 28:7, 28:10, 29:1, 29:2, 29:6, 29:13, 30:13, 30:15, 30:16, 30:17, 30:20, 31:2, 31:12, 31:16, 31:18, 31:24, 32:4, 32:13, 32:21, 33:12, 35:12, 36:19, 37:7, 37:10, 38:23, 41:6, 41:7, 42:7, 65:6, 66:20, 67:1, 67:4, 67:14, 67:22, 68:6, 68:12, 68:14, 68:20, 69:3, 69:4, 71:24, 72:1, 72:3, 73:8, 73:20, 73:21, 73:24, 73:25, 74:14, 74:22, 75:6, 75:9, 75:10, 75:14, 75:20, 77:7, 77:8, 77:11, 77:13, 77:21, 78:3, 78:14, 78:15, 79:22, 81:4, 81:16, 81:19, 82:3, 94:6, 94:7
**marketing** [2] - 82:2, 82:4
**Markman** [6] - 9:10, 14:2, 14:6, 26:15, 53:24, 80:11
**MARY** [1] - 1:25
**mary** [1] - 4:18
**massive** [1] - 28:22
**material** [1] - 13:6
**materials** [2] - 78:1, 82:10
**mathematician** [1] - 16:3
**matter** [19] - 22:22, 40:8, 40:9, 41:5, 49:8, 49:10, 50:5, 51:24, 52:7, 52:9, 59:20,

64:2, 64:4, 65:21, 66:6, 87:15, 96:22
**Matterer** [1] - 4:19
**MATTERER** [4] - 1:25, 3:5, 4:18, 7:5
**matters** [3] - 23:11, 23:22, 71:18
**Matthew** [1] - 4:16
**maximum** [8] - 12:1, 56:1, 56:2, 56:9, 90:8, 90:21, 90:24, 91:14
**MCGUIRE** [1] - 2:1
**McGuire** [1] - 4:21
**McNeil** [2] - 72:14, 72:20
**meal** [1] - 17:8
**mean** [20] - 6:3, 12:1, 16:5, 55:7, 62:12, 65:5, 65:12, 65:18, 66:17, 67:2, 69:2, 73:20, 75:23, 76:8, 78:4, 78:19, 79:12, 79:17, 94:7, 96:13
**means** [13] - 12:5, 14:3, 14:16, 16:7, 16:10, 16:11, 32:11, 37:9, 54:24, 76:7, 83:24, 93:7, 93:17
**meant** [1] - 58:15
**measurement** [1] - 55:4
**measures** [2] - 38:22, 39:5
**meat** [1] - 43:20
**mechanism** [1] - 23:8
**medical** [3] - 13:25, 49:18, 63:8
**meet** [5] - 10:25, 11:16, 13:5, 70:15, 70:21
**meeting** [1] - 80:18
**meets** [1] - 55:16
**mention** [3] - 25:18, 71:22, 81:22
**mentioned** [2] - 82:20, 86:2
**mere** [3] - 9:17, 23:23, 47:19
**merely** [2] - 20:12, 32:5
**merits** [13] - 6:16, 6:19, 7:7, 7:12, 10:18, 10:22, 11:7, 19:20, 26:23, 27:1, 31:13, 32:24, 44:16
**Metformin** [8] - 9:15, 12:3, 12:18, 48:8, 48:15, 62:13, 62:15, 71:7

**methodologies** [1] - 19:9

**methodology** [1] - 17:22

**Meyers** [1] - 84:25

**Micah** [2] - 91:6, 91:17

**Microsoft** [1] - 84:12

**middle** [1] - 95:6

**midnight** [3] - 10:16, 37:9, 95:11

**might** [4] - 7:6, 78:18, 79:10, 82:2

**mightily** [1] - 13:14

**milligram** [3] - 75:4, 75:10, 77:9

**milligrams** [2] - 67:18, 67:19

**millimeter** [1] - 56:3

**million** [5] - 30:11, 30:24, 35:25, 43:21, 44:3

**millions** [1] - 30:2

**mind** [2] - 6:6, 10:17

**ministerial** [1] - 93:12

**minus** [2] - 18:24, 18:25

**minute** [2] - 29:8, 76:12

**minutes** [2] - 46:13, 92:23

**Miss** [2] - 44:17, 64:12

**mistake** [6] - 22:20, 22:22, 22:25, 76:19, 76:21, 76:23

**Mitchell** [1] - 1:9

**mitigate** [1] - 32:5

**mix** [1] - 18:7

**model** [2] - 41:5, 41:9

**modify** [3] - 21:17, 84:19, 84:24

**moment** [7] - 21:9, 27:20, 42:19, 60:14, 60:15, 87:22, 95:5

**moments** [1] - 43:3

**Monday** [3] - 3:21, 95:3, 95:7

**money** [8] - 33:24, 35:8, 41:7, 41:25, 68:7, 82:23, 94:6, 94:20

**month** [7] - 21:25, 37:7, 40:17, 41:19, 69:14, 80:1, 82:19

**months** [6] - 9:19, 29:9, 30:16, 71:4, 72:2, 72:4, 74:2

**Moontaz** [1] - 5:5

**moreover** [2] - 14:8, 31:15

**morning** [17] - 3:3, 3:4, 3:5, 3:6, 3:7, 3:8, 3:9, 3:10, 4:6, 4:11, 4:12, 4:17, 4:18, 4:22, 4:24, 67:5, 78:7

**Morris** [2] - 4:7, 4:19

**MORRIS** [2] - 1:15, 1:24

**Morron** [1] - 5:5

**MORRON** [1] - 2:7

**most** [8] - 30:22, 36:4, 40:8, 40:13, 41:24, 42:2, 52:15, 92:24

**motion** [22] - 3:18, 4:2, 5:17, 6:10, 6:14, 7:9, 7:19, 8:16, 10:7, 10:18, 10:19, 10:22, 13:10, 13:19, 25:17, 26:14, 28:13, 29:12, 36:9, 80:16, 80:18

**motivated** [2] - 84:18, 84:24

**motivation** [3] - 41:12, 85:2, 85:3

**move** [3] - 28:3, 41:8, 54:25

**moved** [1] - 32:14

**MPY** [1] - 91:17

**MR** [103] - 3:4, 3:6, 3:7, 3:9, 3:12, 3:24, 4:12, 4:22, 4:24, 5:16, 5:21, 6:13, 6:23, 7:1, 7:4, 7:6, 8:3, 8:9, 11:11, 20:23, 21:1, 21:18, 22:24, 23:18, 23:21, 27:22, 27:24, 28:2, 29:10, 29:19, 29:23, 30:1, 30:3, 30:4, 30:5, 30:7, 30:9, 37:19, 37:22, 38:1, 38:5, 38:7, 38:10, 38:14, 38:21, 40:5, 40:25, 41:3, 42:10, 42:12, 42:16, 43:6, 43:8, 44:5, 44:9, 44:11, 44:14, 44:19, 44:22, 45:15, 47:22, 48:6, 48:25, 49:16, 49:18, 49:25, 50:9, 50:11, 51:6, 51:10, 51:14, 51:18, 51:21, 52:6, 52:14, 53:7, 57:7, 58:3, 62:20, 62:23, 63:1, 63:4, 63:7, 64:12, 83:8, 83:11, 83:15, 83:18,

85:20, 86:24, 87:11, 88:2, 90:15, 91:3, 92:25, 94:25, 95:9, 95:18, 95:25, 96:5, 96:8, 96:15, 96:18

**MS** [34] - 3:5, 3:8, 4:6, 4:18, 7:5, 64:15, 64:17, 64:19, 64:23, 65:9, 67:2, 67:9, 67:24, 69:10, 70:4, 71:14, 74:1, 74:11, 75:25, 76:16, 77:17, 79:6, 79:9, 79:14, 79:20, 79:24, 80:8, 80:10, 81:9, 81:13, 81:20, 81:22, 83:2, 95:13

**multiple** [2] - 31:6, 59:4

**must** [6] - 12:13, 13:4, 45:8, 65:19, 92:5, 94:3

**MYLAN** [2] - 1:25, 2:2

**Mylan** [2] - 4:20, 79:25

**Mylan's** [4] - 58:17, 58:21, 58:23, 80:1

## N

**name** [4] - 32:3, 32:13, 42:1, 64:23

**named** [1] - 35:7

**names** [1] - 48:3

**NAMI** [1] - 97:20

**Nami** [2] - 2:11, 97:5, 97:19

**narrow** [1] - 61:4

**narrower** [2] - 11:13, 12:7

**nature** [1] - 27:13

**nearly** [3] - 19:3, 30:24, 54:11

**necessarily** [1] - 8:1

**necessary** [6] - 36:21, 37:6, 37:15, 42:24, 60:20, 95:21

**need** [8] - 5:10, 11:7, 11:13, 35:8, 43:17, 62:5, 81:21, 95:22

**needed** [1] - 73:4

**needs** [3] - 20:12, 28:6, 40:15

**negative** [1] - 77:19

**negotiating** [2] - 10:13, 32:22

**negotiation** [1] - 32:20

**net** [2] - 30:24, 36:2

**never** [13] - 9:10, 13:6, 13:18, 21:23, 26:14, 26:15, 34:24, 51:3, 51:5, 79:13, 92:13, 93:2, 94:16

**New** [7] - 1:10, 2:12, 5:6, 33:10, 33:11, 66:8, 97:6

**new** [4] - 5:24, 6:4, 33:13, 90:7

**newly** [1] - 14:23

**next** [25] - 9:19, 16:17, 16:18, 40:16, 40:17, 41:8, 41:19, 43:19, 80:25, 86:6, 86:13, 86:18, 86:25, 87:6, 88:9, 88:17, 88:22, 89:9, 89:14, 90:13, 95:3, 95:7, 95:8, 95:16, 95:22

**NICHOLS** [1] - 1:15

**Nichols** [1] - 4:8

**nine** [1] - 72:4

**non** [13] - 17:21, 19:2, 22:1, 44:17, 54:6, 54:8, 57:15, 63:24, 64:1, 81:23, 81:25, 82:25, 83:25

**non-economic** [3] - 81:23, 81:25, 82:25

**non-extendable** [1] - 22:1

**non-infringement** [8] - 17:21, 19:2, 54:6, 54:8, 57:15, 63:24, 64:1, 83:25

**non-patent** [1] - 44:17

**none** [2] - 7:24, 83:19

**norm** [1] - 66:4

**normal** [2] - 61:21, 65:23

**normally** [2] - 27:8, 81:8

**North** [1] - 39:17

**note** [1] - 10:11

**nothing** [9] - 3:25, 5:23, 7:13, 14:24, 30:17, 81:25, 93:8, 93:17, 93:23

**Notice** [14] - 21:13, 22:7, 23:1, 24:14, 89:6, 89:25, 90:5, 90:17, 91:20, 91:22, 91:23, 92:2, 92:10

**notice** [6] - 89:3, 89:6, 89:19, 89:21, 89:23, 90:11

**November** [20] - 21:8, 21:19, 21:21, 22:7, 24:8, 67:13, 67:18, 67:19, 86:21, 87:2, 87:14, 88:4, 88:14, 89:8, 90:22, 91:8, 91:11, 91:12, 91:21, 93:23

**nowhere** [1] - 24:8

**Noyes** [1] - 4:9

**NOYES** [2] - 1:18, 3:7

**Number** [2] - 86:5, 86:18

**NUMBER** [1] - 1:5

**number** [22] - 17:4, 17:8, 18:6, 18:9, 25:16, 28:13, 29:25, 35:23, 42:18, 43:12, 43:20, 48:13, 54:20, 67:6, 81:13, 87:22, 89:4, 89:16, 89:17, 89:18, 89:20

**numbered** [2] - 85:22, 87:21

**numbers** [8] - 9:22, 42:11, 43:1, 43:23, 44:2, 44:3, 80:25, 85:13

## O

**objections** [1] - 26:11

**objectively** [1] - 28:21

**obligated** [8] - 8:14, 8:18, 9:1, 9:12, 10:2, 40:9, 40:13, 42:17

**obligation** [6] - 8:24, 15:9, 48:13, 60:12, 60:13, 62:11

**obligations** [1] - 48:13

**obvious** [4] - 26:6, 86:9, 86:10, 86:12

**obviously** [12] - 6:15, 8:17, 28:23, 35:4, 35:5, 43:16, 58:11, 59:1, 66:3, 67:2, 79:15, 81:6

**obviousness** [2] - 26:9, 84:17

**occur** [3] - 32:7, 40:16, 58:9

**occurrence** [1] - 31:23

**October** [4] - 8:19, 82:9, 82:10, 82:18

**odd** [2] - 46:18, 87:22
**OF** [1] - 1:2
**offer** [2] - 32:2, 32:6
**offered** [1] - 6:1
**offers** [2] - 19:4, 57:5
**office** [3] - 21:6, 21:8, 86:8
**Office** [16] - 11:4, 20:4, 20:21, 24:3, 26:5, 26:6, 26:7, 26:8, 26:10, 76:1, 76:14, 76:15, 76:22, 92:1, 92:10
**officer** [1] - 33:21
**Official** [2] - 2:12, 97:5
**often** [1] - 41:6
**old** [1] - 9:7
**omitted** [1] - 46:13
**once** [3] - 32:13, 32:24, 74:21
**One** [1] - 1:10
**one** [86] - 5:10, 7:1, 8:10, 8:21, 9:3, 9:14, 10:4, 11:8, 11:10, 12:22, 13:9, 13:17, 13:21, 14:4, 14:25, 15:20, 16:8, 16:12, 16:18, 17:20, 18:12, 18:20, 18:21, 18:23, 19:18, 25:15, 26:23, 28:2, 28:6, 30:21, 36:4, 41:6, 42:14, 43:11, 44:21, 46:22, 48:13, 51:7, 52:19, 54:4, 54:16, 54:21, 54:22, 54:23, 55:9, 55:11, 55:13, 55:17, 57:17, 58:16, 58:22, 59:14, 61:24, 65:1, 66:17, 67:12, 69:11, 70:6, 71:23, 72:14, 73:15, 75:4, 76:13, 76:23, 77:23, 79:11, 79:20, 79:21, 79:23, 79:24, 79:25, 80:5, 80:25, 81:3, 81:13, 81:22, 82:13, 83:11, 84:18, 87:3, 88:4, 88:5, 96:15
**one-time** [1] - 14:25
**ones** [4] - 76:25, 77:1, 77:2, 85:2
**ongoing** [1] - 40:16
**open** [1] - 3:1
**opening** [1] - 91:6
**operating** [1] - 33:21
**operations** [1] - 73:6
**opine** [1] - 19:7

**opinion** [11] - 3:20, 3:21, 14:2, 17:12, 19:5, 19:8, 27:4, 41:2, 53:24, 61:8
**opportunity** [8] - 28:10, 43:9, 74:11, 94:17, 95:16, 96:8, 96:10, 96:14
**opposed** [2] - 13:17, 34:20
**opposite** [1] - 27:10
**opposition** [2] - 13:19, 25:17
**optimistic** [1] - 81:4
**option** [2] - 63:16, 80:2
**Order** [2] - 21:13, 72:8
**order** [11] - 22:1, 22:22, 30:15, 32:2, 32:7, 38:12, 38:13, 39:4, 39:23, 80:17, 94:10
**ordered** [3] - 75:10, 78:12, 78:13
**orderly** [1] - 87:20
**orders** [4] - 9:21, 9:25, 30:8, 30:12
**ordinary** [2] - 84:18, 84:24
**Organizational** [1] - 82:11
**originally** [1] - 77:1
**Ortho** [2] - 72:14, 72:20
**otherwise** [6] - 25:1, 44:22, 45:12, 63:15, 71:9, 77:21
**ourselves** [1] - 79:22
**outside** [2] - 56:25, 63:19
**outweigh** [1] - 37:4
**outweighed** [1] - 52:15
**outweighs** [1] - 36:25
**overcame** [1] - 26:10
**overcome** [4] - 20:1, 23:24, 26:20, 36:21
**overcoming** [1] - 25:2
**oversight** [2] - 70:17
**own** [32] - 9:6, 10:24, 11:14, 11:18, 11:21, 12:8, 12:15, 13:15, 14:1, 14:24, 15:2, 15:10, 15:12, 15:23, 17:1, 17:6, 17:18, 19:13, 19:16, 24:6, 24:17, 31:15, 34:1,

34:15, 35:2, 36:5, 36:8, 36:10, 36:13, 46:24, 61:3, 67:5
**owner** [2] - 27:14, 36:22

---

**P**

**P.I** [1] - 10:18
**PA** [2] - 2:3, 4:25
**package** [14] - 46:16, 50:1, 50:21, 51:25, 57:20, 57:25, 58:6, 59:6, 61:19, 64:4, 64:5, 83:13, 83:20, 83:24
**Page** [5] - 87:5, 87:13, 88:12, 88:15, 91:24
**page** [15] - 26:1, 54:15, 55:18, 85:23, 86:6, 86:18, 86:25, 87:6, 87:7, 87:24, 87:25, 88:9, 91:5, 91:15, 91:16
**pages** [1] - 56:12
**papers** [5] - 3:14, 68:1, 68:10, 71:19, 96:19
**parameters** [9] - 48:11, 49:4, 61:1, 63:9, 70:6, 70:15, 70:18, 70:20, 70:22
**Pardon** [1] - 27:22
**Parent** [2] - 82:2, 82:13
**parent** [1] - 34:6
**part** [9] - 11:19, 18:2, 18:4, 27:25, 29:12, 33:8, 57:1, 61:12, 71:13
**participants** [3] - 87:2, 87:3, 87:12
**participation** [1] - 75:19
**particular** [4] - 28:15, 66:19, 68:12, 73:17
**particularly** [6] - 25:12, 48:11, 53:19, 82:6, 86:15, 89:15
**PARTIES** [2] - 1:21, 1:23
**parties** [1] - 4:14, 7:15, 8:14, 9:10, 10:2, 37:8, 53:25, 73:1, 80:4, 80:14, 97:12
**partner** [2] - 34:7, 82:3

**parts** [2] - 70:10, 92:4
**party** [7] - 31:21, 32:11, 32:19, 32:22, 33:1, 34:4, 38:4
**patent** [59] - 6:20, 6:21, 11:9, 13:16, 13:20, 19:22, 19:24, 22:14, 23:9, 24:6, 24:17, 24:25, 25:6, 27:11, 36:22, 36:24, 44:17, 44:25, 45:5, 45:7, 46:7, 53:13, 54:1, 65:21, 70:12, 76:3, 76:5, 76:6, 76:7, 76:9, 76:13, 76:16, 77:3, 77:5, 78:21, 84:4, 84:8, 84:9, 84:17, 85:7, 85:21, 86:11, 87:4, 87:5, 90:16, 90:19, 90:20, 92:7, 92:8, 92:11, 92:15, 92:16, 92:21, 92:22, 93:11, 93:13
**Patent** [37] - 11:4, 11:9, 11:17, 12:25, 15:20, 16:2, 16:15, 16:24, 17:5, 17:15, 17:17, 18:1, 19:18, 19:25, 20:4, 20:19, 20:20, 20:21, 24:18, 24:24, 25:4, 26:1, 26:2, 26:3, 26:6, 26:8, 26:10, 26:11, 26:24, 76:1, 76:14, 76:15, 76:22, 76:24, 77:3, 92:1, 92:10
**patentability** [1] - 88:20
**patentable** [1] - 88:18
**patented** [1] - 51:17
**patents** [4] - 27:13, 75:23, 76:1
**patient** [5] - 13:22, 14:4, 14:7, 14:19, 34:19
**patients** [4] - 17:22, 32:17, 35:15, 71:6
**patron** [1] - 60:18
**pattern** [1] - 30:18
**Paul** [2] - 91:6, 91:17
**pause** [1] - 43:7
**pay** [2] - 32:12, 32:16
**paying** [1] - 35:15
**payor** [1] - 32:19
**payors** [4] - 32:11, 32:22, 33:1, 38:4
**peaks** [1] - 14:16
**penalty** [1] - 12:14

**pending** [3] - 86:8, 90:4, 90:6
**pendulum** [1] - 27:9
**pent** [1] - 14:20
**people** [13] - 3:22, 9:6, 28:21, 45:11, 57:14, 69:17, 69:20, 69:21, 71:3, 71:5, 71:10
**percent** [13] - 12:20, 16:8, 16:13, 19:3, 30:10, 30:15, 30:25, 33:6, 36:2, 67:18, 67:19, 69:1, 77:14
**percentage** [1] - 30:3
**perfectly** [1] - 96:7
**perform** [3] - 49:15, 70:24
**performance** [2] - 50:5, 51:23
**performed** [2] - 18:20, 19:15
**performing** [1] - 71:7
**performs** [5] - 47:20, 62:18, 62:20, 62:21, 64:1
**perhaps** [9] - 7:19, 30:10, 32:16, 50:20, 69:5, 71:11, 72:2, 72:17, 75:18
**period** [2] - 29:20, 58:24
**peripheral** [1] - 25:19
**perjury** [1] - 12:14
**permission** [2] - 44:15, 84:14
**permit** [2] - 50:8, 63:14
**person** [2] - 66:18, 84:23
**perspective** [4] - 3:25, 5:16, 41:11, 96:6
**petition** [2] - 50:15, 50:17
**Pfizer** [1] - 36:18
**PHARMA** [1] - 1:4
**Pharmaceutical** [1] - 14:11
**pharmaceutical** [2] - 32:14, 42:1
**PHARMACEUTICA LS** [1] - 1:7
**pharmaceuticals** [2] - 32:3, 35:8
**pharmacies** [4] - 40:1, 40:7, 41:25, 42:2
**pharmacist** [2] -

40:9, 40:11
**pharmacist's** [1] - 39:17
**pharmacokinetic** [1] - 49:4
**pharmacokinetics** [3] - 15:7, 49:22, 51:23
**pharmacy** [4] - 34:18, 39:10, 39:17, 47:4
**Pharmacy** [1] - 28:17
**phone** [1] - 95:13
**physicians** [1] - 12:11
**pick** [1] - 79:23
**picked** [1] - 79:24
**piece** [3] - 9:7, 19:19, 82:6
**pieces** [3] - 25:18, 25:21, 25:24
**pike** [1] - 41:23
**pipe** [1] - 39:25
**pipeline** [1] - 30:12
**place** [9] - 35:6, 37:8, 37:10, 37:12, 38:23, 72:10, 72:11, 94:19, 97:9
**placement** [1] - 32:15
**plaintiff** [28] - 4:7, 45:19, 46:8, 46:13, 46:21, 49:2, 54:9, 57:2, 57:17, 58:7, 58:13, 58:14, 59:3, 59:14, 60:15, 61:7, 64:10, 66:5, 72:1, 72:18, 75:8, 76:4, 79:13, 81:18, 83:18, 87:4, 89:11, 92:4
**plaintiff's** [4] - 45:16, 59:10, 60:4, 61:22
**Plaintiff's** [4] - 45:23, 58:16, 71:19
**Plaintiffs** [1] - 1:5
**plaintiffs** [7] - 4:4, 4:5, 6:12, 27:11, 71:9, 78:2, 78:22
**planned** [1] - 8:19
**planning** [1] - 7:23
**plans** [2] - 8:17, 8:20
**plasma** [2] - 12:2, 56:9
**Plavix** [2] - 71:23, 71:25
**play** [2] - 28:12, 31:6
**plays** [1] - 81:3
**Plaza** [1] - 1:10
**pleasure** [1] - 64:8
**Pliva** [13] - 46:19, 52:23, 52:24, 57:22,

59:9, 59:13, 59:20, 60:12, 60:13, 61:7, 61:8, 63:14, 63:15
**plus** [4] - 18:23, 18:25, 30:16, 80:21
**point** [31] - 3:17, 4:1, 5:24, 6:21, 8:6, 14:12, 17:9, 18:19, 23:25, 42:21, 43:25, 46:8, 46:16, 48:7, 51:11, 59:12, 60:3, 65:16, 74:22, 75:13, 77:23, 78:22, 80:2, 81:14, 81:24, 82:20, 83:11, 84:15, 93:1, 93:24, 94:2
**pointed** [2] - 61:23, 84:23
**pointing** [2] - 55:6, 82:25
**points** [9] - 9:17, 15:17, 28:2, 33:15, 44:20, 81:13, 81:14, 81:24, 93:3
**POLSINEZLI** [1] - 1:22
**Polsinezli** [1] - 4:15
**portion** [2] - 30:7, 50:16
**posed** [1] - 7:11
**posited** [2] - 58:7, 92:4
**position** [9] - 32:10, 32:11, 32:14, 32:21, 33:2, 45:11, 58:16, 60:17, 73:9
**positions** [2] - 3:22, 5:15
**possible** [2] - 72:19, 79:10
**post** [1] - 42:17
**postcard** [2] - 91:9
**potential** [5] - 29:1, 29:2, 32:9, 33:5, 34:10
**potentially** [3] - 28:24, 31:22, 32:23
**powerful** [1] - 54:6
**PPO** [1] - 53:6
**practice** [1] - 68:15
**precise** [1] - 43:12
**predict** [1] - 35:18
**predictable** [1] - 14:17
**predicted** [1] - 77:14
**prediction** [1] - 68:23
**predictions** [1] - 31:4
**prefer** [1] - 45:12

**prejudgment** [1] - 36:14
**preliminary** [13] - 10:7, 10:14, 10:20, 13:10, 20:8, 26:13, 63:21, 65:1, 65:19, 65:22, 65:25, 72:23, 78:24
**prepared** [3] - 3:18, 7:1, 95:2
**preparing** [2] - 9:1, 78:11
**preponderance** [2] - 10:23, 19:12
**prescription** [3] - 34:17, 40:10, 46:25
**prescriptions** [4] - 30:23, 35:23, 35:25, 61:23
**presence** [2] - 77:9, 78:6
**present** [2] - 44:20, 77:18
**presentation** [6] - 44:15, 46:14, 47:15, 52:18, 56:4, 71:13
**presentations** [1] - 95:19
**presented** [3] - 54:13, 69:12, 87:15
**presents** [1] - 60:19
**president** [1] - 28:17
**presumably** [1] - 82:16
**presume** [2] - 49:20, 58:11
**presumed** [1] - 20:19
**presumption** [15] - 19:25, 20:1, 22:13, 24:23, 24:24, 25:2, 25:8, 25:9, 26:12, 26:17, 27:6, 53:6, 84:13, 92:18
**presumptions** [1] - 27:12
**pretty** [1] - 80:13
**prevail** [4] - 11:7, 26:18, 32:24, 95:24
**prevented** [1] - 65:4
**preventing** [1] - 77:23
**price** [23] - 31:22, 32:4, 32:6, 35:3, 35:13, 43:13, 43:16, 65:6, 67:7, 67:17, 67:19, 68:2, 68:3, 68:5, 68:7, 68:8, 68:10, 68:13, 68:16, 68:19, 74:6, 74:19, 77:6

**priced** [1] - 35:5
**prices** [11] - 31:24, 35:15, 67:12, 68:15, 69:12, 69:13, 69:14, 69:22, 74:20, 74:23, 75:15
**primarily** [2] - 20:3, 26:19
**primary** [4] - 20:18, 33:10, 84:7, 87:5
**printed** [6] - 76:6, 76:17, 77:1, 90:19, 92:2
**printer's** [1] - 76:17
**Printing** [1] - 92:1
**printing** [1] - 93:10
**printout** [1] - 67:16
**problem** [4] - 9:7, 54:13, 73:10, 82:21
**problems** [5] - 9:2, 22:3, 34:15, 78:5, 82:15
**procedural** [2] - 24:12, 93:21
**procedures** [1] - 94:18
**proceed** [2] - 88:14, 96:13
**proceeding** [1] - 65:24
**process** [3] - 14:6, 60:21, 92:20
**produced** [4] - 7:21, 18:25, 85:10, 85:12
**product** [113] - 7:18, 7:23, 9:5, 9:13, 9:18, 9:20, 9:24, 10:24, 11:22, 12:17, 13:4, 13:17, 14:1, 15:14, 15:24, 17:1, 19:17, 28:8, 28:22, 29:6, 29:9, 29:11, 29:13, 29:20, 30:13, 31:16, 32:2, 32:18, 32:21, 34:14, 34:16, 34:20, 34:24, 36:14, 38:22, 38:25, 39:4, 39:12, 40:2, 40:7, 40:22, 41:7, 41:8, 41:14, 41:22, 43:12, 43:22, 45:18, 46:6, 46:10, 46:15, 47:20, 50:2, 52:9, 54:4, 54:11, 56:10, 56:23, 56:25, 57:16, 57:19, 57:21, 57:23, 58:1, 60:6, 60:7, 62:13, 62:14, 63:25, 64:1, 66:16, 66:19, 67:4, 67:12, 68:19, 69:5, 69:20,

70:16, 70:17, 70:19, 70:23, 71:7, 72:14, 72:21, 73:2, 73:7, 73:9, 73:14, 73:20, 73:25, 74:3, 74:18, 74:19, 74:21, 74:24, 75:4, 75:5, 75:8, 75:16, 75:17, 75:19, 77:10, 78:12, 78:18, 83:20, 85:1, 94:20
**production** [2] - 56:14, 80:13
**products** [17] - 15:6, 16:20, 17:15, 33:13, 34:12, 35:5, 35:9, 35:11, 36:4, 37:10, 38:9, 50:22, 56:2, 56:5, 56:17, 69:16, 69:17
**professionals** [2] - 49:19, 63:8
**professor** [1] - 28:18
**proffered** [1] - 14:6
**profile** [1] - 15:24
**profiles** [1] - 17:1
**profit** [2] - 30:24, 43:11
**profitable** [1] - 36:4
**profits** [9] - 31:1, 33:7, 33:11, 33:17, 33:20, 34:5, 36:2, 79:22
**prolonged** [1] - 12:20
**promising** [1] - 78:17
**promoting** [1] - 66:15
**proof** [2] - 36:11, 46:5
**proper** [1] - 56:16
**properly** [4] - 17:25, 52:16, 70:24, 90:12
**properties** [1] - 12:9
**property** [2] - 13:4, 27:14
**propose** [3] - 45:2, 45:12, 57:3
**proposed** [4] - 12:13, 58:13, 87:1
**proposition** [3] - 46:18, 47:17, 59:6
**proscribing** [1] - 12:12
**prosecuting** [1] - 76:22
**prosecution** [12] - 22:2, 25:11, 26:21, 44:25, 45:3, 53:13, 53:19, 53:23, 84:4,

85:7, 85:15, 89:13
**protect** [3] - 7:10, 10:9, 81:5
**prove** [9] - 13:1, 15:11, 19:2, 19:12, 19:23, 25:7, 59:11, 81:6, 94:13
**proved** [1] - 11:18
**proves** [2] - 17:21, 19:8
**provide** [2] - 88:21, 90:11
**provided** [8] - 17:20, 49:5, 52:3, 53:16, 75:12, 75:19, 88:24, 90:6
**provides** [3] - 12:1, 12:11, 46:4
**providing** [1] - 78:18
**proving** [3] - 11:1, 13:2, 26:23
**provision** [1] - 15:5
**PTO** [1] - 22:14
**PTO's** [1] - 92:20
**public** [18] - 6:17, 7:25, 8:2, 8:4, 8:6, 36:23, 36:24, 37:2, 49:14, 49:20, 67:17, 75:17, 75:22, 76:10, 77:5, 77:19, 77:20
**public's** [1] - 37:1
**published** [2] - 82:9, 90:19
**pull** [3] - 37:13, 41:22, 85:8
**purchases** [1] - 68:18
**purported** [1] - 90:22
**purpose** [3] - 41:10, 61:12, 89:14
**purposes** [2] - 23:11, 86:15, 89:15
**pursuant** [2] - 72:24, 75:24
**pursue** [1] - 3:17
**push** [1] - 93:25
**put** [12] - 5:9, 15:3, 36:19, 37:7, 43:12, 43:19, 56:5, 67:6, 70:2, 72:2, 74:5, 84:19

## Q

**quality** [5] - 9:2, 34:14, 70:18, 70:19
**quantifiable** [1] - 68:21
**quantities** [1] - 9:14

**quarter** [1] - 35:24
**questionable** [2] - 18:1, 18:14
**questioning** [1] - 74:17
**questions** [2] - 44:12, 94:23
**quick** [1] - 46:24
**quickly** [2] - 7:20, 61:15, 84:2
**quite** [3] - 5:25, 70:12, 71:16
**quo** [7] - 7:16, 8:14, 8:18, 8:25, 9:1, 9:12, 10:3
**quote** [1] - 70:10

## R

**R&D** [3] - 28:11, 65:16, 65:18
**rainy** [2] - 70:13, 71:11
**raise** [6] - 52:13, 67:12, 68:5, 69:12, 69:13, 95:10
**raised** [9] - 6:19, 26:15, 26:16, 58:17, 67:17, 67:19, 68:10, 69:14, 74:20
**raising** [3] - 68:15, 69:22, 75:15
**Rambacy** [1] - 63:12
**ran** [1] - 9:2
**range** [13] - 12:22, 12:25, 16:1, 16:9, 16:14, 16:24, 17:2, 17:17, 19:17, 43:21, 53:16, 93:6
**ranges** [1] - 15:20
**ranked** [1] - 35:23
**rapidly** [1] - 73:7
**rather** [2] - 21:14, 92:12
**ratio** [1] - 59:14
**RD** [1] - 31:25
**Re** [1] - 14:6
**re** [4] - 32:20, 33:1, 34:6, 35:13
**re-access** [1] - 34:6
**re-establish** [1] - 33:1
**re-increase** [1] - 35:13
**re-negotiation** [1] - 32:20
**reach** [1] - 73:24
**reached** [1] - 29:12
**reaction** [1] - 14:18

**read** [4] - 21:3, 69:23, 77:13, 96:19
**reading** [2] - 27:5, 61:7
**ready** [1] - 78:10
**real** [7] - 20:25, 21:2, 33:16, 34:14, 35:2, 61:15
**realistic** [1] - 84:22
**reality** [1] - 50:10
**realize** [1] - 33:18
**realizing** [1] - 23:1
**really** [18] - 6:5, 54:1, 57:11, 60:5, 60:16, 64:25, 67:21, 71:1, 71:9, 71:21, 72:16, 73:11, 73:22, 74:14, 80:22, 81:25, 82:24
**reason** [16] - 9:8, 18:3, 22:13, 23:5, 23:10, 24:20, 25:19, 27:19, 27:21, 27:23, 39:13, 48:12, 51:21, 74:14, 79:1, 80:9
**reasonable** [4] - 38:22, 39:5, 39:6, 80:19
**reasons** [3] - 69:10, 79:25, 91:25
**received** [1] - 91:10
**recent** [1] - 20:11
**recently** [1] - 27:3
**recipients** [1] - 40:1
**recognize** [1] - 57:24
**recommendations** [1] - 57:11
**reconsideration** [2] - 87:18
**record** [6] - 5:9, 56:23, 69:13, 74:2, 74:5, 81:25
**recorded** [1] - 87:15
**recoverable** [1] - 34:25
**refer** [1] - 52:18
**reference** [6] - 53:15, 84:25, 85:17, 86:1, 86:2, 89:8
**referenced** [1] - 89:23
**references** [3] - 25:16, 25:20, 84:16
**referred** [2] - 56:12, 64:21, 82:11
**refers** [2] - 86:16, 86:20
**reflect** [1] - 61:20
**reflecting** [1] - 50:23
**regarding** [2] - 36:8, 60:14

**regardless** [1] - 50:22
**Register** [2] - 50:16, 60:18
**regularity** [1] - 92:19
**regulated** [1] - 92:21
**regulation** [3] - 61:3, 63:14, 94:21
**regulations** [1] - 61:11
**regulators** [1] - 71:5
**rejected** [6] - 11:3, 26:6, 65:14, 86:9, 86:10, 86:12
**rejecting** [1] - 21:6
**rejection** [2] - 26:9, 86:8
**rejections** [1] - 26:10
**relates** [2] - 13:16, 68:15
**relation** [1] - 66:13
**relations** [1] - 41:15
**relationship** [1] - 87:16
**relationships** [1] - 36:20
**relative** [2] - 97:11, 97:13
**Release** [1] - 8:13
**release** [5] - 7:15, 9:15, 12:18, 31:17, 60:7
**relevant** [5] - 11:24, 27:2, 37:3, 66:9, 89:15
**reliability** [1] - 45:23
**reliable** [2] - 19:15, 31:5
**reliance** [2] - 52:22, 63:21
**relied** [3] - 19:10, 25:14, 54:9
**relief** [2] - 10:9, 27:18
**relies** [3] - 20:3, 21:8, 25:20
**rely** [5] - 19:1, 24:25, 27:11, 48:16, 57:18
**relying** [5] - 25:5, 26:18, 59:10, 76:14, 76:16
**remains** [1] - 20:16
**remedied** [1] - 17:13
**remedy** [5] - 35:3, 65:22, 65:23, 71:19, 73:18
**remember** [3] - 55:17, 72:8, 82:10
**remind** [2] - 26:12, 61:15

**removed** [1] - 22:8
**rendered** [1] - 59:9
**renegotiate** [1] - 31:14
**reparable** [1] - 67:6
**repeat** [1] - 61:14
**repeatedly** [1] - 36:25
**report** [2] - 82:8, 82:17
**reported** [2] - 57:25, 64:4
**Reporter** [3] - 2:12, 97:6
**reports** [1] - 88:16
**represent** [2] - 30:12, 48:17
**representation** [11] - 46:19, 46:20, 46:21, 46:22, 52:1, 52:2, 62:7, 62:16, 62:18, 62:21, 64:5
**represented** [2] - 30:25, 63:18
**represents** [1] - 70:21
**reproduce** [1] - 18:12
**reproduced** [1] - 17:24
**reputation** [1] - 40:22
**reputational** [1] - 65:6
**request** [8] - 73:13, 79:11, 87:1, 87:18, 89:19, 90:11, 90:18, 95:20
**requested** [2] - 72:5, 91:6
**requesting** [1] - 89:20
**require** [3] - 30:22, 32:20, 40:6
**required** [5] - 7:15, 90:5, 94:4, 94:5, 94:21
**requirement** [1] - 47:19
**requirements** [1] - 62:11
**requires** [1] - 58:8
**requisite** [1] - 86:3
**research** [3] - 33:8, 35:7, 63:16
**Research** [1] - 52:19
**resolve** [2] - 75:5, 75:9
**respect** [5] - 13:7, 45:22, 53:3, 78:24,

84:11
**respected** [1] - 26:4
**respectfully** [7] -
10:10, 52:24, 56:15,
63:7, 90:10, 90:18,
96:9
**respond** [1] - 92:24
**response** [6] - 68:3,
68:8, 74:21, 88:23,
90:17, 96:15
**responsible** [1] -
78:22
**responsive** [1] - 89:7
**rest** [2] - 72:10, 95:5
**restrain** [2] - 37:18,
37:21
**result** [10] - 18:14,
26:21, 28:8, 31:18,
32:15, 35:4, 36:13,
41:21, 49:1, 55:25
**results** [8] - 15:19,
17:23, 18:1, 18:9,
18:13, 18:22, 19:7
**retail** [1] - 40:2
**reversed** [1] - 59:18
**review** [2] - 74:12,
89:25
**reviewed** [1] - 54:5
**revised** [3] - 22:7,
82:8, 82:18
**revisit** [1] - 80:15
**revisiting** [1] - 85:4
**rewritten** [1] - 88:6
**Richard** [2] - 4:13,
4:24
**RICHARD** [2] - 1:20,
2:4
**Richter** [3] - 55:1,
55:2, 55:4
**rights** [5] - 8:5,
27:14, 36:24, 51:2,
77:5
**rigid** [1] - 84:20
**rip** [1] - 23:24
**rise** [3] - 3:2, 34:2,
36:20
**risk** [6] - 27:19, 28:4,
31:9, 35:2, 36:15,
59:14
**risks** [2] - 36:14,
36:16
**road** [1] - 55:16
**ROBERT** [1] - 1:12
**Robinson** [1] - 72:7
**Romano** [1] - 5:6
**routine** [1] - 65:22
**routinely** [3] - 49:1,
65:19, 71:20
**rubber** [1] - 55:16
**rule** [5] - 3:19, 5:17,

27:7, 58:12, 95:2
**ruled** [1] - 59:1
**rules** [2] - 4:1, 59:17
**ruling** [3] - 58:20,
73:16, 95:12
**run** [3] - 16:8, 16:12,
83:3

## S

**S.D** [1] - 16:7
**S/Carl** [1] - 97:19
**safe** [4] - 47:12,
47:14, 60:23, 62:2
**safely** [2] - 47:6, 61:2
**safety** [3] - 50:24,
60:19, 62:5
**sale** [4] - 40:2, 43:11,
43:22, 52:11
**sales** [21] - 28:24,
29:22, 29:23, 30:9,
30:10, 30:25, 31:21,
32:5, 32:7, 32:16,
36:2, 37:22, 37:23,
37:24, 40:16, 43:14,
67:4, 71:5, 78:23,
80:24
**salient** [1] - 17:9
**satisfies** [1] - 54:7
**satisfy** [1] - 9:14
**saturation** [1] -
14:20
**saw** [4] - 3:14, 22:6,
75:8, 89:5
**scale** [14] - 54:17,
54:24, 55:1, 55:2,
55:6, 55:10, 55:23,
56:8, 56:15, 56:16
**scenario** [1] - 44:3
**scenarios** [3] -
42:13, 79:10, 80:24
**scheduling** [1] -
80:17
**scheme** [2] - 35:6,
61:10
**SCHIFF** [1] - 2:5
**Schiff** [1] - 5:4
**Schionogi** [1] - 82:5
**schizophrenia** [2] -
59:25, 60:1
**schizophrenics** [1] -
59:22
**Schneider** [1] -
80:19
**school** [1] - 54:19
**School** [1] - 28:18
**Sciele** [1] - 82:4
**SCIELE** [1] - 1:4
**science** [1] - 14:9

**Sciences** [1] - 14:11
**scientific** [2] - 13:25,
46:5
**scientifically** [8] -
14:13, 14:15, 17:23,
18:17, 19:4, 19:6,
56:24
**screen** [1] - 88:16
**scribbled** [1] - 91:15
**scroll** [1] - 47:25
**scrutiny** [2] - 52:23,
63:22
**season** [2] - 70:13,
71:11
**seat** [1] - 3:10
**second** [15] - 9:16,
10:12, 10:15, 12:24,
15:23, 19:19, 26:7,
29:13, 45:7, 46:8,
64:25, 69:15, 75:13,
92:3
**secondly** [3] - 13:24,
93:9, 93:18
**secrecy** [1] - 8:20
**secretly** [2] - 9:20,
29:11
**see** [31] - 22:4,
30:17, 34:1, 45:3,
45:4, 49:7, 55:19,
71:9, 72:1, 85:16,
85:18, 85:21, 85:23,
86:7, 86:18, 86:20,
86:21, 87:7, 87:11,
87:12, 87:21, 87:25,
88:2, 89:12, 89:16,
89:19, 90:8, 91:3,
91:5, 91:14, 91:20
**seek** [3] - 34:7,
37:17, 37:20
**seeking** [2] - 10:8,
27:18
**seem** [5] - 6:6, 58:20,
69:15, 69:25, 80:3
**self** [1] - 28:1
**self-inflicted** [1] -
28:1
**sell** [7] - 40:2, 40:5,
40:19, 40:20, 42:2,
51:4, 94:20
**selling** [6] - 29:9,
38:3, 39:23, 41:25,
42:1, 67:3
**send** [7] - 5:24,
38:15, 38:20, 39:11,
96:3, 96:12
**sense** [4] - 31:23,
43:10, 81:15, 84:23
**sensitive** [1] - 68:16
**sentence** [2] - 8:10,
88:22

**separate** [1] - 33:21
**separately** [1] -
64:20
**September** [11] -
7:17, 8:15, 9:9, 9:13,
9:17, 9:20, 9:25,
80:20, 80:21, 91:11,
91:12
**series** [1] - 78:9
**serious** [2] - 60:10,
75:7
**serve** [1] - 41:9
**set** [8] - 16:1, 21:4,
37:10, 41:19, 47:11,
68:22, 90:19, 97:10
**setting** [1] - 29:4
**settlement** [4] - 3:15,
3:16, 3:22, 7:14
**Settlement** [1] - 8:13
**seven** [11] - 53:17,
54:14, 55:4, 58:9,
85:24, 88:5, 88:8,
88:20, 91:14, 92:6,
92:12
**several** [3] - 48:13,
84:1, 93:3
**severe** [2] - 33:17,
34:15
**share** [8] - 28:10,
29:1, 31:2, 36:19,
65:6, 67:1, 67:4,
68:14
**shelf** [2] - 39:12,
39:16
**shelves** [3] - 39:12,
39:14, 40:18
**Shepard** [8] - 6:22,
45:16, 45:17, 46:3,
52:8, 54:5, 56:21,
60:5
**shift** [1] - 82:2
**Shionogi** [69] - 4:7,
7:9, 7:14, 8:12, 8:23,
10:1, 10:8, 10:11,
10:21, 10:22, 11:4,
11:7, 15:11, 19:11,
21:21, 26:22, 26:25,
27:16, 27:17, 27:18,
28:8, 28:23, 29:4,
29:7, 30:24, 31:1,
31:20, 32:21, 33:8,
33:19, 33:22, 34:4,
34:6, 34:12, 34:20,
34:22, 35:13, 35:25,
37:15, 42:5, 65:2,
65:5, 66:14, 67:11,
67:14, 67:17, 69:3,
69:5, 69:15, 69:18,
69:22, 74:7, 74:13,
74:20, 74:25, 77:8,

77:10, 77:14, 78:4,
78:11, 78:12, 79:3,
81:16, 81:24, 82:7,
82:11, 82:23
**SHIONOGI** [2] - 1:16,
1:19
**Shionogi's** [11] -
3:24, 13:20, 31:2,
31:4, 33:7, 33:10,
33:12, 35:21, 36:2,
36:4, 43:22
**shipped** [5] - 9:13,
9:21, 10:3, 70:19,
72:21
**shipping** [1] - 38:8
**shop** [1] - 96:14
**short** [2] - 35:9,
52:14
**shortcuts** [1] - 27:12
**Shorthand** [1] - 97:6
**shortly** [1] - 68:9
**show** [19] - 10:23,
10:24, 11:8, 15:11,
16:15, 17:21, 20:12,
21:9, 34:15, 46:12,
46:14, 47:20, 47:24,
48:19, 61:16, 71:10,
71:24, 78:10, 91:10
**showing** [6] - 26:4,
54:7, 65:14, 66:1,
81:16
**shown** [5] - 47:12,
49:4, 65:2, 66:20,
68:17
**shows** [19] - 15:19,
15:24, 16:5, 16:6,
16:16, 16:19, 16:25,
19:16, 21:19, 45:18,
56:23, 57:18, 63:25,
64:2, 69:3, 69:13,
78:24, 83:22, 92:20
**Shugart** [1] - 4:15
**SHUGART** [1] - 1:22
**side** [6] - 51:7, 59:21,
59:25, 60:1, 85:13
**signature** [2] - 91:24,
91:25
**signed** [3] - 45:6,
91:24, 92:9
**significance** [1] -
18:15
**significant** [3] -
28:23, 31:3, 69:5
**significantly** [1] -
79:2
**silly** [1] - 57:8
**similar** [2] - 17:14,
59:13
**similarly** [1] - 17:15
**simply** [6] - 14:16,

15:5, 41:22, 46:6,
93:11, 94:1
**Simply** [1] - 36:19
**single** [14] - 11:16,
13:22, 14:3, 14:7,
14:15, 14:19, 58:10,
58:12, 58:14, 58:15,
59:3, 59:8, 64:3, 64:6
**sit** [1] - 73:2
**sitting** [8] - 4:14,
4:15, 39:11, 39:13,
39:16, 40:11, 40:17,
58:19
**situation** [7] - 28:21,
58:23, 68:12, 77:17,
77:19, 85:4, 92:13
**situations** [2] -
40:14, 71:20
**six** [7] - 12:24, 21:25,
30:16, 44:3, 52:2,
52:17, 64:6
**size** [3] - 35:23,
66:19, 68:20
**skill** [2] - 84:18,
84:24
**skip** [1] - 18:18
**sleep** [1] - 83:16
**slept** [1] - 8:5
**slide** [15] - 16:17,
18:18, 21:3, 25:15,
45:23, 46:1, 47:24,
54:14, 56:11, 64:20,
67:9, 71:16, 71:17,
81:14, 85:13
**Slide** [4] - 24:3,
25:10, 25:24, 28:16
**slides** [10] - 7:1,
18:19, 44:23, 45:24,
64:21, 71:14, 71:15,
77:12, 83:3, 84:1
**slightly** [1] - 12:7
**small** [3] - 39:17,
84:3, 85:8
**smaller** [2] - 44:24,
68:6
**smile** [1] - 61:6
**so-called** [3] - 9:21,
10:5, 13:20
**society** [2] - 35:10,
41:10
**sold** [13] - 29:16,
29:21, 30:1, 32:3,
37:6, 37:14, 38:16,
38:25, 39:1, 39:2,
72:15, 74:18, 74:21
**solely** [2] - 26:18,
65:25
**Solutions** [1] - 28:18
**solve** [1] - 75:2
**solved** [1] - 70:13

**someone** [1] - 65:16
**sometime** [1] - 95:22
**sometimes** [8] -
32:3, 41:16, 53:10,
65:10, 66:12, 68:5,
68:7
**somewhat** [1] -
87:20
**somewhere** [3] -
30:15, 39:14, 43:21
**SOMIL** [1] - 1:19
**Somil** [1] - 4:9
**soon** [1] - 96:2
**sooner** [2] - 80:8,
80:9
**Sophia** [1] - 5:5
**sorry** [8] - 30:7,
37:19, 40:23, 51:6,
51:15, 53:11, 67:17,
76:12
**sort** [7] - 21:4, 65:21,
66:6, 72:16, 77:17,
82:21
**speaking** [1] - 14:13
**specific** [1] - 73:5
**specifically** [1] -
43:25
**specifies** [1] - 57:10
**specify** [1] - 91:14
**speculations** [1] -
36:12
**speculative** [2] -
33:3, 33:15
**speed** [2] - 5:12, 6:4
**spent** [1] - 93:1
**splitting** [1] - 78:12
**sporadic** [1] - 41:17
**squared** [1] - 54:22
**squarely** [3] - 12:21,
12:25, 16:14
**squash** [1] - 55:15
**squashing** [1] - 56:1
**squeezed** [1] - 91:4
**stage** [2] - 20:8,
63:21
**stamped** [1] - 91:9
**Standard** [1] - 85:1
**standard** [16] -
10:24, 13:9, 15:21,
16:2, 16:7, 16:10,
20:7, 20:10, 20:14,
20:17, 45:24, 45:25,
56:20, 94:14
**standards** [1] - 10:19
**standstill** [1] - 72:25
**Standstill** [8] - 10:2,
10:12, 10:15, 29:13,
37:8, 78:16, 95:10,
95:15
**start** [9] - 4:3, 4:4,

6:18, 6:22, 48:2, 55:9,
62:6, 85:16
**started** [3] - 8:17,
30:19, 80:16
**starting** [1] - 61:14
**State** [2] - 40:6, 97:6
**state** [14] - 12:21,
13:17, 13:21, 14:2,
14:8, 14:14, 14:16,
14:22, 14:23, 15:1,
58:5, 58:25, 82:16
**statement** [6] - 59:7,
63:15, 82:9, 82:18,
86:17
**statements** [1] -
47:16
**STATES** [2] - 1:1,
1:12
**States** [10] - 1:9,
9:14, 9:24, 30:22,
35:24, 40:8, 61:24,
70:19, 75:24, 97:5
**status** [8] - 7:16,
8:14, 8:18, 8:25, 9:1,
9:12, 10:3, 29:1
**statute** [3] - 48:12,
48:20, 51:18
**statutes** [1] - 40:6
**statutory** [4] - 35:6,
61:10, 61:11, 62:10
**stay** [2] - 72:10, 80:1
**stayed** [3] - 8:15,
72:9, 72:11
**staying** [1] - 96:7
**steadily** [2] - 67:12,
68:11
**steady** [13] - 13:17,
13:20, 14:1, 14:7,
14:8, 14:14, 14:15,
14:22, 14:23, 15:1,
58:5, 58:24, 68:19
**stealth** [5] - 8:21,
27:15, 28:5, 36:3,
36:15
**stenographically** [1]
- 97:8
**step** [2] - 36:16,
65:25
**steps** [3] - 7:10,
10:9, 82:12
**STERNS** [1] - 2:9
**Steve** [1] - 4:12
**STEVEN** [1] - 1:21
**still** [19] - 9:11, 21:7,
24:13, 31:6, 32:2,
32:6, 37:14, 39:11,
40:5, 49:23, 53:10,
63:19, 78:2, 81:5,
93:5, 93:6, 93:18,
95:24

**stood** [1] - 54:11
**stop** [7] - 29:8,
29:16, 38:6, 38:8,
39:23, 89:12, 94:22
**stopped** [2] - 40:15,
66:15
**storage** [1] - 39:15
**store** [2] - 37:25,
38:19
**story** [1] - 92:4
**Street** [2] - 8:7, 9:16
**strong** [5] - 36:24,
75:22, 75:25, 76:2,
76:10, 77:5, 77:6
**stronger** [1] - 55:3
**strongly** [2] - 77:20,
84:15
**structure** [2] - 53:15,
64:19
**struggles** [1] - 13:14
**studies** [6] - 17:5,
17:25, 18:14, 18:22,
19:14, 45:21
**study** [51] - 6:21,
11:19, 15:12, 15:18,
15:22, 15:23, 16:5,
16:6, 16:8, 16:11,
16:15, 16:25, 17:9,
17:19, 17:20, 17:22,
17:24, 18:2, 18:3,
18:4, 18:9, 18:13,
18:17, 18:24, 19:16,
45:16, 45:17, 45:20,
45:22, 45:25, 46:2,
46:3, 46:4, 46:9, 54:4,
54:5, 54:6, 54:9,
56:19, 56:20, 56:22,
56:23, 57:9, 57:10,
57:18
**study's** [1] - 17:22
**stuff** [2] - 6:5, 40:17
**subject** [3] - 18:6,
59:20, 87:15
**subjects** [2] - 16:12,
18:7
**submission** [3] -
15:16, 18:3, 18:4
**submit** [12] - 17:19,
18:2, 18:3, 18:17,
18:20, 18:24, 19:18,
45:19, 45:21, 51:7,
51:8, 56:15
**submitted** [26] -
11:19, 12:14, 14:9,
14:12, 15:13, 15:14,
15:18, 15:22, 18:23,
19:16, 28:13, 29:4,
33:4, 33:9, 33:14,
33:22, 34:9, 43:1,
43:23, 46:9, 51:17,

52:8, 54:10, 78:1,
85:21, 89:9
**subsequently** [1] -
10:12
**subsidiaries** [1] -
82:14
**substantial** [6] -
6:20, 20:12, 51:4,
52:13, 54:8, 83:25
**substantially** [3] -
17:14, 62:23, 63:5
**substantive** [4] -
22:12, 23:25, 24:15,
93:24
**substantively** [9] -
22:17, 23:12, 23:13,
23:21, 25:20, 25:23,
26:5, 93:7, 93:20
**substitute** [1] - 47:8
**substitution** [4] -
30:22, 47:6, 47:10,
61:12
**succeed** [2] - 10:22,
27:1, 34:1
**success** [12] - 6:16,
6:18, 7:7, 7:12, 11:6,
11:23, 19:20, 26:22,
27:1, 44:16, 44:23,
45:13
**successful** [1] -
27:11
**successfully** [1] -
36:7
**sued** [1] - 92:21
**suffer** [3] - 27:20,
28:8, 41:21
**suffered** [2] - 11:4,
27:20
**suffering** [2] - 37:16,
40:15
**sufficient** [2] - 9:14,
39:22
**suggest** [15] - 10:10,
11:5, 15:3, 23:9,
23:18, 23:21, 25:3,
42:18, 43:17, 52:24,
63:7, 77:18, 87:17,
94:3, 94:15
**suggested** [4] - 8:5,
24:8, 33:6, 36:13
**suggesting** [5] - 8:3,
14:21, 28:25, 47:18,
47:22
**suggestion** [4] - 7:8,
24:19, 70:22, 71:19
**suggests** [4] - 8:22,
9:11, 30:18, 82:7
**suitability** [2] -
50:14, 50:17
**sum** [2] - 15:17,

18:12
**summarize** [1] - 84:2
**summary** [6] - 63:24,
67:16, 68:21, 73:16,
86:21, 87:6
**summed** [1] - 58:14
**supervising** [1] -
87:5
**Supervisory** [1] -
88:12
**Supplemental** [3] -
91:20, 91:22, 92:10
**supplemental** [1] -
90:11
**supplier** [1] - 40:12
**suppliers** [2] - 41:5,
41:17
**supply** [5] - 10:4,
30:21, 37:7, 40:21,
42:6
**supplying** [2] -
30:17, 35:10
**support** [6] - 14:22,
15:13, 28:13, 65:18,
67:25, 75:15
**supported** [2] - 73:8,
77:8
**supporting** [3] -
17:14, 47:16, 75:16
**supports** [1] - 36:24
**supposed** [11] -
14:25, 45:21, 48:21,
48:23, 49:3, 54:1,
57:12, 60:23, 69:16,
93:4
**supposedly** [1] -
10:2
**Supreme** [4] - 52:25,
59:17, 84:9, 84:21
**surprising** [1] -
57:12
**surprisingly** [1] -
15:4
**swing** [1] - 27:9
**switch** [3] - 34:23,
53:3, 83:11
**swoop** [1] - 28:6
**sworn** [2] - 33:23,
34:8
**system** [3] - 14:21,
42:21, 47:11

**T**

**tab** [4] - 67:15,
89:20, 90:13, 90:15
**Tab** [12] - 85:16,
86:14, 86:20, 87:8,
87:24, 88:9, 89:2,

89:14, 89:16, 91:19
**table** [6] - 4:14,
12:22, 45:1, 58:4,
85:10, 85:17
**tablet** [2] - 12:18,
61:17
**tablets** [1] - 70:15
**talks** [4] - 9:4, 45:19,
46:8, 76:9
**target** [1] - 27:18
**tarta** [3] - 59:20,
60:2, 60:10
**tarta-dyskinesia** [2] -
60:2, 60:10
**task** [1] - 57:21
**teaching** [1] - 87:17
**technicality** [3] -
23:23, 25:1, 54:2
**Ted** [1] - 88:13
**teenagers** [1] - 53:11
**temper** [1] - 71:10
**ten** [1] - 17:22,
54:20, 54:22, 54:23,
54:25, 55:3, 55:11,
55:12
**tense** [1] - 48:7
**term** [3] - 35:9,
35:10, 58:21
**terminated** [1] - 7:17
**terminating** [1] -
10:1
**terms** [3] - 31:14,
57:19, 77:23
**terrible** [2] - 59:21,
60:3
**test** [11] - 17:13,
19:7, 19:9, 19:10,
48:10, 63:25, 64:3,
83:19, 83:21, 83:22,
84:20
**testimony** [1] - 97:8
**testing** [1] - 70:21
**tests** [5] - 17:14,
18:5, 19:5, 47:20,
58:5
**Tether** [1] - 36:18
**Teva** [3] - 72:16,
72:21, 73:1
**text** [3] - 12:15, 26:2,
26:3
**THE** [131] - 1:2, 1:12,
1:21, 1:23, 2:2, 2:4,
2:8, 2:10, 3:2, 3:3,
3:10, 3:13, 4:3, 4:11,
4:17, 4:23, 5:8, 5:19,
5:22, 6:14, 6:25, 7:3,
8:1, 8:8, 11:10, 20:22,
20:25, 21:16, 22:19,
23:16, 23:20, 27:21,
27:23, 28:1, 29:8,

29:18, 29:20, 29:25,
37:17, 37:20, 37:23,
38:3, 38:6, 38:8,
38:11, 38:18, 39:22,
40:19, 41:2, 42:8,
42:11, 42:13, 43:3,
44:2, 44:7, 44:10,
44:12, 44:18, 44:21,
45:14, 47:18, 48:5,
48:23, 49:12, 49:17,
49:24, 50:7, 50:10,
50:25, 51:8, 51:12,
51:16, 51:20, 52:4,
52:10, 53:5, 57:6,
58:2, 62:18, 62:22,
62:24, 63:2, 63:5,
64:9, 64:14, 64:16,
64:18, 64:22, 65:5,
66:25, 67:7, 67:21,
69:9, 70:2, 71:12,
73:23, 74:9, 75:22,
76:12, 77:16, 79:4,
79:7, 79:12, 79:17,
79:23, 80:6, 80:9,
81:8, 81:12, 81:18,
81:21, 83:1, 83:6,
83:10, 83:14, 83:16,
85:19, 86:23, 87:10,
88:1, 90:14, 91:2,
92:23, 94:24, 95:1,
95:17, 95:19, 96:1,
96:11, 96:17, 96:19
**themselves** [2] -
15:18, 15:21
**therefore** [6] - 17:12,
18:1, 46:11, 58:5,
70:14, 77:4
**they've** [14] - 6:19,
20:11, 26:16, 29:8,
33:25, 34:15, 34:19,
36:5, 39:1, 39:2,
40:22, 43:23, 66:21,
82:25
**third** [15] - 9:14,
10:4, 26:8, 28:5,
30:20, 31:21, 32:11,
32:19, 32:22, 33:1,
35:24, 38:4, 46:16,
54:21, 64:25
**thoroughly** [1] -
25:25
**thousand** [2] - 55:14,
67:18
**three** [12] - 30:1,
30:11, 30:16, 32:15,
37:7, 45:5, 54:21,
57:20, 71:22, 72:2,
74:2, 87:3
**throw** [1] - 85:6
**Thurman** [2] - 87:4,

91:24
**tied** [1] - 66:19
**tier** [3] - 32:10,
32:15, 33:2
**tiers** [1] - 32:14
**ties** [1] - 61:15
**time-to-time** [1] -
66:3
**timing** [1] - 37:3
**Timmins** [5] - 25:21,
26:2, 26:4, 84:16,
84:25
**Timothy** [1] - 4:20
**TIMOTHY** [1] - 2:2
**tinker** [3] - 23:8,
61:19, 62:4
**Tmax** [69] - 11:13,
11:15, 11:17, 12:2,
12:7, 12:16, 12:19,
12:20, 12:24, 13:21,
15:8, 15:19, 15:24,
16:1, 16:6, 16:13,
16:16, 16:19, 16:21,
17:1, 17:2, 17:6,
17:11, 18:8, 18:15,
18:23, 18:25, 45:18,
46:5, 46:15, 49:4,
50:3, 52:1, 52:17,
53:16, 55:17, 55:20,
56:6, 56:9, 56:17,
56:25, 57:16, 57:19,
58:8, 59:7, 60:4, 60:5,
60:7, 60:11, 60:14,
60:16, 64:5, 83:23,
85:2, 85:24, 86:3,
87:15, 87:17, 88:7,
88:18, 88:19, 88:25,
90:8, 90:20, 90:23,
92:6, 92:12, 94:17
**today** [8] - 3:19,
3:20, 5:10, 10:13,
39:23, 95:2, 96:20
**together** [1] - 84:19
**tomorrow** [1] - 37:11
**tonight** [3] - 10:16,
37:9, 95:11
**took** [5] - 7:9, 9:23,
10:9, 36:16, 75:4
**top** [2] - 55:16, 56:1
**total** [5] - 28:5, 31:1,
33:7, 58:15, 58:22
**touched** [3] - 21:23,
53:24, 61:14
**tracking** [2] - 9:22,
10:5
**training** [1] - 12:17
**transcript** [1] - 97:8
**translating** [1] -
15:16
**transmitted** [1] -

91:7
**treated** [1] - 13:13
**trek** [1] - 45:2
**trial** [8] - 20:10,
52:20, 63:20, 72:6,
80:4, 80:7, 95:6
**tried** [2] - 6:7, 74:7
**tries** [5] - 13:15,
15:2, 17:18, 18:15,
19:1
**TRIVEDI** [1] - 1:19
**Trivedi** [1] - 4:9
**TRO** [1] - 43:18
**trouble** [1] - 9:6
**truck** [2] - 9:21, 9:22
**true** [6] - 15:5, 16:6,
16:21, 24:11, 46:3,
97:7
**trumped** [1] - 80:18
**trust** [1] - 96:19
**truth** [1] - 7:13
**truthful** [1] - 12:13
**try** [7] - 6:8, 7:7,
22:3, 26:13, 32:5,
34:12, 80:4
**trying** [7] - 5:22,
23:23, 23:24, 24:25,
25:13, 39:18, 41:8
**Tuesday** [3] - 3:21,
95:3, 95:7
**TUNNELL** [1] - 1:15
**Tunnell** [1] - 4:8
**turn** [18] - 7:6, 7:10,
10:17, 11:6, 19:21,
21:3, 24:3, 25:24,
28:16, 86:6, 86:18,
86:19, 86:24, 87:6,
87:24, 89:2, 89:20,
91:19
**turned** [1] - 59:25
**turns** [2] - 56:18,
67:10
**twice** [1] - 87:23
**twist** [1] - 59:23
**two** [37] - 9:17,
15:17, 16:9, 16:20,
18:19, 18:22, 19:5,
25:20, 25:21, 32:10,
33:21, 35:16, 35:22,
39:12, 44:20, 46:15,
53:20, 53:21, 54:15,
54:22, 55:17, 55:20,
56:9, 56:13, 56:17,
57:19, 63:12, 69:10,
71:4, 71:22, 72:8,
72:13, 78:9, 79:25,
81:1, 82:14, 85:11
**two-year** [1] - 39:12
**type** [2] - 76:2, 77:4
**typical** [2] - 67:21,

68:1
**typically** [2] - 32:13, 65:7

## U

**U.S** [4] - 34:1, 34:3, 34:7, 82:12
**ultimate** [2] - 23:5, 40:1
**ultimately** [10] - 20:15, 22:8, 23:3, 24:14, 31:13, 32:24, 34:7, 76:18, 77:2
**unclear** [1] - 31:10
**uncontrollable** [1] - 59:23
**under** [5] - 12:14, 20:16, 48:12, 62:14, 87:8
**underlie** [1] - 17:5
**underlining** [2] - 53:22, 53:23
**underlying** [1] - 17:25
**undersigned** [2] - 88:11, 88:12
**understandably** [1] - 78:8
**understood** [5] - 22:16, 52:16, 58:20, 58:25, 95:25
**unduly** [1] - 81:9
**unequivocal** [1] - 19:14
**unhappy** [2] - 35:15, 79:15
**UNITED** [1] - 1:1
**United** [8] - 1:9, 9:13, 9:24, 35:24, 61:24, 70:19, 75:24, 97:5
**uNITED** [1] - 1:12
**University** [2] - 14:10, 28:18
**unknown** [2] - 31:7, 31:13
**unknowns** [1] - 31:6
**unless** [5] - 44:11, 45:12, 53:4, 57:3, 94:22
**unlike** [1] - 72:2
**unlikely** [5] - 10:25, 19:23, 33:3, 33:24, 78:19
**unpredictable** [2] - 32:23, 34:25
**unreasonable** [1] - 39:18
**unreliable** [1] - 19:19

**unsupported** [3] - 33:18, 36:6, 36:11
**unusual** [3] - 71:18, 71:19, 96:13
**up** [24] - 5:12, 6:4, 6:5, 6:24, 14:20, 20:15, 23:24, 33:20, 33:25, 41:19, 45:9, 47:11, 54:12, 54:15, 58:14, 69:3, 76:12, 76:17, 77:1, 78:12, 82:1, 85:22, 87:1, 93:22
**upheld** [1] - 72:12
**upper** [6] - 88:7, 93:4, 93:6, 93:13, 93:14, 93:19
**useless** [1] - 19:4
**uses** [1] - 61:25
**USPTO** [3] - 88:14, 91:9, 91:10

## V

**valid** [7] - 18:17, 20:19, 26:24, 27:9, 46:5, 56:24, 78:21
**validity** [15] - 20:1, 20:16, 22:13, 24:24, 25:3, 26:17, 53:3, 53:6, 53:9, 64:7, 83:8, 83:9, 84:2, 84:13, 92:18
**valleys** [1] - 14:16
**valuable** [1] - 41:9
**value** [9] - 13:21, 15:24, 16:9, 16:20, 16:21, 17:2, 17:11, 18:15, 88:22
**values** [4] - 17:6, 18:8, 19:3, 49:2
**variation** [1] - 61:5
**variety** [1] - 48:11
**various** [1] - 11:25
**vary** [4] - 19:3, 61:5, 63:9
**Velltturo** [3] - 28:16, 28:17, 28:19
**verdict** [1] - 80:20
**verified** [2] - 17:24, 19:10
**verify** [1] - 18:13
**versus** [2] - 12:21, 36:18
**vertical** [1] - 55:7
**viability** [1] - 34:6
**viable** [1] - 34:2
**view** [4] - 58:20, 86:10, 87:19, 88:23

**viewed** [1] - 52:20
**views** [1] - 59:19
**violates** [2] - 13:23, 18:4
**violating** [1] - 6:21
**virtually** [5] - 11:12, 15:25, 16:20, 17:1, 17:10
**volumes** [1] - 32:5
**vs** [1] - 1:6

## W

**walk** [5] - 11:21, 13:14, 15:2, 17:18, 37:24
**Wall** [2] - 8:6, 9:16
**wants** [3] - 51:18, 57:18, 84:6
**warehouses** [1] - 39:14
**warranted** [1] - 73:17
**water** [1] - 70:7
**WATSON** [2] - 1:21, 1:23
**Watson** [10] - 4:14, 4:16, 43:15, 75:2, 77:10, 78:2, 78:10, 78:11, 78:16, 78:23
**Watson's** [1] - 77:24
**waves** [1] - 41:18
**Waxman** [1] - 47:9
**ways** [2] - 18:6, 82:25
**week** [8] - 40:16, 43:19, 73:3, 95:4, 95:7, 95:8, 95:16, 95:22
**weekend** [2] - 10:6, 72:9
**weeks** [3] - 58:6, 58:24, 89:25
**weight** [3] - 10:10, 36:7, 36:10
**WEINROTH** [1] - 2:9
**welcome** [1] - 4:17
**Whitlock** [2] - 87:13, 88:13
**whole** [3] - 47:11, 51:11, 60:22
**willing** [2] - 32:12, 95:15
**WILMER** [1] - 1:17
**Wilmer** [1] - 4:10
**Wilmington** [4] - 4:19, 4:25, 6:7, 6:8
**win** [4] - 31:13, 35:11, 42:9, 79:18
**wish** [1] - 53:10

**withdraw** [3] - 21:17, 22:3, 31:11
**withdrawals** [1] - 17:8
**withdrawn** [1] - 75:15
**withdrew** [1] - 26:10
**withhold** [1] - 18:21
**withstand** [2] - 52:23, 63:22
**wonderful** [1] - 56:7
**Woods** [1] - 4:21
**WOODS** [1] - 2:1
**word** [1] - 73:21
**words** [2] - 27:10, 88:24
**works** [1] - 42:21
**worry** [2] - 47:5, 51:1
**worrying** [1] - 58:23
**worth** [2] - 27:5, 74:2
**wound** [1] - 28:1
**write** [1] - 47:8
**writes** [1] - 47:1
**written** [3] - 3:20, 3:21, 89:21

## Y

**year** [27] - 8:11, 9:7, 9:9, 30:11, 30:21, 30:24, 31:1, 32:20, 35:15, 35:24, 39:12, 40:17, 43:11, 75:4, 77:11, 79:11, 79:20, 79:21, 79:23, 79:24, 79:25, 80:5, 80:6, 80:25, 81:2, 81:3
**years** [2] - 59:22, 68:11
**Young** [2] - 91:6, 91:17

## Z

**zero** [4] - 54:23, 54:24, 55:9, 55:24